**E-FILED**
Tuesday, 03 May, 2005  11:59:25 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

|  |  |
|---|---|
| UNITED STATES, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:05-cr-40024-JBM-1 |
| JEFF ALEX MAZON, and ALI HIJAZI, | ) |
| Defendants. | ) |

**FILED**

MAY 3 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## MEMORANDUM IN SUPPORT OF DEFENDANT ALI HIJAZI'S
## MOTION TO DISMISS THE INDICTMENT

Pursuant to Fed. R. Crim. P. 7 and 12, Defendant Ali Hijazi submits

this memorandum in support of his motion to dismiss the indictment as it pertains

to him. As shown below, this Court lacks jurisdiction over Hijazi—a foreign

national being prosecuted by the U.S. Government based on extraterritorial

conduct—and the exercise of such jurisdiction would violate Hijazi's right to due

process. 1/

### BACKGROUND

The Government has charged Defendants Jeff Mazon and Ali Hijazi

with violations of the Major Fraud Act, 18 U.S.C. §1031(a), the wire fraud statute,

18 U.S.C. §1343, and the aiding and abetting statute, 18 U.S.C §2 (collectively, "the

charging statutes"). The indictment alleges that Defendants defrauded the U.S.

---

1/ Defendant Hijazi respectfully requests oral argument on this motion because
of the complexity of the legal issues involved.

Government while Mazon was stationed in Kuwait as a procurement manager for Kellogg Brown & Root ("KBR"), the prime contractor on a government contract. Indictment ¶12. KBR is a subsidiary of Halliburton, and KBR's own legal difficulties with the U.S. Government are well known.

The indictment alleges that Mazon inflated a bid on a subcontract received from La Nouvelle, a Kuwaiti company of which Hijazi was the managing partner, and also inflated a competitor's bid and then awarded the subcontract to La Nouvelle. *Id.* ¶¶14, 16-17. 2/

To be clear: Ali Hijazi flatly denies any wrongdoing in connection with the KBR contract or the La Nouvelle subcontract. It is telling that Mazon cooperated fully with KBR's investigation of this matter—which hardly suggests he and Hijazi had anything to hide. And Hijazi repeatedly offered to meet with the U.S. Attorney's Office to address any concern about Hijazi's conduct, but his overtures were completely rebuffed. The circumstances suggest that KBR has pointed an accusatorial finger at Mazon and Hijazi in order to burnish its own reputation with the U.S. Government and to deflect scrutiny from itself.

Significantly, none of the conduct alleged in the indictment to have been committed by Hijazi was allegedly committed by him within the territorial

---

2/   The indictment alleges that Hijazi "presented" Mazon with a $1 million payment after Mazon left KBR. Indictment ¶20. It is *not* alleged, however, that Mazon actually cashed any financial instrument "presented" to him or that any money in fact changed hands between them. Thus, the Government's contention is that Mazon was bribed without pocketing any money. Furthermore, there is no allegation that KBR ever paid any money to La Nouvelle on the subcontract, and, in fact, KBR has never paid a dime or dinar to La Nouvelle.

2

jurisdiction of the United States. 3/ Furthermore, we submit that the following facts are undisputed, and that no contrary fact is alleged in the indictment:

- Hijazi is not, and has never been, a citizen or resident of the United States;

- Hijazi is, and at all material times has been, a resident of Kuwait;

- Hijazi has been to the United States only once on a brief trip;

- Hijazi has never set foot in the State of Illinois;

- Hijazi has never filed an income tax return with the Internal Revenue Service or any state tax authority;

- Hijazi does not own any property, real or otherwise, in Illinois or anywhere within the United States;

- The conduct of which Hijazi is accused is not a crime under Kuwaiti law; and

- Prior to his indictment, Hijazi did not foresee, and had no expectation, that he might be haled into an American court on criminal charges for any action he had ever taken.

---

3/ The indictment recites that "the defendants" acted "in the Central District of Illinois and elsewhere" (e.g., ¶¶15, 30) without specifying which defendant, or whether both of them, acted in this District or what specific actions were taken in the District. Such allegations are insufficient to confer jurisdiction in this case. See Fed. R. Crim. P. 7(c)(1) (indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged").

3

# ARGUMENT

## I.  THE CHARGING STATUTES DO NOT APPLY TO THE EXTRATERRITORIAL CONDUCT OF FOREIGN NATIONALS.

### A.  The Extraterritoriality Canon.

The criminal statutes under which Hijazi has been charged, properly construed, do not apply to the acts Hijazi, a foreign national, allegedly committed in a foreign country.

In construing federal statutes, courts apply the extraterritoriality canon—*i.e.*, "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." *Small* v. *United States*, No. 03-750 (U.S. April 26, 2005), slip op. at 3. As the Supreme Court has explained: "It is longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC* v. *Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (hereinafter, "*Aramco*") (quoting *Foley Bros., Inc.* v. *Filardo*, 336 U.S. 281, 285 (1949)). *See also Sale* v. *Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993); *Smith* v. *United States*, 507 U.S. 197, 203-204 (1993); *Glass* v. *Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) ("federal statutes presumptively lack extraterritorial reach"). The extraterritoriality canon applies to the interpretation of criminal as well as civil statutes. *See Small*; *United States* v. *Dawn*, 129 F.3d 878, 882 (7th Cir. 1997).

