IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

FILED
MAY 2 0 2005
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEFF ALEX MAZON and<br>ALI HIJAZI,<br><br>Defendants. | Case No. 05-40024<br><br>Violations: Title 18, United<br>States Code, Sections 1031(a),<br>1343, and 2 |

SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

COUNTS ONE THROUGH FOUR
(Major Fraud Against The United States)

A.  **Introductory Allegations**

*Overview*

1.  The defendants, JEFF ALEX MAZON and ALI HIJAZI, devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait.

2.  The defendants developed and executed the fraud under a prime contract known as LOGCAP III that the United States Army had awarded for the logistical support of United States military operations.

*The LOGCAP III Prime Contract*

3.  The United States Army administered a program to use civilian contractors to provide the Army with additional means to support the logistical needs of the United States military forces in wartime and other operations. One of the contracts the Army awarded for that purpose was known as the Logistics Civil Augmentation Program III ("LOGCAP III") prime contract.

4.  The United States Army Operations Support Command was headquartered at the Rock Island Arsenal at Rock Island, Illinois, within the Central District of Illinois.

5.  On or about December 14, 2001, the Operations Support Command awarded the LOGCAP III prime contract to Brown & Root Services, a division of Kellogg Brown & Root, Inc. Brown & Root Services thereafter transferred the responsibilities for the LOGCAP III prime contract to Kellogg Brown & Root Services, Inc., a subsidiary of Kellogg Brown & Root, Inc. Brown & Root Services and Kellogg Brown & Root Services, Inc. are collectively referred to in this Indictment as "KBR."

6.  The Army Field Support Command was located at the Rock Island Arsenal and administered the LOGCAP III prime contract.

7.  As the prime contractor under LOGCAP III, KBR was to provide property and services to the United States military at locations around the world, including the State of Kuwait.

*The Task Order and Payment Process*

8.  The Army Field Support Command issued Task Orders to KBR under the LOGCAP III prime contract. Each Task Order incorporated a statement of the work to be performed by KBR and the period of time to perform the work.

9.  To accomplish a given Task Order, KBR commonly utilized subcontractors. These subcontractors invoiced KBR for their work and were paid by KBR. KBR thereafter sent vouchers to the government for the cost of the work done by the subcontractors, plus KBR's allowable fees under the LOGCAP III prime contract. The vouchers were then paid by the Defense Finance and Accounting Service ("DFAS").

10. The Resource Management Unit of the Army Field Support Command managed the money for the LOGCAP III prime contract. This included the Resource Management Unit obligating funding in Rock Island, Illinois for the payment of Task Orders.

*Contract Requirements Relating to Fuel*

11.  Among the Army's requirements to be accomplished through the LOGCAP III prime contract was the storage and dispensation of fuel at the Aerial Port of Debarkation, or "APOD," located in Kuwait. The APOD was the airport used by the United States military for military operations in Kuwait.

*The Defendants*

12.  From in or about 1996 through in or about June 2003, MAZON was a procurement employee for KBR. From in or about December 2002 through in or about June 2003, MAZON was stationed in Kuwait and held the position of Procurement, Materials and Property Manager. His duties then included the negotiation, execution, and administration of subcontracts with subcontractors on behalf of KBR under the LOGCAP III prime contract.

13.  MAZON then knew that he was prohibited pursuant to both his employment contract and KBR's Business Conduct Standards and Rules from accepting any bribes, kickbacks, or payoffs from any company or person.

14.  HIJAZI was the managing partner of a Kuwaiti company called LaNouvelle General Trading & Contracting Co. ("LaNouvelle"). LaNouvelle provided subcontracting services to KBR under the LOGCAP III prime contract.

B.  **The Scheme and Artifice**

15.  From in or about February 2003 and continuing to on or about December 17, 2003, in the Central District of Illinois and elsewhere, the defendants,

**JEFF ALEX MAZON and
ALI HIJAZI,**

knowingly devised a scheme and artifice to defraud the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is described below.

*The Manner and Means of the Scheme*

16.  It was part of the scheme that MAZON inflated a bid he received from HIJAZI of LaNouvelle for fuel operations at the APOD under the LOGCAP III prime contract to ensure that LaNouvelle would be overpaid. Also, without the knowledge or consent of the Kuwaiti business that submitted a competing bid, MAZON inflated the competitor's bid to ensure that LaNouvelle's inflated bid would be the low bid.