The extraterritoriality canon is based on several considerations. First, it prevents "international discord." *Aramco*, 499 U.S. at 248. As Justice Holmes said in *American Banana Co.* v. *United Fruit Co.*, 213 U.S. 347, 356 (1909), for one

4

nation to apply its laws to a person for actions taken in another nation "not only would be unjust, but would be an interference with the authority of another sovereign, contrary to the comity of nations." *See also Sale*, 509 U.S. at 174 (the presumption "avoid[s] conflict with the laws of other nations").

Second, the canon recognizes that the exercise of jurisdiction over foreign conduct and/or foreign citizens implicates international relations, and that federal courts lack the foreign policy expertise of the legislative branch. *See Benz* v. *Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957) (clear expression of intent to legislate extraterritorially required because Congress "alone has the facilities necessary" to operate in the "delicate field of international relations").

Third, the canon against interpreting federal statutes to regulate the overseas conduct of foreign nationals also helps insure that American citizens are not unjustly prosecuted in foreign lands. *See McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (application of U.S. law to foreign citizens and operations "invite[s] retaliatory action from other nations"). "By respecting the rights of foreign nationals, we encourage other nations to respect the rights of our citizens." *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 285 (1990) (Brennan, J., dissenting).

A final rationale for the canon is simply the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith*, 507 U.S. at 204 n.5.

5

### B.    The Standard For Overcoming The Presumption Against Extraterritoriality.

In light of the important purposes served by the presumption against the extraterritorial application of U.S. law, overcoming the presumption should not be easy—and it isn't. 4/

To overcome the presumption, there must be "affirmative evidence" that Congress intended the statute at issue to apply abroad, and Congress must have made a "clear statement" of such intent. *Aramco*, 499 U.S. at 259, 258. *See Sale*, 509 U.S. at 188 ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested."). Congress' intent to apply a law extraterritorially must be more than a merely plausible reading; that "is not a substitute for the affirmative evidence of intended extraterritorial application that our cases require." *Id.* at 176. Rather, a federal statute said to apply overseas must contain "words which definitely disclose an intention to give it extraterritorial effect." *Aramco*, 499 U.S. at 251 (quoting *New York Cent. R.R. Co.* v. *Chisholm*, 268 U.S. 29, 31 (1925)). There must be " 'specific language' in the Act reflecting congressional intent to do so." *Id.* at 252 (quoting *McCulloch*, 372 U.S. at 19). In short, as the Seventh Circuit has held, "a statute will be applied to conduct occurring abroad only when to do so comports with the *affirmative* intention of the

_____

4/      As the party supporting the extraterritorial application of a federal law, the burden of proof is on the prosecutors here: "it is they who must make the affirmative showing." *Aramco*, 499 U.S. at 250. *See Alcar Group, Inc.* v. *Corporate Performance Systems, Ltd.*, 109 F. Supp. 2d 948, 950 (N.D. Ill. 2000) (party urging the "exercise [of] extraterritorial jurisdiction over foreign citizens for actions committed abroad must overcome this presumption").

Congress clearly *expressed*." *Dawn*, 129 F.3d at 882 (emphases in original)
(quotation marks omitted).

The strong presumption against the extraterritorial application of
federal legislation has equal bite in the context of criminal statutes. *See id.; United
States* v. *Yakou*, 393 F.3d 231, 243 (D.C. Cir. 2005) (to overcome presumption,
Congress must provide " 'affirmative evidence' to the contrary, which is 'clearly
expressed' ") (quoting *Sale*, 509 U.S. at 176, and *Aramco*, 499 U.S. at 248); *Ito* v.
*United States*, 64 F.2d 73, 75 (9th Cir.) (extraterritorial intent "must clearly appear
from the language of the statute"), *cert. denied*, 289 U.S. 762 (1933).

Indeed, a federal indictment based on foreign conduct was dismissed
because of the presumption 141 years ago in *United States* v. *Smiley*, 27 F. Cas.
1132 (Cir. Ct. N.D. Cal. 1864). There, Justice Field's opinion for the court sustained
a demurrer to a federal indictment charging Smiley, an American, with plundering
a sunken ship off the Mexican coast. Although acknowledging that "[t]he criminal
jurisdiction of the government of the United States * * * may in some instances
extend to its citizens everywhere," Justice Field stated that "in all such cases it will
be found that the law of congress indicates clearly the extraterritorial character of
the act at which punishment is aimed." *Id.* at 1134. Because such a clear
indication was lacking in law under which Smiley was charged, Justice Field held
that there was "no jurisdiction to try the offense charged." *Id. See also Ito*
(reversing criminal conviction based on conduct outside of the United States).