17.  MAZON awarded LaNouvelle a subcontract with inflated prices for the fuel operations at the APOD. MAZON and HIJAZI signed the subcontract,

knowing that the subcontract price was inflated and that HIJAZI would pay MAZON money for MAZON's favorable treatment of LaNouvelle.

18. MAZON and HIJAZI caused LaNouvelle to send inflated invoices to KBR under the subcontract and to receive payment from KBR on those invoices. MAZON and HIJAZI also caused KBR to submit inflated vouchers to the United States Government for the costs KBR incurred under the subcontract with LaNouvelle, plus KBR's allowable fees under the LOGCAP III prime contract.

19. MAZON and HIJAZI caused the United States Government to pay the inflated vouchers submitted by KBR.

20. After MAZON left employment with KBR, HIJAZI presented MAZON with a $1,000,000 payment in exchange for MAZON's favorable treatment of LaNouvelle.

*Acts in Furtherance of the Scheme*

21. On or about February 2, 2003, MAZON solicited bids by electronic mail from potential subcontractors for fuel tankers to store and dispense fuel for a six-month period at the APOD. KBR had estimated that the cost of the subcontract for fuel tankers would be 685,080 U.S. Dollars.

22. On or about February 8, 2003, MAZON received at least two bids from two different subcontractors. One of the bids was from HIJAZI of LaNouvelle. The LaNouvelle bid was for 507,000 Kuwaiti Dinars, which equaled

approximately 1,673,100 U.S. Dollars. The other bid, which was higher, was from a business referred to herein as "Company A." The Company A bid was for 573,300 Kuwaiti Dinars, which equaled approximately 1,891,890 U.S. Dollars.

23. Thereafter, MAZON inflated both Company A's and LaNouvelle's respective bids by a factor of 3.3. MAZON raised Company A's bid to approximately 6,243,237 U.S. Dollars without Company A's knowledge or permission. MAZON inflated LaNouvelle's bid to approximately 5,521,230 U.S. Dollars. By inflating both bids, MAZON made it appear that LaNouvelle's inflated bid was still the low bid when in fact LaNouvelle's bid, as inflated, was substantially higher than Company A's original bid of 1,891,890 U.S. Dollars.

24. On or about February 14, 2003, MAZON and HIJAZI signed the subcontract for fuel operations at the APOD. The subcontract number was GU49-KU-S00039 ("Subcontract 39"). Subcontract 39 specified that KBR was to pay LaNouvelle the firm fixed price of 1,673,100 Kuwaiti Dinars, or approximately 5,521,230 U.S. Dollars. Subcontract 39 was nearly 4 million U.S. Dollars higher than LaNouvelle's original bid of 1,673,100 U.S. Dollars and nearly 5 million U.S. Dollars higher than the KBR estimate of 685,080 U.S. Dollars.

25. Although MAZON believed he was required to obtain the consent of the United States Army representative when a subcontract amount exceeded the

estimated subcontract amount, MAZON knowingly and intentionally failed to inform the United States Army representative in Kuwait that the amount of Subcontract 39 exceeded the estimate by nearly five million U.S. Dollars.

26.  MAZON also knowingly and intentionally failed to inform his supervisor that the amount of Subcontract 39 was nearly five million U.S. Dollars higher than the estimate.

27.  From in or about March 2003 through in or about August 2003, MAZON and HIJAZI caused LaNouvelle to submit six different invoices to KBR for payment under Subcontract 39 in the total amount of 1,673,100 Kuwaiti Dinars, or approximately 5,521,230 U.S. Dollars. MAZON and HIJAZI caused KBR to pay LaNouvelle in full on each of the six invoices.

28.  MAZON and HIJAZI caused KBR to submit to the United States Government four vouchers for payment for costs KBR incurred in paying the LaNouvelle invoices, plus KBR's allowable fees under the LOGCAP III prime contract. MAZON and HIJAZI caused the United States Government to pay KBR pursuant to these four vouchers on or about September 15, 16, and 27, 2003, and December 17, 2003, respectively. The government funds used to pay these four vouchers had been obligated to the LOGCAP III prime contract by the Resource Management Unit in Rock Island, Illinois.

29. In or about September 2003, HIJAZI gave a $1 million draft to MAZON in exchange for MAZON's favorable treatment of LaNouvelle. MAZON and HIJAZI also executed a promissory note as a ruse to make the $1 million payment appear to be a $1 million loan from HIJAZI to MAZON.

30. On or about September 24, 2003, HIJAZI sent an electronic mail message to MAZON's employee electronic mail account, which was located in the United States, telling MAZON that he, HIJAZI, considered "this whole lown [sic] (principal & interest) as totally your money . . . ."