7

Modern cases also reject prosecutions based on criminal statutes that

do not expressly apply to overseas conduct. *See, e.g., United States* v. *Javino,* 960

F.2d 1137, 1142 (2d Cir.) (reversing conviction under statute criminalizing

possession of firearm made in violation of certain regulatory requirements due to

"the absence of any language clearly expressing an intent to legislate with respect

to firearms made outside of the United States"), *cert. denied,* 506 U.S. 979 (1992);

*United States* v. *Mitchell,* 553 F.2d 996, 1002 (5th Cir. 1977) (reversing conviction

under Marine Mammal Protection Act for taking dolphins in territorial waters of

foreign sovereign because of lack of "clear expression of congressional intent").

From the foregoing cases, it is clear that the extraterritoriality canon

is not mere cant, to be recited and then ignored. On the contrary, application of the

canon involves a demanding mode of analysis that requires a court to give strict

scrutiny to claims that federal statutes apply to conduct in other Nations. Where,

as here, the statute at issue is a criminal statute, and the foreign conduct is that of

a foreign national, the canon should be applied with even greater rigor.

## C. The Charging Statutes Do Not Clearly Express An Affirmative Intent To Reach The Foreign Conduct Of A Foreign National.

### 1. 18 U.S.C. §1031(a)

The Major Fraud Act punishes "[w]hoever," with the requisite

knowledge and intent, commits fraud as a prime contractor or subcontractor on a

U.S. government contract worth $1 million or more. *See* Appendix (reproducing

§1031 and the other charging statutes). Nothing in that highly general language

demonstrates "the *affirmative* intention of the Congress clearly *expressed*" to apply

8

the Act to overseas conduct—let alone to the overseas conduct of a foreign national. *Dawn*, 129 F.3d at 882. Overcoming the presumption against extraterritoriality requires a clear, affirmative expression based upon "the plain language of the statute." *Aramco*, 499 U.S. at 257. There is no such expression in §1031(a), a statute that "contains no words which definitely disclose an intention to give it extraterritorial effect." *Id.* at 251 (quoting *Chisholm*, 268 U.S. at 31). In the case of §1031(a), Congress simply has failed "to make a clear statement that [the] statute applies overseas." *Aramco*, *supra*, at 258. *See Small*, slip op. at 5 ("The statute's language does not suggest any intent to reach beyond [the] domestic").

In *Filardo*, the Supreme Court considered a statute governing U.S. Government contracts. The Eight Hour Law stated that "[e]very contract made to which the United States * * * is a party" shall include a provision that no worker employed by the contractor or any subcontractor is required to work more than eight hours per day. 40 U.S.C. §324. Despite the Law's literal language, which applied to *every* U.S. Government contract, the Court, invoking extraterritoriality canon, held that the Law did not apply to a U.S. company that employed a U.S. citizen in Iran and Iraq. The Court explained that "[t]here is no language in the Eight Hour Law, here in question, that gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." 336 U.S. at 285. And because the Law drew no distinction between the citizenship of workers, the Court said that extraterritorial application of the Law to American citizens would also

9

require its application to aliens working for American companies abroad—a construction that the Court rejected. *See id.* at 286 (refusing to conclude "that Congress intended to regulate the working hours of a citizen of Iran").

Like the Eight Hour Law, the Major Fraud Act, if read literally, would apply to any U.S. Government contract above a certain dollar value. As in *Filardo*, however, the extraterritoriality canon requires that §1031(a) be read not to reach overseas conduct, especially where, as here, a foreign national is involved. *See also Small*, slip op. at 2 ("In law, a legislature that uses the statutory phrase 'any person' may or may not mean to include 'persons' outside 'the jurisdiction of the state.' ") (quotation marks omitted); *American Banana*, 213 U.S. at 357 ("Words having universal scope, such as 'every contract in restraint of trade,' " should be construed "to mean only everyone subject to such legislation, not all that the legislator subsequently may be able to catch.") (quoted in *Filardo*, 336 U.S. at 287 n.3); *Mitchell*, 553 F.2d at 1004 (applying *Filardo* in construing criminal statute and holding that "all inclusive language that does not expressly address territoriality cannot be held to indicate clear intent for extraterritorial application").

Notably, we are not aware of any case decided by any court in which §1031 has been held to apply extraterritorially.

## 2.   18 U.S.C. §1343

Nor does the wire fraud statute reflect congressional intent to reach the extraterritorial conduct of a foreign national. Like the Major Fraud Act, the language of §1343 is highly general, applying to "[w]hoever" commits fraud "by

10

means of wire, radio, or television communication in interstate or foreign
commerce." The only arguably relevant difference is the reference to "foreign
commerce."

*Aramco*, however, holds that such a reference does not overcome the
presumption against extraterritoriality. In *Aramco*, the Court held that Title VII of
the Civil Rights Act of 1964 lacked extraterritorial reach. The Court explained that
no clear congressional intent to apply the law overseas was discernible in the text of
Title VII, which contained only "boilerplate language" that "does not speak directly
to the question" of extraterritoriality. 499 U.S. at 251, 250. Although the Court
found the broader reading of Title VII to be "plausible," the Court said that "[i]f we
were to permit possible, or even plausible, interpretations of language such as that
involved here to override the presumption against extraterritorial application, there
would be little left of the presumption." *Id.* at 253.