31. On or about October 1, 2003, while in the United States, MAZON opened an account with a financial institution in the United States in order to deposit the $1 million payment. On or about that same date, in an unsuccessful attempt to deposit the $1 million payment and to make the $1 million appear to be a loan from HIJAZI, MAZON presented a promissory note purportedly signed by MAZON and HIJAZI to a representative of the financial institution in the United States.

32. On or about October 9, 2003, HIJAZI sent an electronic mail message to MAZON's personal electronic mail account, which was located in the United States, instructing MAZON to open an offshore account with three different financial institutions. In the message, HIJAZI informed MAZON that each

institution would ask MAZON how much he expected to transfer, and HIJAZI instructed MAZON to "say close to 300 K" from "consultancy work, business assoicates [sic], salaries abd [sic] bonuses, or any other reasoning."

33.     On or about October 28, 2003, while in the United States, MAZON again attempted to deposit the $1 million payment from HIJAZI at a second financial institution in the United States.

34.     On or about November 13, 2003, following an interview the previous day with a KBR investigator concerning Subcontract 39, HIJAZI sent an electronic mail message to MAZON at MAZON's personal electronic mail account, which was located in the United States, instructing MAZON, "Please when you call your ex-friends in kuwait [sic] please be very carreful [sic] on what you say." MAZON was in the United States at the time he received the electronic mail from HIJAZI.

35.     On or about the dates set forth below, in the Central District of Illinois and elsewhere, the defendants,

> **JEFF ALEX MAZON and
> ALI HIJAZI,**

knowingly executed and attempted to execute the above-described scheme and artifice with the intent to defraud the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

and promises, in the procurement of property and services as a prime contractor with the United States and as a subcontractor on a subcontract in which there was a prime contract with the United States, where the value of the prime contract and the value of the subcontract for such property and services were in excess of 1,000,000 U.S. Dollars, and where the gross loss to the United States was 500,000 U.S. Dollars or more, as described in the following counts:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 1 | September 15, 2003 | Payment from the United States Government to KBR through check no. 756247 |
| 2 | September 16, 2003 | Payment from the United States Government to KBR through check no. 756276 |
| 3 | September 27, 2003 | Payment from the United States Government to KBR through electronic funds transfer trace no. E1000046 |
| 4 | December 17, 2003 | Payment from the United States Government to KBR through electronic funds transfer trace no. E1000060 |

All in violation of Title 18, United States Code, Sections 1031(a) and 2.

## COUNTS FIVE THROUGH TWELVE
### (WIRE FRAUD)

1.  From in or about February 2003 and continuing to on or about December 17, 2003, in the Central District of Illinois and elsewhere, the defendants,

**JEFF ALEX MAZON and
ALI HIJAZI,**

knowingly devised and intended to devise a scheme and artifice to defraud the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is described below.

2.  The grand jury realleges the allegations in paragraphs 1 through 14 and 16 through 34 of Counts One through Four of this Indictment as describing the defendant's scheme and artifice to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as though fully set forth herein.

3.  On or about the dates set forth below, in the Central District of Illinois and elsewhere, the defendants,

**JEFF ALEX MAZON and
ALI HIJAZI,**

for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud the United States, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted in interstate and foreign commerce by means of wire communications certain writings, signs, signals, pictures, and sounds, as described in the following counts:

| COUNT | DATE | ORIGIN | DESTINATION | DESCRIPTION |
|---|---|---|---|---|
| 5 | February 14, 2003 | Kuwait | United States | Electronic mail message from MAZON to D.G., a KBR employee, relating to Subcontract 39 |
| 6 | February 15, 2003 | United States | Kuwait | Electronic mail message from D.G., a KBR employee, to MAZON, relating to Subcontract 39 |
| 7 | February 15, 2003 | Kuwait | United States | Electronic mail message from MAZON to D.G., a KBR employee, relating to Subcontract 39 |
| 8 | February 15, 2003 | United States | Kuwait | Electronic mail message from D.B., a KBR employee, to MAZON, relating to Subcontract 39 |

| 9 | September 27, 2003 | Ohio | Georgia | Wire communication directing that a payment be made to KBR |
| 10 | December 17, 2003 | Ohio | Georgia | Wire communication directing that a payment be made to KBR |

All in violation of Title 18, United States Code, Section 1343 and 2.

**A TRUE BILL**

s/Foreperson
**Foreperson**

s/Jan Paul Miller
JAN PAUL MILLER
UNITED STATES ATTORNEY
GRW