Significantly, the *Aramco* Court observed that "we have repeatedly
held that even statutes that contain broad language in their definitions of
'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Id.* at
251 (emphasis in *Aramco*). The Court pointed out that in both *Chisholm* and
*McCulloch* the statute at issue had "contained broad language that referred by its
terms to foreign commerce" but the Court still "refused to find a congressional
intent to apply the statute abroad because there was not 'any specific language' "
reflecting such an intent. *Id.* at 251-252 (quoting *McCulloch*, 372 U.S. at 19).
Under *Aramco*, overcoming the presumption against extraterritoriality requires

11

more than an "inference from boilerplate language which can be found in any number of congressional Acts." *Id.* at 251. Thus, the reference to "foreign commerce" in §1343 is not enough to make the statute apply to the overseas conduct *of a foreign national.*

Congress knows perfectly well how to write a criminal statute that applies extraterritorially. 5/ "[W]hen Congress intend[s] to provide jurisdiction for acts outside this country having an effect within our borders, it sa[ys] so explicitly." *Frolova* v. *USSR*, 761 F.2d 370, 379-380 (7th Cir. 1985). Congress did not do so in the case of §1343. 6/

The only reported case of which we are aware involving the prosecution under §1343 of a foreign national based on his conduct overseas resulted in a reversal of the conviction on appeal. *See United States* v. *Golitschek,*

---

5/    *See, e.g.*, Maritime Drug Law Enforcement Act, 46 U.S.C. App. §1903(h) ("This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."); 18 U.S.C. §1512(h) ("There is extraterritorial Federal jurisdiction over an offense under this section."); 18 U.S.C. §1119(b) (crime "to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country"); 18 U.S.C. §351(i) ("There is extraterritorial jurisdiction over the conduct prohibited by this section.") (assassination of high-ranking federal officers); (witness tampering); 18 U.S.C. § 175(a) ("There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States") (crimes relating to biological weapons).

6/    *Pasquantino* v. *United States*, No. 03-725 (U.S. April 26, 2005), is not to the contrary. There, it was held that a plot to defraud a foreign government of tax revenue violates §1343. The Court specifically noted that its "interpretation of the wire fraud statute does not give it 'extraterritorial effect,' slip op. at 20, and that an extraterritoriality argument "was not pressed or passed upon below." *Id.* at 20 n.12.

12

808 F.2d 195, 197 (2d Cir. 1986) (defendant was "an Austrian citizen who never set foot in this country during the entire episode alleged to constitute his offense").

Finally, even if §1343 applies extraterritorially, none of the six e-mails or wire communications alleged in the indictment were allegedly sent or received by Hijazi. *See* Indictment at pp. 12-13 (chart).

### 3.    18 U.S.C. §2

The indictment also relies upon the aiding and abetting statute. Like §1031(a) and §1343, §2 contains broadly-worded language; indeed, its language is even broader and more all-inclusive than that of the other two charging statutes. But §2 contains no clear and affirmative indication that Congress intended that statute to apply extraterritorially.

Furthermore, the D.C. Circuit has held that §2 "is not so broad as to expand the extraterritorial reach of the underlying statute." *Yakou*, 393 F.3d at 242. *Yakou* refused "[t]o apply the aiding and abetting statute to Yakou's conduct in Iraq" because the underlying criminal statute did not have extraterritorial reach. *Id.* at 243. Under *Yakou*, therefore, if §1031 and §1343 do not reach Hijazi's alleged conduct in Kuwait, neither does §2. 7/

### D.    *United States* v. *Bowman* is Inapposite.

*United States* v. *Bowman*, 260 U.S. 94 (1922), does not compel the conclusion that the charging statutes apply extraterritorially. In *Bowman* four

---

7/    It should be noted that Hijazi has *not* been charged with taking part in a criminal conspiracy in furtherance of which overt acts were committed within the United States. No conspiracy of any kind is alleged in the indictment.

defendants were indicted for conspiring to defraud a U.S. government-owned corporation. Of the four, "the first three were American citizens, and [the fourth] was a British subject." *Id.* at 95. The indictment was objected to on the ground that the alleged crime was committed "on the high seas or within the jurisdiction of Brazil." *Id.* at 96-97.

The *Bowman* Court said that the interpretive rule with respect to most federal criminal statutes is that "[i]f punishment of them is to be extended to include those out side of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." *Id.* at 98. But the Court said that the usual rule does not apply "to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Id.*

Significantly, however, *Bowman* expressly reserved the question whether there was jurisdiction over the British defendant:

> The three defendants who were found in New York were
> citizens of the United States, and were certainly subject
> to such laws as it might pass to protect itself and its
> property.  * * * The other defendant is a subject of Great
> Britain.  He has never been apprehended, and it will be
> time enough to consider what, if any, jurisdiction, the
> District Court below has to punish him when he is
> brought to trial.

*Id.* at 102-103. Thus, *Bowman* lends absolutely no support to the Government's position where, as here, the defendant is a foreign national accused of a crime

14

committed abroad. To the extent that *Bowman* undermined the presumption against extraterritoriality as to federal criminal statutes premised on "the right of the government to defend itself," it did so only with respect to the prosecution of "citizens, officers, and agents" of the United States. *Id.* at 98.

*Skiriotes* v. *Florida*, 313 U.S. 69 (1941), confirms that the rule of *Bowman* applies only to crimes committed abroad by U.S. citizens. Skiriotes, a U.S. citizen and Floridian, was convicted of using diving equipment to aid the taking of sponges from the Gulf of Mexico in violation of Florida law. The Supreme Court affirmed his conviction despite his contention that the state court that convicted him lacked jurisdiction because his conduct took place in international waters. In so doing, however, the Court explained that it was "significant" that Skiriotes "has not asserted or attempted to show that he is not a citizen of the United States" or "that he is a national of any foreign country." *Id.* at 71-72. And the Court cited *Bowman* as making a limited category of federal criminal statutes "applicable to *citizens of the United States* upon the high seas or in a foreign country." *Id.* at 74 (emphasis added).

Furthermore, it is not clear that *Bowman* remains good law. In *Aramco*, *Sale*, and *Smith*, the Supreme Court held, contrary to *Bowman*, that overcoming the presumption against extraterritoriality requires a clear expression by Congress in the plain language of the statute at issue; *Bowman* was not cited in any of those cases. And *Small*, a criminal case decided just last month, cited *Aramco*, *Smith*, and *Filardo* with approval but did not cite *Bowman*.

15

Finally, even if the Government can rely on *Bowman* with respect to

the Major Fraud Act, it surely cannot do so as to the wire fraud and the aiding and

abetting statutes. The latter two statutes are not premised on "the right of the

government to defend itself," *Bowman*, 260 U.S. at 98, but rather are driven by

more general concerns. Indeed, §1343 and §2 reach and make criminal all sorts of

conduct that does not involve the Government at all.

## II.  OTHER CANONS OF STATUTORY INTERPRETATION SUPPORT HIJAZI'S READING OF THE CHARGING STATUTES.

### A.  The Presumption Against Violating International Law.

"International law is a part of our law, and must be ascertained and

administered by the courts of justice of appropriate jurisdiction." *The Paquete*

*Habana*, 175 U.S. 677, 700 (1900). *See Sosa* v. *Alvarez-Machain*, 124 S. Ct. 2739,

2764 (2004) ("For two centuries, we have affirmed that the domestic law of the

United States recognizes the law of nations."). Thus, it is necessary to determine

whether this prosecution violates international legal norms.

When federal statutes are construed so as "to regulate foreign persons

or conduct," such construction may "conflict with principles of international law."

*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting).

Therefore, the longstanding rule is that "an act of Congress ought never to be

construed to violate the law of nations if any other possible construction remains."

*Murray* v. *Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) (Marshall, C.J.). *Accord*

*Sale*, 509 U.S. at 178 n.35. *See also F. Hoffman-La Roche Ltd.* v. *Empagran S.A.*,

124 S. Ct. 2359, 2366 (2004) ("we must assume" Congress follows "principles of

16

customary international law"); *Aramco*, 499 U.S. at 255 ("we are unwilling to
ascribe to [Congress] a policy which would raise difficult issues of international
law"); *The Apollon*, 22 U.S. 362, 371 (1824) (that Congress would violate the laws of
nations "cannot be presumed").

Accordingly, if this prosecution violates principles of international law,
the charging statutes should be construed so as not to criminalize Hijazi's alleged
conduct. As Justice Scalia has noted, "using international law to limit the
extraterritorial reach of statutes is firmly established in our jurisprudence."
*Hartford Fire*, 509 U.S. at 818. *See Dawn*, 129 F.3d at 882 (criminal statutes may
apply extraterritorially only "to the extent that extraterritorial application is
consistent with the principles of international law").

International law certainly permits the prosecution of a foreign citizen
for a crime committed within the host nation. *Cf. United States* v. *Jordan*, 223 F.3d
676, 692-694 (7th Cir. 2000) (citizen of Puerto Rico living in Chicago charged with
bombing military facility in that city). But this case involves the prosecution of a
foreign national for acts committed in a foreign country, and those facts raise
different issues.

Section 403 of the Restatement (Third) of Foreign Relations Law of the
United States (1987) provides that "a state may not exercise jurisdiction to
prescribe law with respect to a person or activity having connections with another
state when the exercise of such jurisdiction is unreasonable." *Id.* §403(1). Section
403 then sets forth a list of factors relevant to the reasonableness determination.

17

*See id.* §§403(2)(a)-(h).  Section 403 of the Restatement supplies "the relevant principles of international law" to be applied in this case.  *Hartford Fire*, 509 U.S. at 818 (Scalia, J.) (conducting §403 reasonableness analysis).  *See Spinozzi* v. *ITT Sheraton Corp.*, 174 F.3d 842, 845 (7th Cir. 1999) (Posner, C.J.) (applying §403 in civil case); *Javino*, 960 F.2d at 1143 (applying §403 in criminal case and holding that giving extraterritorial effect to statute "would likely be ruled unreasonable"); *see also* Restatement §403 Comment (a) (the principle that the exercise of jurisdiction is "unlawful if it is unreasonable is established in United States law").

        The §403 factors point strongly to the conclusion that this prosecution is unreasonable.  To begin with, and very importantly, none of Hijazi's alleged conduct took place within the territorial jurisdiction of the United States.  *See* Restatement §403(2)(a) (identifying as a factor "the link of the activity to the territory of the regulating state").  Furthermore, Hijazi is neither a citizen nor a resident of the United States.  *See id.* §403(2)(b) (requiring consideration of "the connections, such as nationality [and] residence," with the regulating state).  And the fact that Hijazi's citizenship, residence, and alleged conduct are all non-U.S. is especially important in the reasonableness analysis because this is a *criminal* case.  *See id.* §403 Comment (f) ("the presence of substantial foreign elements will ordinarily weigh against application of criminal law"); *id.* § 403 Reporters' Note 8 ("In applying the principle of reasonableness, the exercise of criminal * * * jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive.").

Section 403(2)(c) directs attention to the "character" of the regulated activity; the "importance" to the regulating state of the regulation; "the extent to which other states regulate such activities"; and the degree to which the "desirability of such regulation is generally accepted." Here, the crime of which Hijazi is accused does not implicate U.S. national security. Nor does it involve drug-trafficking or any physical violence or other harm to any U.S. citizen. A financial fraud on the U.S. Government, while not commendable behavior, does not cause direct harm to any American citizen; the immediate impact of such an offense is on the U.S. Treasury. And it is not clear, nor has it been alleged, that the conduct of which Hijazi is accused is considered criminal behavior in Kuwait or in most of the world.

Hijazi could hardly have expected that he would be criminally prosecuted in an American court for his acts in Kuwait. *See id.* §403(2)(d) (looking to "the existence of justified expectations" regarding the regulation). On this score, it is important to remember that (a) La Nouvelle's subcontract was executed, not with the U.S. Government, but with KBR, which is a private entity, and (b) Hijazi himself did not have a contractual relationship with either the U.S. Government or a U.S. Government contractor.

The "importance of the regulation to the international political, legal, or economic system" is not at all obvious. *Id.* §403(2)(e). And this prosecution is not "consistent with the traditions of the international system." *Id.* §403(2)(f). Far from it. We are aware of no successful prosecution under the statutes at issue here of a

19

foreign citizen based on foreign conduct. (Nor are we aware of any comparable prosecutions of American citizens in Kuwait.)

A final factor—whether "another state may have an interest in regulating the activity"—also cuts in Hijazi's favor. *Id.* §403(g). Here, Kuwait, where the regulated activity took place and where Hijazi resides, would have such an interest. The assertion by the United States of an interest in regulating with its criminal courts the behavior of a non-U.S. citizen outside of U.S. territory is both interventionist and unreasonable. *Cf. Rose Hall, Ltd.* v. *Chase Manhattan Overseas Banking Corp.*, 576 F. Supp. 107, 163 (D. Del. 1983) ("[A]n argument in favor of the export of United States law represents not only a form of legal imperialism but also embodies the essence of sanctimonious chauvinism."), *aff'd*, 740 F.2d 956 (3d Cir. 1984), *cert. denied*, 469 U.S. 1159 (1985). If—as the Seventh Circuit has held— "[i]t is unreasonable that the Illinois courts should be setting safety standards for hotels in Mexico," *Spinozzi*, 174 F.3d at 845 (citing §403), it is also unreasonable for an American court to enact a Criminal Code for Kuwait.

In sum, because the exercise of jurisdiction over Hijazi plainly would be unreasonable under §403, the charging statutes should be construed not to reach his alleged conduct. *See* Restatement §403 Comment (g) (U.S. statutes, if at all possible, are "to be construed to apply to a person or activity only to the extent consistent with" §403). 8/

---

8/    A statute asserting extraterritorial jurisdiction beyond that permitted by the Restatement may violate due process. *See Tamari* v. *Bache & Co.*, 730 F.2d 1103, 1107 n.11 (7th Cir.), *cert. denied*, 469 U.S. 871 (1984).

### B.   The Doctrine Requiring Avoidance of Constitutional Questions.

Another reason that the charging statutes should not be construed to criminalize the alleged conduct of Hijazi in Kuwait is that Congress' constitutional authority to criminalize such conduct is not well established, and statutory constructions raising serious constitutional questions are to be avoided.

"The Constitution is the source of Congress' authority to criminalize conduct, whether here or abroad." *Verdugo-Urquidez*, 494 U.S. at 281. Yet there is no provision of the Constitution that clearly gives Congress the power to criminalize the overseas conduct at issue here. There is only one clause of the Constitution that expressly authorizes Congress to criminalize conduct beyond our borders. *See* U.S. Const., art. I, §8 (empowering Congress to "define and punish Piracies and Felonies committed on the High Seas"). 9/ That clause, however, is not the source of authority for any of the criminal statutes involved in this case.

Case law has settled the power of the U.S. Government to punish crimes committed by or upon American citizens abroad. *See United States* v. *Flores*, 289 U.S. 137 (1933) (murder of American citizen by another American citizen aboard an American ship at port in the Belgian Congo); *Blackmer* v. *United States*, 284 U.S. 421 (1932) (refusal of American citizen residing in France to respond to properly served subpoena). But such cases do not establish congressional authority to criminalize overseas conduct by foreign nationals. *See Verdugo-Urquidez*, 494

---

9/   The Piracies and Felonies Clause "is the *only* specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States." *United States* v. *Suerte*, 291 F.3d 366, 376 (5th Cir. 2002) (Fifth Circuit's emphasis) (quotation marks omitted).

U.S. at 275 (Kennedy, J., concurring) (noting constitutional distinction between the extraterritorial application of law to citizens and to non-citizens); *cf. Alcar Group*, 109 F. Supp. 2d at 950 (distinguishing prior precedent holding that Lanham Act applied extraterritorially because "[t]he present case, however, involves, foreign citizens acting abroad, not American citizens"). When the Government prosecutes a foreign national for extraterritorial acts, the issue is not solely one of congressional intent; in such a case, the question of Congress' very power also is raised. *See Blackmer*, 284 U.S. at 437 (extraterritorial application of federal law is question, "not of legislative power," but of construction, "so far as *citizens of the United States* in foreign countries are concerned") (emphasis added).

Indeed, the Supreme Court has indicated that constitutional authority to regulate foreign individuals in foreign lands is lacking, saying that "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory *unless in respect of our own citizens*." *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) (emphasis added). *See also American Banana*, 213 U.S. at 356 ("[T]he general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done."); *The Apollon*, 22 U.S. at 370 ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens") (Story, J.).

So, too, in the criminal context it has been said that "illegal activity conducted outside of the jurisdiction of the United States, by foreign nationals, not

intended to have an effect in the United States * * * is beyond the reach of the laws of the United States." *United States* v. *One Gates Learjet*, 861 F.2d 868, 871 (5th Cir. 1988). *See also American Banana*, 213 U.S. at 357 ("the improbability of the United States attempting to make acts done in Panama or Costa Rica criminal is obvious"); *Ito*, 64 F.2d at 75 ("It is a general rule of criminal law that the crime must be committed within the territorial jurisdiction of the sovereignty seeking to try the offense in order to give that sovereign jurisdiction.").

We are not aware of a single case, not involving the Piracies and Felonies Clause, in which the Supreme Court has sustained the criminal conviction of a foreign national for extraterritorial conduct. Thus, caution is warranted before one reaches the conclusion that congressional authority exists to declare a citizen of another sovereign a criminal under U.S. law for acts committed half a world away.

Because there is substantial doubt about the authority of the U.S. Government to criminalize the foreign conduct of Hijazi, a foreign national, the charging statutes should be construed not to apply to the facts alleged in the indictment. This is a well-established rule of statutory construction: "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909).

Applying this rule, *Jones* v. *United States*, 529 U.S. 848, 857-858 (2000), construed a federal arson statute as not reaching the torching of an owner-

23

occupied private residence because of doubts about Congress' authority to criminalize such conduct pursuant to the Commerce Clause. Here, too, any doubt about Congress' power to criminalize the foreign conduct ascribed to Hijazi should be resolved in favor of Hijazi's reading of the charging statutes.

### C.    The Rule of Lenity in Criminal Matters.

A final interpretative cannon that supports Hijazi's construction of those statutes is the rule of lenity, which instructs that "Congress should have spoken in language that is clear and definite" before a court will select the more draconian of "two readings of what conduct Congress has made a crime." *Jones*, 529 U.S. at 858 (quotation marks omitted). Here, because Congress did not speak clearly and definitely in the charging statutes, those statutes should not be read to criminalize Hijazi's alleged conduct.

### III.  THIS COURT'S EXERCISE OF CRIMINAL JURISDICTION OVER HIJAZI WOULD VIOLATE DUE PROCESS.

It is beyond debate that a non-resident foreign national named as a defendant in an American legal proceeding has a constitutional right to due process, whether in a civil or criminal case, in state or federal court. *See Verdugo-Urquidez*, 494 U.S. at 265-266 (contrasting language of the Fourth Amendment with that of the Fifth, which applies to all "person[s]"); *id.* at 278 (Kennedy, J., concurring) ("All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."); *Asahi Metal Indus. Co.* v. *Superior Court*, 480 U.S. 102, 108 (1987) (due process "limits the power of a state court to exert personal

24

jurisdiction over a nonresident defendant"); *Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 413-414 (1984) (same).

For the exercise of jurisdiction over a foreign defendant to comport with due process, there must be a "substantial connection between the defendant and the forum" based on "*an action of the defendant purposefully directed toward the forum State.*" *Asahi*, 480 U.S. at 112 (quotations and citations omitted; emphasis in original). *Asahi* applied the Due Process Clause of the Fourteenth Amendment in the context of a foreign corporation that was a party to a civil action in state court. But there is absolutely no reason why the same clause in the Fifth Amendment would confer less protection upon a foreign individual being prosecuted criminally in federal court. If anything, the Due Process Clause should provide greater protection in this context than it does in a case like *Asahi*. 10/

Here, there is no "substantial connection" between Hijazi and this forum—and certainly no such connection based on an act by Hijazi "purposefully directed toward the forum." None of the conduct of which Hijazi is accused took place within the United States. Indeed, Hijazi has been to America only once during a brief trip. That lone appearance here surely does not establish the requisite contacts with the United States. *See Helicopteros*, 466 U.S. at 416 (one

---

10/    Several courts have held that due process requires, in the case of a criminal prosecution of a foreign defendant, that there be a "sufficient nexus" between the defendant and the United States such that the prosecution is not fundamentally unfair. *See United States* v. *Yousef*, 327 F.3d 56, 111 (2d Cir.), *cert. denied*, 540 U.S. 933 (2003); *United States* v. *Davis*, 905 F.2d 245, 248-249 (9th Cir. 1990), *cert. denied*, 498 U.S. 1047 (1991); *United States* v. *Peterson*, 812 F.2d 486, 493 (9th Cir. 1987) (opinion by now-Justice Kennedy).

trip to Houston by corporation's CEO insufficient to confer jurisdiction in Texas consistent with due process); *Wallace* v. *Herron*, 778 F.2d 391, 394 (7th Cir. 1985) (one visit to forum not enough), *cert. denied*, 475 U.S. 1122 (1986). And Hijazi has never been to the State of Illinois even once. *See Shaffer* v. *Heitner*, 433 U.S. 186, 213 (1977) (no allegation that out-of-state defendants "have ever set foot in Delaware"); *Asahi*, 480 U.S. at 113 n.\*. Furthermore, Hijazi has never had to file an income tax return with the IRS or any state, and he does not own any real or other property anywhere in the United States. Given the dearth of contacts between Hijazi and the United States and Illinois, Hijazi could not have foreseen or had any reasonable expectation that he could be haled into a U.S. court on criminal charges.

The Due Process Clause does not permit such prosecutorial overreach. The Constitution does not make the U.S. Attorney for the Central District of Illinois the world's Prosecutor General. And the United States can no more "pass a law to bind the rights of the whole world" than can the Island of Tobago. 11/

---

11/   *See Buchanan* v. *Rucker*, 103 Eng. Rep. 546, 547 (K.B. 1808) ("Ellenborough, C.J.) ("Can the island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?").

26

## CONCLUSION

For the foregoing reasons, the indictment should be dismissed as it pertains to Defendant Hijazi.

Respectfully submitted,

*Ty Cobb / HCB*

Ty Cobb (Lead Counsel)
H. Christopher Bartolomucci
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Fax: (202) 637-5900
E-mail: tcobb@hhlaw.com
E-mail: hcbartolomucci@hhlaw.com

Dated: May 2, 2005                    *Counsel for Defendant Ali Hijazi*

## APPENDIX

### 18 US.C. §1031.  Major fraud against the United States

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—

(1) to defraud the United States; or

(2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,

in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of the contract, subcontract, or any constituent part thereof, for such property or services is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

### 18 U.S.C. §1343.  Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commence, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

### 18 U.S.C. § 2.  Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## CERTIFICATE OF COMPLIANCE

Pursuant to CDIL-LR 7.1(B)(4)(c), I hereby certify that the foregoing

Memorandum in Support of Defendant Ali Hijazi's Motion to Dismiss the

Indictment complies with the type volume limitation of CDIL-LR 7.1(B)(4)(b)(1) and

contains 6,954 words and 43,691 characters.

H. Christopher Bartolomucci

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Entry of Appearance;

Certificate of Interest; Motion of Defendant Ali Hijazi to Dismiss the Indictment;

and Memorandum in Support of Ali Hijazi's Motion to Dismiss the Indictment; were

on this 2nd day of May, 2005, served by overnight delivery upon:

> Greggory R. Walters
> Office of the United States Attorney
>  for the Central District of Illinois
> 211 Fulton Street
> Peoria, Illinois 61602
> Telephone:  (309) 637-4900
> Fax:  (309) 637-4928
> E-mail:  Greggory.Walters@usdoj.gov

> Jeffrey B. Lang
> Office of the United States Attorney
>  for the Central District of Illinois
> 1830 Second Avenue
> Rock Island, Illinois 61201-8003
> Telephone:  (309) 793-5884
> Fax:  (309) 793-5895
> E-mail:  jeffrey.lang2@usdoj.gov

> *Counsel for Plaintiff*

> John Scott Arthur
> 14315 South 108th Avenue
> Orland Park, Illinois 60497
> Telephone:  (708) 460-9800
> Fax:  (708) 460-9850
> E-mail:  jscottarthur@msn.com

> *Counsel for Defendant Jeff Alex Mazon*

H. Christopher Bartolomucci