E-FILED
Monday, 01 February, 2010  04:54:27 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 05-40024-02 |
| v. | ) | |
| | ) | |
| ALI HIJAZI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT
HIJAZI'S MOTIONS TO DISMISS THE INDICTMENT**

The United States of America, by its attorneys, Jeffrey B. Lang, Acting United

States Attorney for the Central District of Illinois, and Joseph H. Hartzler,

Assistant United States Attorney, opposes defendant Ali Hijazi's motions to

dismiss the indictment. In support of its position, the government states:

The United States has jurisdiction to prosecute Hijazi for the charged crimes

primarily because the victim of his alleged fraud scheme was the United States

herself. No principle of extraterritoriality, international law, or due process

prohibits the United States from prosecuting crimes committed against her,

especially when, as here, conduct in furtherance of those crimes occurred, at least

in part, within the United States. Nor should the indictment be dismissed on

speedy-trial or failure-to-prosecute grounds. The government is not to blame for

1

the delay in bringing Hijazi to trial, and that delay has not caused any discernible prejudice to Hijazi's defense.

## PROCEDURAL BACKGROUND

In March 2005, a grand jury in this district charged Hijazi, along with Jeff Alex Mazon, with four counts of major fraud against the United States, in violation of 18 U.S.C. §§ 1031(a) and 2, and six counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. (d/e 6) The indictment alleged that the defendants devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers to the United States in support of our military operations in Kuwait. Hijazi moved to dismiss the indictment, claiming the government's prosecution of him violated principles of extraterritoriality, international law, and due process. (d/e 15; d/e 16 pp.4-20, 24-26)

In August 2006, the grand jury returned a second superseding indictment charging the same offenses. (d/e 59) Hijazi's co-defendant Mazon pleaded not guilty and twice proceeded to trial. Both trials ended in hung juries. (d/e 4/30/08; d/e 10/20/08) In March 2009, the government and Mazon reached a plea agreement. Pursuant to that agreement, the government filed a misdemeanor false statement charge against Mazon in a separate case (Case No. 09-40028 (CDIL)), and Mazon pleaded guilty to that offense in exchange for the dismissal of all charges in this case. (d/e 210, 215 ##3 & 4)

2

Hijazi has never appeared for arraignment. In December 2007, he moved to dismiss the second superseding indictment. (d/e 131) Hijazi's second motion repeated the three arguments from his first motion (*compare* d/e 16 pp.4-20, 24-26 *with* d/e 133 pp.3-15, 22-29) and inserted two new arguments, alleging that the defense cooperation agreement between Kuwait and the United States barred prosecution of him and that the indictment should be dismissed due to the government's failure to bring Hijazi to trial. (d/e 133 pp.17-21, 29-32) In September 2008, Hijazi filed a third motion to dismiss the indictment, which added a sixth argument, contending that the indictment should be dismissed on speedy trial grounds. (d/e 174; d/e 175)

The district court declined to rule on Hijazi's motions until Hijazi appeared for arraignment. (d/e 36; d/e 178) Hijazi petitioned the court of appeals for a writ of mandamus ordering the district court to rule on the motions. Following briefing and oral arguments on that issue, the court of appeals asked the parties to file supplemental briefs addressing the merits of Hijazi's motions to dismiss. Hijazi's supplemental brief presented the same arguments his motions to dismiss present. The court of appeals issued the requested writ, ordering the district court to rule on Hijazi's motions. It declined to rule on the merits of the motions. *In re Hijazi*, 489 F.3d 401 (2009). Thereafter, Hijazi filed with this court copies of

the pleadings he filed in the court of appeals, identifying them as exhibits. (d/e 215)

This consolidated response treats Hijazi's second motion to dismiss as replacing his first motion. It presumes that Hijazi's most recent pleading – that is, his supplemental brief to the court of appeals, which Hijazi filed in this court as an exhibit (d/e 215 #1)– presents his six arguments[1] in his most preferred order. The government responded to Hijazi's arguments roughly in that order in its supplemental brief. This response echoes those responses and that order.

## FACTUAL BACKGROUND

In reviewing a motion to dismiss, a court takes as true the allegations in the indictment. *See United States v. Sampson*, 371 U.S. 75, 78-79 (1962); *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) (indictment may be tested "solely on the basis of the allegations made on its face, and such allegations are to be taken as true"). The second

---

[1]   A seventh argument based on the "Rule of Lenity" appears as a sub-argument in Hijazi's first motion and as a principal argument in his second motion. (d/e 16 at 24; d/e 133 at 27) In both motions, the argument consists of a single paragraph. Hijazi did not include the "Rule of Lenity" argument in the supplemental brief he filed in the court of appeals. The rule of lenity should not apply to this case. The "touchstone" of the rule is statutory ambiguity. *Bifulco v. United States*, 447 U.S. 381, 387 (1980). The rule applies only when "a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotations omitted). No such doubt exists with respect to the statutes at issue here, as disclosed throughout the body of this pleading.

superseding indictment alleges the following facts:

### A. To Support U.S. Military Operations in Kuwait, Mazon Awarded Hijazi's Company an Inflated Subcontract for Fuel Tankers.

In late 2001, the U.S. Army contracted with Kellogg Brown & Root Services ("KBR"), an American company, to provide property and services to the military at locations around the world, including Kuwait. (d/e 59 ¶¶3-8) To fulfill its responsibilities under the contract, KBR commonly hired subcontractors and billed the United States for the cost of the subcontractors' work. (d/e 59 ¶9)

In 2003, the Army needed fuel tankers and related services at the Kuwaiti airport, which it used for military operations. (d/e 59 ¶11) At the time, Jeff Mazon, an American, was the procurement manager for KBR stationed in Kuwait. (d/e 59 ¶12) His job responsibilities included the hiring of subcontractors to perform work covered by KBR's prime contract with the Army. (d/e 59 ¶12) In February 2003, Mazon solicited bids for the fuel tankers, which KBR estimated should cost about $685,000. (d/e 59 ¶20)

Mazon received at least two bids. One of them – for approximately $1,673,100 – came from Hijazi on behalf of his company, LaNouvelle General Trading & Contracting Co. ("LaNouvelle"), a Kuwaiti company. (d/e 59 ¶¶13, 21) The other bid, from "Company A," was higher, at $1,891,890. (d/e 59 ¶21)

After receiving the two bids, Mazon inflated both, representing that Company A's bid was about $6.243 million and LaNouvelle's bid was about $5.521 million. (d/e 59 ¶22) Mazon awarded LaNouvelle the lower (but still greatly inflated) subcontract, knowing that Hijazi would reward Mazon for the favorable treatment. (d/e 59 ¶16)

Mazon and Hijazi both signed the subcontract (called "Subcontract 39"), which specified that KBR would pay LaNouvelle $5,521,230 – nearly $4 million more than LaNouvelle's original bid. (d/e 59 ¶23) At about the same time, Mazon sent emails relating to the subcontract to KBR employees in the United States. (d/e 59 p.13 (chart)) From March through August 2003, LaNouvelle submitted six invoices totaling $5,521,230 to KBR for its work. (d/e 59 ¶26) KBR paid LaNouvelle and billed the United States for reimbursement. (d/e 59 ¶¶26-27) The Army made four payments to KBR in September and December 2003 to cover the Hijazi subcontract. (d/e 59 ¶27)[2]

Mazon's position as a procurement employee for KBR ended in June 2003. (d/e 59 ¶12)

---

[2]     Counts 1-4, the Major Fraud Act counts, charge these four government payments to KBR for LaNouvelle's services. (d/e 59 p.11) Two of the wire fraud counts (9 and 10) correspondingly allege wire transmissions directing payments from the government to KBR in the United States. (d/e 59 p.14)

6

**B.  Hijazi Gave Mazon a $1 Million Draft and Advised Him How To Conceal the Reason for the Payment.**

In September 2003, Hijazi gave Mazon a $1 million "draft" for the fraudulent subcontract, and at the same time executed a promissory note to make it look like the payment was a loan. (d/e 59 ¶28) Hijazi separately made it clear, however, that the money was entirely Mazon's. One of Hijazi's emails to Mazon reads: "this whole lown [*sic*] (principal & interest) [i]s totally your money . . . ." (d/e 59 ¶29)

While in the United States in October 2003, Mazon opened an account with a financial institution to deposit the $1 million. (d/e 59 ¶30) When that effort failed, Hijazi instructed Mazon by email to open three different offshore accounts in order to deposit the money. (d/e 59 ¶31) Specifically, Hijazi instructed Mazon to say he expected to transfer "close to 300 K" to each account from "consultancy work, business asso[ci]ates, salaries a[n]d bonuses, or any other reasoning." (d/e 59 ¶31)

On October 28, 2003, Mazon tried to deposit the $1 million draft at a different bank in the United States. (d/e 59 ¶32) Two weeks later, and following an interview with a KBR investigator about Subcontract 39, Hijazi sent Mazon an email that cautioned him to be very careful about what he said when he called his "ex-friends in [K]uwait." Mazon was in the United States when he received this

7

email. (d/e 59 ¶33)

**C. The Charges.**

The four major-fraud counts charge that the defendants executed and attempted to execute the scheme to defraud the United States on September 15, 16, and 27, 2003, and December 17, 2003, when they caused four payments from the United States Government to KBR. (d/e 59 ¶9 and p.11 (chart)) The six wire-fraud counts charge the defendants with transmitting or causing the transmission of six different wire communications between February 14, 2003, and December 17, 2003. Four of these wire communications took place, in part, within the United States. The remaining two took place wholly within the United States. (d/e 59 pp.13-14 (chart))

For purposes of the motions to dismiss, the government concedes that Hijazi was corporeally outside the United States and was not a citizen or resident of the United States during the period of the alleged scheme to defraud the United States.

## SUMMARY OF ARGUMENT

___Hijazi's motions to dismiss the indictment should be denied.

Contrary to the basic premise of Hijazi's jurisdictional challenges, one of the co-schemers – namely, Mazon – took action in furtherance of the allegedly fraudulent scheme while in the United States, and Hijazi took action that reached into the United States. They also jointly caused money to flow from the United States through KBR to Hijazi's company. The crime thus was committed, at least in part, within this country, and this court consequently has territorial jurisdiction over the alleged perpetrators, without resort to any theory of extraterritoriality and regardless of the nationality of the alleged perpetrators.

Even if the alleged fraud had been committed entirely in Kuwait, the district court would have extraterritorial jurisdiction over Hijazi. As the Supreme Court long ago held, frauds on the United States committed abroad may be prosecuted here even if Congress does not explicitly say so. *See United States v. Bowman*, 260 U.S. 94, 97-98 (1922). The Major Fraud Act thus applies extraterritorially to Hijazi, and the wire fraud statute's prohibition on wirings "in foreign commerce" also covers the emails charged in the indictment.

Principles of international law provide for jurisdiction over foreigners whose overseas crimes harm the United States. Those principles apply here, where the alleged procurement fraud was intended to cost the United States millions of

9

dollars. By the same token, it is neither arbitrary nor fundamentally unfair to indict in this country a foreign national who defrauds our government. Prosecution of Hijazi thus also comports with constitutional due process.

The Military Extraterritorial Jurisdiction Act does not apply to this prosecution because Hijazi is charged under different, unrelated statutes, and the Act certainly does not prohibit this prosecution. So, too, nothing in the U.S.-Kuwait Defense Cooperation Agreement prohibits U.S. jurisdiction over Hijazi.

Hijazi's constitutional right to a speedy trial has not been violated. Hijazi has not been tried because he remains in a country that refuses to extradite him. While his unwillingness to leave Kuwait may be his right, he cannot at the same time complain that he has not been brought to trial fast enough. Hijazi also has not effectively demanded a speedy trial. If anything, he has tried to avoid a trial altogether. And he has failed to show the requisite speedy-trial prejudice.

Similarly, dismissal of the indictment under Federal Rule of Criminal Procedure 48(b) is unwarranted. The government is not to blame for the delay in bringing Hijazi to trial. If Hijazi wants to speed up this prosecution and resolve the charges against him, he should come to court and face them.

10

## ARGUMENT

**I. This Court Has Jurisdiction Over Hijazi Because Action in Furtherance of the Alleged Scheme to Defraud the United States Took Place in the United States.**

Hijazi's jurisdictional arguments are all based on one central premise: that "none of *his* alleged conduct took place within the United States." (d/e 133 p.3) (emphasis added) This premise inappropriately isolates Hijazi's alleged conduct from that of his alleged co-schemer, Mazon, and treats Hijazi's alleged complicity in a fraud scheme as irrelevant. Under Hijazi's theory, a foreigner could commit crimes against the United States with total impunity so long as he remained outside our borders and only sent henchmen inside to do the dirty work.[3]

Putting aside the fact that the alleged scheme was "knowingly executed . . . with the intent to defraud the United States" of millions of dollars (d/e 59 ¶34), all ten counts specifically allege a connection to the United States: the Major Fraud Act counts itemize our government's payments on the Hijazi-Mazon

---

[3]     We appreciate the distinctions between someone who sends underlings to commit violent crimes in another country and someone who schemes with a third party to commit fraud in his own country. Hijazi, however, is charged with more than merely scheming with Mazon in Kuwait to commit fraud in Kuwait. He's charged with scheming to "defraud the United States." (d/e 59 ¶¶1, 34) The court of appeals may have overlooked this allegation when it remarked in dicta that the "sketchy record" prevented it from concluding "whether Hijazi knew that the [fuel] tankers were for the use of the U.S. military." *Hijazi*, 589 F.3d at 411. According to the indictment, Hijazi knew the *United States* was paying – indeed, over-paying – for the tankers, regardless of who used them.

fraudulent subcontract, and the wire fraud counts allege pertinent wire transmissions either partly or wholly within this country. (d/e 59 pp.11, 13-14) Because the co-schemers took action in the United States in aid of their fraud, this court has territorial jurisdiction over Hijazi. Thus, this court need not even consider the extraterritorial reach of the charging statutes. *See United States v. Philip Morris* USA, 566 F.3d 1095, 1130 (D.C. Cir. 2009) (court need not decide whether RICO has extraterritorial reach because defendant's "conduct had substantial domestic effect"); *Environmental Defense Fund v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("by definition an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders").

### A. Hijazi and Mazon's Conduct Occurred Within the United States.

The United States was both the target of this alleged scheme and the site of relevant conduct by the co-schemers. According to the indictment, at about the time Hijazi and Mazon signed the subcontract, Mazon emailed KBR employees in the United States regarding the transaction. When the work was complete, Hijazi submitted his inflated invoices to KBR; KBR paid them and, in turn, billed the U.S. Army. (d/e 59 ¶¶26-27) Hijazi's company collected $5.521 million, and Hijazi gave Mazon a $1 million draft, which Mazon twice tried to deposit in the United States. Three times thereafter, Hijazi sent emails to Mazon relating to the subcontract and the $1 million payment: the first concerned Hijazi's supposed

12

loan to Mazon (d/e 59 ¶29 ("[it's] totally your money")); the second directed

Mazon to set up three different offshore accounts in order to deposit the money

surreptitiously (d/e 59 ¶31 (advising Mazon to say money was from

"consultancy work . . . or any other reasoning")); and the third, which came on

the heels of an interview with a KBR investigator about Subcontract 39, warned

Mazon to be "very careful" when speaking with his "ex-friends" in Kuwait. (d/e

59 ¶33) Although Mazon was apparently in Greece when he received the first

two messages, he was physically in the United States when he received the third

Hijazi email. (d/e 59 ¶33)

## B.  The Co-Schemers' Conduct in the United States Establishes Jurisdiction Over Hijazi.

"Jurisdiction is proper if the offense, or part of the offense, occurred within

the United States." *United States v. Moncini*, 882 F.2d 401, 403 (9th Cir. 1989).

Moreover, "[w]henever [a] conspiracy is in whole or in part carried on in the

country whose laws are conspired against," jurisdiction exists over all

conspirators, including foreigners whose activities are entirely overseas. *Ford v.*

*United States*, 273 U.S. 593, 622-24 (1927); *see United States v. Inco Bank & Trust*

*Corp.*, 845 F.2d 919, 920 & n.4 (11th Cir. 1988) (conspiracy occurring partly in the

United States can be prosecuted here without resort to any theory of

extraterritoriality).

13

This rules applies with equal force even where, as here, the indictment does not allege a conspiracy, for it is well established that "it is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy." *United States v. Macey*, 8 F.3d 462, 468 (7th Cir. 1993) (citations, quotations omitted); *see Pinkerton v. United States*, 328 U.S. 640, 647 (1946) ("A scheme . . . to defraud, which is joined in by more than one person, is a conspiracy"); *United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008), *cert. denied*, 129 S.Ct. 2010 (2009) (co-schemers jointly responsible for one another's acts in furtherance of fraudulent scheme); *accord Macey*, 8 F.3d at 468 (defendant in mail fraud case liable for acts of co-conspirator even if indictment did not charge conspiracy); *United States v. Wormick*, 709 F.2d 454, 461 (7th Cir. 1983) (same).

In *Ford*, the Supreme Court upheld U.S. jurisdiction over aliens who were outside the United States during the entire course of the conspiracy, where their co-conspirators committed overt acts inside the United States and the conspiracy had for its object a violation of U.S. law. 273 U.S. at 600-01, 619-24; *see id.* at 620 ("all are guilty . . . whether they are in or out of the country"). Other courts followed suit. *See, e.g., United States v. Schmucker-Bula*, 609 F.2d 399, 401-02 (7th Cir. 1980) (district court had jurisdiction over alien who helped plan U.S. sale of cocaine entirely from overseas, where co-conspirator mailed sample packet of

cocaine from Colombia to Chicago); *Inco Bank*, 845 F.2d at 919-21 (foreign

company guilty of money laundering even though it performed no act in U.S.);

*United States v. Winter*, 509 F.2d 975, 980-82 (5th Cir. 1975) (court had jurisdiction

over foreigners who never came to or acted in U.S., where co-conspirator

committed three "seemingly innocuous overt acts" in this country); *accord United*

*States v. Lawson*, 507 F.2d 433, 445 (7th Cir. 1974); *United States v. MacAllister*, 160

F.3d 1304, 1307 & n.4 (11th Cir. 1998); *Chua Han Mow v. United States*, 730 F.2d

1308, 1312 (9th Cir. 1984); *United States v. Correa-Negron*, 462 F.2d 613, 614 (9th

Cir. 1972); *Rivard v. United States*, 375 F.2d 882, 886-88 (5th Cir. 1967).

Thus, it is not just Hijazi's alleged conduct, but Mazon's conduct as well – the

emails with his fellow employees in the U.S., and his attempts to deposit Hijazi's

$1 million payment here – that bring Hijazi within the district court's reach. The

co-schemers' collective conduct, moreover, was neither minimal nor tangential to

the alleged scheme: Mazon sent KBR employees emails related to the subcontract

in furtherance of the alleged scheme, and the $1 million payment was a central

part of the alleged scheme from the start. Hijazi's emails to Mazon, relating as

they do to the $1 million and to concealing the fraud ("be very carreful [*sic*] on

what you say") after KBR investigators started asking questions, also fall

squarely within the scope of the alleged scheme. *See, e.g., United States v. Lanas*,

324 F.3d 894, 901-02 (7th Cir. 2003) (mailings relating to kickback furthered

fraudulent scheme); *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994)

("Avoidance of detection is often a material part of a fraudulent scheme";

"[c]ommunications which occur after the defendant has obtained the victims'

money . . . are in furtherance of the fraudulent scheme if they facilitate

concealment or postpone investigation of the scheme"); *see also* d/e 59 ¶14

(alleging that scheme lasted through December 2003, after Hijazi's last email to

Mazon in the United States).[4]

Hijazi apparently never left Kuwait during the alleged scheme. But that

circumstance does not mean that his *conduct* never reached the United States.

Consider his emails: Hijazi cannot validly claim that transmissions sent to, and

received in, the United States somehow occurred only in Kuwait. *See, e.g.*,

*Moncini*, 882 F.2d at 403-04 (where Italian citizen sent mail from Italy to U.S., he

acted partly in the United States, such that exercise of territorial jurisdiction was

proper; rejecting argument that conduct only occurred in Italy); *United States v.*

*Gilboe*, 684 F.2d 235, 237-38 (2nd Cir. 1982) (wire communications between Hong

Kong and U.S. "clearly sufficient" to sustain jurisdiction over non-resident alien

---

[4]     By any measure, these actions were part of the overall scheme. In fact, the
indictment alleges Mazon's four emails with KBR employees as separate wire fraud
counts. (d/e 59 p.13) In any event, we know of no criminal case finding that territorial
jurisdiction is justified only where conduct *largely* occurs in this country. *See MacAllister*,
160 F.3d at 1307 ("The general rule is that a conspiracy to violate the criminal laws of
the United States, in which one conspirator commits an overt act in furtherance of that
conspiracy within the United States, is subject to prosecution in the district courts.").

16

under wire fraud statute); *Schmucker-Bula*, 609 F.2d at 402 (mailing of sample

packet of cocaine from overseas to Chicago was act committed within the United

States, and enough to confer jurisdiction over alien co-conspirator); *see also United*

*States v. Ebersole*, 411 F.3d 517, 526-27 (4th Cir. 2005) (under wire fraud statute,

transmittals occur both where wire sent and received); *United States v. Kim*, 246

F.3d 186, 191 (2nd Cir. 2001 (same)).[5]

Furthermore, two of the wire fraud counts – involving payments by the U.S.

Army to cover KBR's costs on the fraudulent subcontract – allege wirings wholly

within the United States. (d/e 59 p.14) The fact that Hijazi himself did not send

these wires is of no moment. The indictment alleges that he and Mazon caused

these payments for the purpose of executing the fraud (d/e 59 pp.12-14), which is

all that the statute requires. *See* 18 U.S.C. § 1343 (whoever transmits or "causes to

be transmitted" a wire for the purpose of executing a fraudulent scheme is

guilty); *see, e.g.*, *United States v. Adcock*, 534 F.3d 635, 640-41 (7th Cir. 2008)

(defendant need not personally perform wire transfer; defendant liable for wires

---

[5]     This Court need not decide whether the two Hijazi emails routed through
Mazon's U.S. account, standing alone, would be sufficient to confer territorial
jurisdiction on the district court. *See United States v. Martinelli*, 62 M.J. 52, 63-64
(C.A.A.F. 2005) (routing child pornography between overseas locations through U.S.
internet server justifies domestic application of child pornography statute); *Gilboe*, 684
F.2d at 238 (wire fraud jurisdiction based on wire transfer of funds between foreign
countries via American bank). Those two emails, which Mazon apparently opened in
Greece, do not stand alone. Mazon opened the third message in the United States.

17

sent and received by innocent third parties where wirings were reasonably foreseeable result of fraudulent conduct).

Whether Hijazi in fact "caused" these wirings and whether they were "for the purpose of executing" the fraud are jury questions, of course. *See*, *e.g.*, *Adcock*, 534 F.3d at 640-41 (federal agency's use of wires to transfer money to low-income housing project was reasonably foreseeable to defendant who devised scheme to over-bill agency for services at project); *United States* v. *Dick*, 744 F.2d 546, 552 (7th Cir. 1984) (where defendant schemed to rig bids on a subcontract, government's reimbursement checks to general contractor were in furtherance of scheme, notwithstanding that general contractor had already paid on subcontract); *accord United States v. Bonansinga*, 773 F.2d 166, 170-71 (7th Cir. 1985). For present purposes, however, the indictment's allegations – that Hijazi and Mazon caused these wirings in furtherance of the scheme – must be accepted as true. *See United States v. Sharpe*, 438 F.3d 1257, 1258 (11th Cir. 2006) (in determining whether indictment invokes district court's jurisdiction, court treats factual allegations as true and views allegations in light most favorable to government); *see also United States v. Risk*, 843 F.2d 1058, 1061 (7th Cir. 1988) (motion to dismiss does not test strength, weakness of government's case).

Additionally, the fact that Hijazi did not have a direct contractual agreement with the government is beside the point. The Major Fraud Act does not

18

criminalize frauds committed only by prime contractors; it also covers

procurement fraud by any "subcontractor . . . on a contract in which there is a

prime contract with the United States." 18 U.S.C. § 1031(a); *see United States v.*

*Brooks*, 111 F.3d 365, 366-69 (4th Cir. 1997) (fraudulent subcontractor guilty under

§ 1031(a) "regardless of its privity with the United States"; statute recognizes "the

seriousness of this species of fraud," especially in military contracts).

Because the charging statutes apply territorially, this Court need look no

further to find jurisdiction over Hijazi.

## II. The Major Fraud Act and Wire Fraud Statute Apply Extraterritorially to Hijazi.

Even if the indictment could be read to allege a crime entirely on Kuwaiti soil,

Hijazi is still mistaken in claiming the district court lacks extraterritorial

jurisdiction over him. "Congress has the authority to apply its laws, including

criminal statutes, beyond the territorial boundaries of the United States." *United*

*States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997); *see EEOC v. Arabian American Oil*

*Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*"); *United States* v. *Bowman*, 260 U.S. 94, 97-

98 (1922). Whether Congress has exercised that authority is a matter of statutory

construction: "Congress ordinarily intends its statutes to have domestic, not

extraterritorial application." *Small v. United States*, 544 U.S. 385, 388-89 (2005). The

presumption against extraterritoriality may be overcome, however, where

19

Congress so intends. *See Bowman*, 260 U.S. at 97-99. That is the case with both the
Major Fraud Act and wire fraud statute.

**A. The Major Fraud Act: Extraterritoriality Inferred**

In *Bowman*, the Supreme Court clearly articulated the inquiry into whether
Congress intended to provide for extraterritorial jurisdiction. To discern
Congress's intent whether to apply a fraud statute extraterritorially, the Court
differentiated between two broad classes of criminal statutes. For "crimes against
private individuals or their property, like assault, murder, burglary, larceny,
robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and
good order of the community . . . [i]f punishment of them is to be extended to
include those committed outside of the strict territorial jurisdiction, it is natural
for Congress to say so in the statute." *Id.* at 97-98. The Supreme Court, however,
refused to require similar express congressional statements for the class of
criminal statutes not "logically dependent on their locality for the government's
jurisdiction, but enacted because of the right of the United States to defend itself
against obstruction or fraud wherever perpetrated." *Id.* at 98. For this latter type
of criminal statute, the Court held that Congress's intent to confer extraterritorial
jurisdiction may be inferred from the nature of the offense, because to limit the
locus of these statutes to the territorial jurisdiction of the United States would be
"greatly to curtail the scope and usefulness of the statute and leave open a large

20

immunity for frauds as easily committed . . . in foreign countries as at home." *Id.*

To illustrate this latter category, the Court cited many statutes proscribing "Offenses against the Operation of the Government," including statutes against: forging or altering a ship's papers; enticing desertions from naval service; bribing a United States officer; and stealing, embezzling, or converting United States military property. *Id.* at 98-100. Each of these offenses, the Court concluded, must by its nature include conduct occurring beyond the strict territorial jurisdiction of the United States. Turning to the facts of the case before it, the Court held that, as with its hypothetical examples, the United States could assert subject matter jurisdiction to enforce a statute making it illegal to conspire, or in fact, to present a false claim against the United States – invoicing for 1000 tons of fuel oil but only delivering 600 – whether the objectionable conduct occurred at home or in foreign ports. *Id.* at 101 (applying extraterritorially 35 Stat. 1095 (currently codified at 18 U.S.C. § 287)).

In numerous subsequent instances, courts have followed *Bowman*'s reasoning to assert subject matter jurisdiction over many criminal statutes, many of them fraud related. For example, in *United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984), the Eleventh Circuit cited *Bowman* for support of its exercise of jurisdiction over a Colombian national accused of theft of United States property and other crimes in Columbia. *See United States v. Fernandez*, 496 F.2d 1294, 1295-

21

96 (5th Cir. 1974) (applying extraterritorially statute criminalizing possessing,

forging, and uttering U.S. Treasury checks); *United States v. Cotten*, 471 F.2d 744,

749-50 (9th Cir. 1973) (applying theft of government property extraterritorially);

*United States v. Birch*, 470 F.2d 808, 810-11 (4th Cir. 1972) (finding counterfeiting

and misuse of military passes conduct proscribed extraterritorially); *Harlow v.*

*United States*, 301 F.2d 361 (5th Cir. 1962) (applying bribery statute

extraterritorially in considering extraterritorial venue statute). *See also United*

*States v. Layton*, 855 F.2d 1388, 1395 (9th Cir. 1988) (upholding jurisdiction over

murder of member of Congress abroad and citing bribery statute as one applied

extraterritorially); *United States v. Bredimus*, 234 F.Supp.2d 639, 647-50 (N.D. Tex.

2002), *aff'd*, 352 F.3d 200 (2003) (applying *Bowman* to child pornography crimes

committed extraterritorially); *United States v. Bin Laden*, 92 F.Supp.2d 189, 194

(S.D.N.Y. 2000) (applying *Bowman*'s rule to foreign nationals accused of bombing

United States embassies in Africa); *United States v. Zehe*, 601 F.Supp. 196, 198 (D.

Mass. 1985) (exercising jurisdiction over an East German national accused of

espionage against the United States in Mexico).

So it is here. The Major Fraud Act does not expressly apply extraterritorially.

But that does not defeat extraterritorial jurisdiction over Hijazi, for the Act is a

textbook example of a law enacted "because of the right of the Government to

defend itself against obstruction or fraud wherever perpetrated." *Bowman*, 260

22

U.S. at 98. And although courts have not had occasion to consider the Act's extraterritorial application, other fraud-related statutes have been so read, as reflected in the previous paragraph. *See also Dawn*, 129 F.3d at 882 n.7 ("*Bowman* recognizes an exception to the presumption against extraterritorial intent" for criminal statutes prohibiting obstruction or fraud against the government); *accord United States v. Gatlin*, 216 F.3d 207, 211 n.5 (2nd Cir. 2000) ("[s]tatutes prohibiting crimes *against the United States government* may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended") (emphasis in original); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991)(where Congress criminalizes obstruction or fraud against the U.S., extraterritorial jurisdiction may be inferred).

Also, in interpreting the reach of the Major Fraud Act, this court should presume that Congress acts with full knowledge of existing law, *see Merrill Lynch v. Curran*, 456 U.S. 353, 382 n.66 (1982), which here includes *Bowman*'s rule of inferred extraterritorial jurisdiction for frauds against the United States. *See United States v. Wells*, 519 U.S. 482, 495 (1997) ("we presume that Congress expects its statutes to be read in conformity with this Court's precedents").

Indeed, the statute in *Bowman* is, if not indistinguishable, directly analogous to the Major Fraud Act. There, the law made it a crime to knowingly "present or cause to be presented" a false or fraudulent claim for "payment or approval"

23

upon the United States or any U.S. department or corporation in which the
United States is a stockholder. 260 U.S. at 100 n.1; *see also id.* at 102 (when it
enacted statute, Congress would know that "wide field for such frauds upon the
government" included lands beyond the United States). That Congress implicitly
meant to apply that statute extraterritorially is doubly true here, for the Major
Fraud Act targets a species of fraud against the United States (in large-scale
procurement contracts) that, as this case demonstrates, is as readily committed
abroad as at home. *See* 260 U.S. at 98.

Hijazi argues that *Bowman* is inapplicable because the overseas defendants in
that case were Americans. (d/e 133 pp.13-14) *Bowman*'s logic does not, however,
depend on that fact. Rather, it is the nature of the statutory prohibition – a fraud
targeted at the United States – that provides the case's driving rationale. *See* 260
U.S. at 98. Thus, as the District of Columbia Circuit found, "the citizenship of the
defendants is irrelevant" to the *Bowman* analysis. *United States v. Delgado-Garcia*,
374 F.3d 1337, 1345-46 (D.C. Cir. 2004); *see also Rocha v. United States*, 288 F.2d 545,
548 (9th Cir. 1961) ("we see no reason why an alien . . . should be placed in a
more favorable position with respect to his actions taken against the sovereignty
of the United States while he was abroad, than a United States citizen would
be"). And even if the *Bowman* rule might "especially" apply to frauds committed
by Americans abroad, *see* 260 U.S. at 98; *Skiriotes v. Florida*, 313 U.S. 69, 73-74

24

(1941), that feature does not render *Bowman* inapplicable to the overseas frauds of foreigners. To the contrary, where courts have invoked *Bowman* to apply a statute extraterritorially, they have not hesitated to bring foreigners acting abroad within its reach. *See, e.g., Delgado-Garcia*, 374 F.3d at 1339 (conspiracy to encourage aliens to illegally enter the United States); *United States v. MacAllister*, 160 F.3d 1304, 1307-08 (11th Cir. 1998) (conspiracy to export cocaine); *United States v. Vasquez-Velasco*, 15 F.3d 833, 837-41 (9th Cir. 1994) (violent crimes abroad in aid of drug trafficking); *Benitez*, 741 F.2d at 1316-17 (theft of government property); *Rocha*, 288 F.2d at 546-49 (false oath before consular officer); *United States v. Reumayr*, 530 F.Supp.2d 1210, 1212, 1218-20 (D.N.M. 2008) (attempted destruction of trans-Alaska pipeline); *Bin Laden*, 92 F.Supp.2d at 194-97 (terrorism offenses; *Bowman*'s "rationale depends in no way on the nationality of the perpetrator"); *United States v. Yunis*, 681 F.Supp. 896, 898-904 (D.D.C. 1988) (hijacking of Jordanian plane carrying several Americans); *United States v. Noriega*, 746 F.Supp. 1506, 1512-19 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (1990) (narcotics-related offenses); *United States v. Golitschek*, 1986 WL 2603 at *2-4 (W.D.N.Y. 1986) (conspiracy to defraud U.S. in connection with arms exports); *United States v. Zehe*, 601 F.Supp. 196, 199 (D.Mass. 1985) (espionage; *Bowman* "does not limit its reasoning to citizens"). *See also Bin Laden*, 92 F.Supp.2d at 195 ("no court, to date, has refused to apply the *Bowman* rule on the ground that the defendant was a foreign national").

25

Nor is *Bowman* limited only to cases that typically involve foreign conduct, like those involving drug importation/smuggling, immigration, terrorism, and violence against U.S. agents who often work abroad. *Bowman* did not turn on that sort of thinking, and it certainly did not infer extraterritorial jurisdiction because fraud typically involves foreign conduct. (It, of course, does not. *See Delgado-Garcia*, 374 F.3d at 1346 ("there is no obvious reason why frauds against the United States . . . would occur overseas")). Rather, the Court found that a fraud directed at the United States implicates the government's right to defend itself; that such frauds are not necessarily sited in the United States but can be committed abroad; and that to limit the statute's application to U.S. territory would "leave open a large immunity for frauds" committed overseas and greatly "curtail [the statute's] scope and usefulness." 260 U.S. at 98.[6]

---

[6]     The types of cases Hijazi cites in his supplemental brief to the court of appeals (d/e 215 #1 pp.18-19) represent an expansion of the *Bowman* rule beyond its four corners: none involves fraud or obstruction, and in none is the United States government the direct target of the crime. Rather, these cases find their jurisdictional footing elsewhere – not because our government is the victim of a fraud, but because the conduct causes some kind of domestic harm with a typically overseas component. *See United States* v. *Plummer*, 221 F.3d 1298, 1304-05 (11th Cir. 2000) (courts "have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign offenses that cause domestic harm") (collecting cases); *United States v. Perez-Herrera*, 610 F.2d 289, 290 (5th Cir. 1980) (*Bowman*'s "approach [of inferring extraterritoriality] was first taken with statutes designed to protect the interests of the United States in its governmental capacity"; has since been extended to smuggling statutes). *See also United States v. Layton*, 509 F.Supp. 212, 218 (N.D.Cal. 1981) (courts have inferred extraterritorial jurisdiction under *Bowman* for two types of statutes: those that "represent an effort by the government to protect itself against obstructions and

26

Also, placing Hijazi's conduct beyond the United States's reach would not make sense. Taking the indictment's allegations as true, Hijazi schemed to defraud the United States of millions of dollars. To allow him to escape prosecution simply because he is a foreigner who managed to stay overseas would encourage other would-be foreign schemers. Given our country's extensive procurement needs around the world, such an escape would create a "free fraud zone" for foreigners intent on targeting our treasury from afar. *See United States v. Schmucker-Bula*, 609 F.2d 399, 403 (7th Cir. 1980) (recognizing U.S. interest in extending jurisdiction over defendants who "avoid actual contact with the United States while profiting" from illegality here).

Although Hijazi doubts whether *Bowman* remains good law (d/e 133 pp.14-15), the Seventh Circuit has noted the continued recognition of the *Bowman* exception. *See Dawn*, 129 F.3d at 882 n.7; *see also MacAllister*, 160 F.3d at 1307 n.7

─────────────────────

frauds," and those "where the vulnerability of the United States outside its own territory to the occurrence of the prohibited conduct is sufficient, because of the nature of the offense, to infer reasonably that Congress meant to reach those extraterritorial acts").

Hijazi, thus, has it backwards: that courts have read *Bowman* expansively does not eclipse its core ruling. And where, as here, a statute vindicates the government's right "to defend itself against obstruction or fraud wherever perpetrated," 260 U.S. at 98, *Bowman*'s rule of statutory interpretation applies with greatest force. *See Martinelli*, 62 M.J. at 57-58 (criticizing expansive reading of *Bowman*, but reaffirming that statutes "involving obstructions and frauds against the Government" are exempt from presumption against extraterritoriality); *accord Kollias v. D&G Marine Maintenance*, 29 F.3d 67, 71 (2nd Cir. 1994).

(*Bowman* has not been overruled, and remains the law); *Felix-Guitierrez*, 940 F.2d

at 1205 n.3 (same). The fact that subsequent Supreme Court cases – *Aramco, supra;*

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993); *Smith v. United States*, 507

U.S. 197 (1993); *Small, supra* – do not mention *Bowman* does not somehow

invalidate it. *Aramco, Sale* and *Smith* all involve civil statutes, and none of the

cases (including *Small*) involves anything like the sort of fraud here at issue and

directly addressed by *Bowman*. *See Aramco*, 499 U.S. at 248-52 (Title VII

employment discrimination); *Sale*, 509 U.S. at 171-74 (refugee provisions of

Immigration and Nationality Act); *Small*, 544 U.S. at 387-90 (unlawful gun

possession); *Smith*, 507 U.S. at 198-204 (Federal Tort Claims Act).

In any event, it is not for this court to conclude that the Supreme Court's

"more recent cases have, by implication, overruled an earlier precedent." *Agostini*

*v. Felton*, 521 U.S. 203, 237 (1997). "If a precedent of [the Supreme] Court has

direct application in a case, yet appears to rest on reasons rejected in some other

line of decisions, the [lower courts] should follow the case which directly

controls, leaving it to [the Supreme] Court the prerogative of overruling its own

decisions." *Id.* (citations, quotations omitted).

## B.  The Wire Fraud Statute: Foreign Jurisdiction Expressly Intended

The wire fraud statute, 18 U.S.C. § 1343, applies to wire transmissions "in

interstate or foreign commerce," which by definition includes "commerce within

28

a foreign country." 18 U.S.C. § 10. A simple statutory reference to "foreign commerce" does not itself evince Congress' intention for a statute to apply abroad. *See Aramco*, 499 U.S. at 250-52. But that is not what we have here. Rather, Section 1343's legislative history reveals that Congress wrote those words into the statute to cover exactly the sort of wirings involved in this case. *See In re French*, 440 F.3d 145, 151 (4th Cir. 2006) (to determine congressional intent, courts may look to "'all available evidence,'" including legislative history) (quoting *Sale*, 509 U.S. at 177; citing *Smith*, 507 U.S. 197, 201-03).

As originally enacted in 1952, Section 1343 only criminalized "interstate" wire transmissions. *See* 18 U.S.C. § 1343, Historical and Statutory Notes. Several years later, the government brought a prosecution alleging a fraudulent scheme involving telephone communications from Mexico to Los Angeles. *See* H.R.Rep.No. 2385 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3091, 3092. The district court dismissed the indictment, finding the wirings were not in "interstate commerce" as required by the statute, but in "foreign commerce." *Id.* Prompted by the case and "to close a loophole" in the law, Congress amended Section 1343 in 1956 to add the prohibition on transmissions in "foreign commerce." *Id.* Its explicit intention was to "extend [the law's] coverage to foreign communications." *Id.*; *see also id.* (letter from Attorney General, urging amendment in order to cover calls from abroad to United States).

29

As the Second Circuit has noted, Section 1343's legislative history shows that "Congress clearly intended [it] to apply to foreign conduct." *Kim*, 246 F.3d at 188-89; *see also Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005) (Section 1343 is "surely not a statute in which Congress had only domestic concerns in mind") (citations, quotation omitted).

Hijazi nevertheless argues that Section 1343 does not cover conduct such as a telephone call that began and terminated abroad. That scenario raises an interesting question, but it is not our scenario. Here, the indictment contains six wire fraud counts: four allege Mazon's wirings between Kuwait and the United States, and two allege wirings entirely within the United States. (d/e 59 pp.13-14) Again, this court need not ask whether the statute applies to exclusively overseas transmissions because it plainly applies to the interstate and foreign transmissions here. *See, e.g., Gilboe*, 684 F.2d at 237-38 (jurisdiction over overseas alien based on wire communications between Hong Kong and New York); *Kim*, 246 F.3d at 189 (wire communication between Croatia and New York); *United States v. Goldberg*, 830 F.2d 459, 464 (3d Cir. 1987) (calls between Pennsylvania and Canada).[7]

---

[7]     Although the court in *United States v. Golitscheck*, 808 F.2d 195 (2nd Cir. 1986), reversed a Section 1343 conviction of a foreigner acting overseas, the reversal was due to an erroneous jury instruction, not because jurisdiction was found lacking. *See id.* at 201-04 (not reaching jurisdictional challenge). The district court did, however, decide the jurisdictional issue, and found that wirings by an alien from overseas into the

### III.    Principles of International Law and Constitutional Due Process Commend Hijazi's Prosecution.

Statutes ought not be "construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804). Here, however, principles of international law do not counsel against prosecution. Nor does the exercise of jurisdiction over Hijazi violate due process. Both as a matter of international law and constitutional due process, Hijazi's fraud on the United States justifies an American court's jurisdiction over him.

### A. Because Hijazi's Fraud Injured The United States, Extraterritorial Jurisdiction Comports With International Law.

International law generally recognizes five bases on which a nation may exercise jurisdiction over citizens and non-citizens for acts committed abroad: (1) the "objective territorial principle" provides jurisdiction over conduct outside a nation's borders that has, or is intended to have, a substantial effect within its territory; (2) the "nationality principle" provides jurisdiction over the extraterritorial acts of a nation's own citizens; (3) the "protective principle" provides jurisdiction over the overseas acts of foreigners that are directed against

---

United States satisfy Section 1343. *See Golitscheck*, 1986 WL 2603, at *2. That ruling remains undisturbed.

The district court additionally has jurisdiction over Hijazi as an aider and abetter under both the Major Fraud Act and wire fraud statute – not because the aiding and abetting statute (18 U.S.C. § 2) expands the extraterritorial reach of the underlying statutes, but because, as discussed, the underlying statutes themselves apply both territorially and extraterritorially to this case.

the security of the state or that threaten the integrity of governmental functions; (4) the "passive personality principle" provides jurisdiction over foreigners who commit crimes against a nation's own citizens overseas; and (5) the "universality principle" provides jurisdiction over acts that are so heinous as to be universally condemned by all civilized nations. *See* Wayne R. LaFave, *Substantive Criminal Law*, § 4.2(d), §§ 4.3(b)-(e) (2d. ed. 2008); *United States v. Yousef*, 327 F.3d 56, 91 n.24 (2d Cir. 2003); *United States v. Vasquez-Velasco*, 15 F.3d 833, 839-40 & n.5 (9th Cir. 1994); Restatement (Third) of Foreign Relations Law of the United States § 402 & cmt. d, f; § 404 (1987) ("Restatement"); *see also Chua Han Mow v. United States*, 730 F.2d 1308, 1312 (9th Cir. 1984) ("extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority").

Of particular relevance here are the "objective territorial" and "protective" principles. Justice Holmes gave voice to the first nearly a hundred years ago:

> Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect . . .

*Strassheim v. Daily*, 221 U.S. 280, 285 (1911); *see also Ford v. United States*, 273 U.S. 593, 623 (1927) ("The principle that a man, who outside of a country willfully puts in motion a force to take effect in it, is answerable at the place where the evil is done, is recognized in the criminal jurisprudence of all countries.").

Over the years, courts have accordingly exercised extraterritorial jurisdiction over a wide variety of crimes and criminals based on an injury inflicted within the United States from afar. *See, e.g.*, *United States v. Hill*, 279 F.3d 731, 739-40 (9th Cir. 2002) (extraterritorial jurisdiction over father who fled U.S. to Mexico to evade child support payments justified under objective territorial principle, since evasion of payments has "obvious detrimental effects within the United States" because his children are here); *United States v. Nippon Paper Indust. Co., Ltd.*, 109 F.3d 1, 3-7 (1st Cir. 1997) (jurisdiction over Japanese company whose alleged criminal price-fixing occurred entirely within Japanese territory; conduct created substantial, intended effects within the United States); *Chua Han Mow*, 730 F.2d at 1312 (jurisdiction over foreigners who never came to U.S. but who conspired to import heroin; entry of heroin into the United States created detrimental effect here); *Rivard v. United States*, 375 F.2d 882, 886-87 (5th Cir. 1967) (same; "jurisdiction extends over all acts which take effect within the sovereign even though the author is elsewhere"); *United States v. Winter*, 509 F.2d 975, 980-82 (5th Cir. 1975) (jurisdiction over foreigners in drug smuggling conspiracy, even though neither they nor any contraband entered the U.S.); *United States v. Fernandez*, 496 F.2d 1294, 1296 (5th Cir. 1974) (forgery of stolen U.S. treasury checks in Mexico; acts prevented normal disbursement of funds to those entitled to them in the United States); *United States v. Cotten*, 471 F.2d 744, 745, 749 (9th

33

Cir. 1973) (jurisdiction justified because extraterritorial theft of government property affects sovereign); *Rocha v. United States*, 288 F.2d 545, 549 (9th Cir. 1961) (foreigner's false statements on visa applications abroad; fraudulent document used to gain entry into U.S. produced a "detrimental effect on the sovereignty of the United States"); *see also*, *e.g.*, *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (jurisdiction over drug trafficker justified under protective principle even though drugs did not enter U.S.; "drug trafficking presents . . . [a] threat to our nation's ability to function"); *Benitez*, 741 F.2d at 1316-17 (jurisdiction over foreigner who assaulted DEA agents and stole government property overseas justified under protective principle); *Birch*, 470 F.2d at 811-12 (counterfeiting, misuse of military passes overseas; jurisdiction justified under protective principle; "the national interest is injured by the falsification of official documents no matter where the counterfeit is prepared"); *United States v. Pizzarusso*, 388 F.2d 8, 9-11 (2nd Cir. 1968) (jurisdiction over foreigner who made false statement on visa application in foreign country justified under protective principle; such false statements are "an affront" to U.S. sovereignty and have a "potentially adverse effect" upon security or governmental functions).[8]

---

[8]     Although the "protective" and "objective territorial" principles are occasionally used interchangeably, leading commentators have observed that the former requires only potential harm to a country's interests, where the latter requires actual harm. *See* LaFave, *supra*, § 4.3(c); *e.g.*, *Peterson*, 812 F.2d at 493-94 ("drug trafficking may be prevented under the protective principle . . . without any showing of an actual effect on

34

These principles apply precisely to the prosecution of Hijazi. As alleged, his crime goes well beyond the irresponsibility of a dead-beat dad, the forgery of a few treasury checks, or a false statement on a visa application. Hijazi schemed to defraud the United States of millions of dollars. Far from conflicting with international law, this prosecution is commended by it.

## B. The Exercise Of Jurisdiction Is Also Reasonable.

Hijazi does not discuss (or even mention) these international principles, but skips straight to the list of considerations in Restatement § 403 that provides guidance on whether jurisdiction is "unreasonable" even if otherwise authorized. (d/e 133 pp.23-26) Contrary to his arguments, these considerations also favor the exercise of extraterritorial jurisdiction over him.

Contending that "all of Hijazi's alleged conduct took place in Kuwait," Hijazi cites the first § 403 factor – "the link of the activity to the territory of the regulating state" – as cutting against an exercise of jurisdiction here. (d/e 133 p.24) Putting aside the factual inaccuracy of his premise, Hijazi misreads the provision; it explains that an activity is "linked" to a regulating state's territory if it "has a substantial, direct, and foreseeable effect upon or in the territory." Restatement § 403(2)(a). A multi-million dollar fraud targeted and perpetrated

the United States").

35

against the United States surely fits that bill. Indeed, the Reporter's Note that

Hijazi relies upon (Note 8) cites with approval *United States v. Columba-Colella*,

604 F.2d 356, 358 (5th Cir. 1979), which speaks directly to the point:

> A country's . . . courts have jurisdiction to enforce criminal laws wherever and
> by whomever the act is performed that . . . directly interferes with [the
> country's] governmental operations. A state/nation is competent, for
> example, to punish one who has successfully defrauded its treasury, no
> matter where the fraudulent scheme was perpetrated.

*See id.* at 358-59 (invoking "protective theory" of international law). *See also*

Restatement § 403, Reporter's Note 8 (recognizing that criminal cases "involving

fraud" have been brought against aliens acting "wholly outside the United

States").

   As for the matter of international intrusiveness (d/e 133 p.25): this is simply

not a case where Kuwait's interest in Hijazi's crime outstrips (or even rivals)

ours. *See* Restatement § 403(2)(g). To the contrary, this fraud was committed

entirely against the United States, not against Kuwait or any Kuwaiti. The

Restatement, furthermore, recognizes that a nation may assert jurisdiction based

on an intended, substantial effect within its territory, even if the conduct is lawful

in the country where it was carried out. *See* § 402 cmt. d.; *see also Hartford Fire Ins.*

*Co. v. California*, 509 U.S. 764, 795-99 (1993) (notwithstanding protests from

Britain, and although alleged conduct "was perfectly consistent with British law

and policy," upholding U.S. jurisdiction over foreigners accused of

36

anticompetitive conduct in London, where conduct produced substantial adverse effect here); *United States v. Moncini*, 882 F.2d 401, 403, 405-06 (9th Cir. 1989) (jurisdiction proper over Italian who mailed child pornography into the United States even though conduct legal in Italy); *see also F. Hoffmann-La Roche v. Empagran*, 542 U.S. 155, 165 (2004) (while applying America's antitrust laws to "foreign conduct can interfere with a foreign nation's ability independently to regulate its own commercial affairs, . . . courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable . . . insofar as they reflect a legislative effort to redress *domestic* antitrust injury" caused by foreign anticompetitive conduct) (emphasis in original).

The fact that Hijazi is a foreign national also does not make the exercise of jurisdiction over him unreasonable, *see supra*, at 25-26 (collecting cases involving overseas aliens), and nothing in the Restatement says such prosecutions "will rarely be reasonable." (d/e 215 #1 p.31) Indeed, the "nationality principle" specially justifies jurisdiction based on a perpetrator's nationality, leaving the other principles to address the reasonable exercise of jurisdiction over non-nationals. *See Chua Han Mow*, 730 F.2d at 1311-12 (criminal laws may be applied to foreigners under any one of the other principles, including the principle that a person who acts outside the United States may be held to account for "producing detrimental effects within it.") (citations, quotations omitted).

37

Also, the "character" and "importance" of the anti-fraud provisions at issue here argue for, not against, the exercise of jurisdiction over Hijazi. Restatement § 403(2)(c); *see Cotten*, 471 F.2d at 749 ("this nation has a paramount interest in protecting its property"); *supra*, at 21-22 (collecting extraterritorial fraud-related cases). Again, Hijazi is not simply accused of causing "a Kuwait subcontractor to submit inflated invoices to a prime contractor . . . in Kuwait." (d/e 215 #1 p.3) He is accused of devising and executing a large-scale fraud against the United States itself.

So, too, the United States surely has a "justified expectation" that its procurement process will not be corrupted and its treasury looted, and Hijazi, for his part, cannot justifiably expect to defraud the United States with impunity. *See* Restatement § 403(2)(d). As for whether this prosecution is "consistent with the traditions of the international system," *id.* § 403(2)(f), (d/e 133 p.26), we note that *Bowman* has been on the books since 1922 and that it remains a clear statement of the United States's right to defend itself against such frauds, no matter where conceived or executed.[9]

_____

[9] Against the many cases upholding the reasonable exercise of extraterritorial jurisdiction (often over foreigners), Hijazi cites two that reference Section 403 for the contrary proposition. (d/e 133 p.24) The first, a civil tort case brought by two injured Americans against a Mexican hotel, is not about jurisdiction at all, but about choice-of-law principles. *See Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844-45 (7th Cir. 1999) (holding that Mexico's safety standards, not Illinois', should apply to Mexican hotels). In *United States v. Javino*, 960 F.2d 1137, 1142-43 (2d Cir. 1992), the court found it would

### C. Prosecution of Hijazi Comports with Due Process.

An extraterritorial prosecution violates a foreign defendant's Fifth

Amendment due process rights if it is "arbitrary or fundamentally unfair."

*Yousef*, 327 F.3d at 111-12; *United States v. Suerte*, 291 F.3d 366, 370-72 (5th Cir.

2002); *United States v. Perez Oviedo*, 281 F.3d 400, 403 (3rd Cir. 2002); *United States*

*v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999); *United States v. Davis*, 905 F.2d 245,

248-49 & n.2 (9th Cir. 1990). Courts differ somewhat – linguistically, if not

practically – on what that means: the Second and Ninth Circuits have, at least in

some cases, said "there must be a sufficient nexus" between the defendant and

the United States. S*ee Yousef*, 327 F.3d at 111-12; *Davis*, 905 F.2d at 248-49. Others

have rejected the "nexus" requirement; they appear instead to look to principles

of international law. *See Cardales*, 168 F.3d at 552-53 (no nexus required because

drug trafficking threatens the security of the United States and is universally

condemned); *accord United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3rd Cir.

1993); *Suerte*, 291 F.3d at 377; *cf. United States v. Shi*, 525 F.3d 709, 722-24 (9th Cir.),

*cert. denied*, 129 S.Ct. 324 (2008) (no nexus required in U.S. prosecution of

---

likely be unreasonable under § 403 to require all foreign gun manufacturers to comply
with the manufacturing requirements of the National Firearms Act. *See id.* at 1143
(suggesting, however, that analysis would come out differently had firearm been
imported into this country). Quite apart from the only superficial relevance of these
cases to ours, the weight of authority extending extraterritorial jurisdiction over
foreigners who bring harm to our shores provides the better guidance.

4:05-cr-40024-JBM-BGC   # 217   Page 40 of 59

foreigner who committed act of violence on foreign vessel).[10]

However framed, U.S. jurisdiction over Hijazi is not arbitrary or unfair, and it easily passes even the apparently more stringent "nexus" test. The relevant focus is on the conduct at issue. As the Ninth Circuit said, a sufficient nexus exists if the "attempted transaction is aimed at causing criminal acts within the United States." *Peterson*, 812 F.2d at 493; *see, e.g., Davis*, 905 F.2d at 249 (sufficient nexus where foreigner intended to smuggle contraband into United States); *Peterson*, 812 F.2d at 493-94 (same; no showing of actual effect in U.S. needed); *United States v. Khan*, 35 F.3d 426, 429 (9th Cir. 1994) (sufficient nexus when "the plan for shipping the drugs was likely to have effects in the United States"); *see also United States v. Mohammad-Omar,* 323 Fed. Appx. 259, 261-62 (4th Cir. 2009) (sufficient nexus where defendant's partner knew heroin he sold was destined for U.S.) (unpublished); *Yousef*, 327 F.3d at 112 (conspiracy to attack U.S. commercial airliners in southeast Asia; defendants intended to inflict injury on United States

---

[10]     Hijazi posits yet another test: that "there must be a 'substantial connection between the defendant and the forum' based on 'an action of the defendant purposefully directed toward the forum State.'" (d/e 133 p.28) (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 112 (1987)). Putting aside that *Asahi* is a civil case applying the Fourteenth (not Fifth) Amendment's due process clause, the language Hijazi quotes is not even part of the majority opinion, but the views of a plurality only. *See id.* at 103-04, 112; *id.* at 122 ("I see no reason .. . for the plurality to articulate 'purposeful direction' or any other test") (Stevens, White, Blackmun, JJ.) (concurring in judgment but disagreeing with plurality's reasoning). In any event, none of the cases involving an extraterritorial application of a criminal statute contains either a "substantial connection" or "purposeful contacts" test in its due process analysis.

and its citizens).

Hijazi is accused of both scheming and succeeding in defrauding the United States of millions of dollars. The United States obviously has a keen interest in prosecuting such frauds, and, just as obviously, Hijazi could reasonably anticipate "being haled into a U.S. court" for committing so serious a crime against our country. (d/e 133 p.29) Whether guided by a "nexus" test or principles of international law – which, as noted, also focus on a foreigner's harm to the United States or its interests – this prosecution satisfies due process. *See United States v. Tinoco*, 304 F.3d 1088, 1110 n.21 (11th Cir. 2002) ("compliance with the 'protective principle' of international law is sufficient to meet the requirements of due process because a statute that so complies is not arbitrary or fundamentally unfair"); *Cardales*, 168 F.3d at 553 (invoking "protective principle" in assessing whether due process satisfied); *Davis*, 905 F.2d at 249 n.2 (international law principles useful as a "rough guide" re: whether there is sufficient nexus between defendant and United States). As Judge Hand said many years ago:

> It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which that evil is the fruit.

*United States v. Steinberg*, 62 F.2d 77, 78 (2nd Cir. 1932) (mail fraud from Canada); *see also United States v. Reumayr*, 530 F.Supp.2d 1212, 1223 (D.N.M. 2008) ("While

many defendants argue that extraterritorial application of U.S. law violates their

Fifth Amendment due process rights, it appears that no federal court has

invalidated the extraterritorial application of U.S. law on due process grounds.").

## IV.   Neither the Military Extraterritorial Jurisdiction Act Nor the U.S.-Kuwaiti Defense Cooperation Agreement Precludes U.S. Jurisdiction Over Hijazi.

Hijazi claims that the Military Extraterritorial Jurisdiction Act of 2000

("MEJA"), which creates federal jurisdiction over civilians who commit felonies

"while employed by or accompanying the Armed Forces outside the United

States," 18 U.S.C. § 3261(a), precludes the United States from exercising

jurisdiction over him. (d/e 133 pp.15-17) He also claims that the U.S.-Kuwait

Defense Cooperation Agreement ("DCA") likewise prohibits this prosecution.

(d/e 133 pp.17-21) He is mistaken on both scores.

### A. The MEJA Has No Bearing On This Case.

The short answer to Hijazi's MEJA claim is that it is beside the point: Hijazi is

charged under the Major Fraud Act and wire fraud statute, not MEJA. Whether

MEJA applies extraterritorially to him (or not) simply does not bear on whether

the charging statutes do.

Historically, civilians accompanying our armed forces overseas were, like

them, subject to court martial for crimes committed in host countries. In a series

of cases, however, the Supreme Court held it unconstitutional to subject civilians

42

to courts-martial jurisdiction because such proceedings do not provide many rights (like jury trials) guaranteed under the Constitution. *See, e.g., Reid v. Covert*, 354 U.S. 1 (1957); *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281 (1960). The result was a "jurisdictional gap": because many U.S. statutes prohibiting crimes like rape, robbery, arson, assault and murder do not apply extraterritorially, civilians who committed these crimes abroad went unpunished. For example, in *United States v. Gatlin*, 216 F.3d 207, 209-10 (2d Cir. 2000), the court held that a U.S. military spouse who sexually abused his teenage step-daughter at a military base in Germany could not be prosecuted in a U.S. court because the abuse statute, 18 U.S.C. § 2243(a), did not apply extraterritorially. *See id.* at 221-23 (urging Congress to close jurisdictional gap illustrated by dismissal of Gatlin's indictment).

In response to such cases, Congress enacted the MEJA. *See* H.R.Rep.No. 106-778(I), at 9 (2000) ("House Report") (citing *Gatlin*) (available at 2000 WL 1008725). It provides that:

> Whoever engages in conduct outside the United States that would constitute [a felony] if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States . . . while employed by or accompanying the Armed Forces outside the United States . . . shall be punished as provided for that offense.

18 U.S.C. § 3261(a). Although the statute applies both to U.S. citizens and certain

foreign nationals, *see* House Report, at 4, its driving impulse was to extend U.S. criminal jurisdiction over the increasing numbers of American civilians employed by or otherwise accompanying our military overseas. *See*, *e.g.*, *id.* at 7 (each year, numerous crimes "committed by American civilians abroad go unpunished"); *id.* at 8 (noting calls for legislation "to extend criminal jurisdiction over U.S. citizens accompanying the forces overseas"); *id.* at 10 ("'The inability of the United States to . . . hold its citizens criminally accountable for offenses committed overseas has undermined deterrence, lowered morale, and threatened good order and discipline in our military communities overseas'") (quoting Defense Department testimony); *see also* Glenn R. Schmitt, *Closing the Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad – A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000*, 51 Cath.U.L.Rev. 55, 131 (2001) ("there was very little discussion during the drafting, the public hearings, or the floor debate" about MEJA's applicability to foreign nationals).

Hijazi, thus, is not the sort of civilian the MEJA meant to reach, and his crime does not fall within the "jurisdictional gap" the statute aimed to close. As discussed, Hijazi's fraud is already within the U.S.'s jurisdiction, either territorially (because it was partly committed here) or extraterritorially (under the Major Fraud Act per *Bowman*, and the "foreign commerce" provision of the

44

wire fraud statute). *See also Gatlin*, 216 F.3d at 223 (recognizing that statutes criminalizing offenses against the United States already apply extraterritorially).

MEJA's sweep, furthermore, is broad: it would cover a felony assault on the streets of Baghdad or a robbery in Kuwait City. That it excludes citizens or residents of a host nation from its reach, *see* 18 U.S.C. §§ 3267(1)(C), (2)(C), thus makes good sense, both in deference to the host country and in recognition of that country's stronger interest in prosecuting such crimes committed by its own citizens. *See* House Report, at 21. But that exclusion does not mean the statute places Hijazi's fraud against the United States off-limits to our courts or that it somehow revokes or curtails jurisdiction elsewhere authorized by the fraud statutes.

## B.  The U.S.-Kuwait Defense Cooperation Agreement Is Also Inapposite.

As Hijazi notes (d/e 133 p.17-18), the United States and Kuwait entered into a Defense Cooperation Agreement ("DCA"), a type of Status of Forces Agreement ("SOFA") typically made between the United States and a nation that receives our forces overseas. Although Hijazi has not seen the DCA – it is a classified document to which he has no right of access – he claims that it bars the United States from exercising jurisdiction over him. (d/e 133 pp.18-19) Hijazi is incorrect: nothing in the DCA precludes or even discourages this prosecution. To permit this court to see for itself that Hijazi's DCA claim is meritless, we can

arrange for the classified document to be available to the court, ex parte and under seal. Although we cannot disclose anything about the substance of the document in this public filing, we make these brief observations about several of Hijazi's related arguments.

First, and most basically: as with the MEJA, we are not purporting to exercise jurisdiction over Hijazi on the basis of the DCA, but under established principles of U.S. and international law. Whether or not the DCA grants jurisdiction over Hijazi is thus immaterial.

The Kuwaiti Ambassador asserts that the DCA prevents this prosecution. (d/e 133 p.19 & Appendix B) We respectfully disagree. In his correspondence, the Ambassador maintains that the United States lacks jurisdiction because Hijazi's subcontract for the fuel tankers "was between two private companies operating in Kuwait, not a contract with the U.S. Government." (d/e 133-2 p.7) He also contends the prosecution is "factually incorrect" because "[n]o inflation of prices happened on [the Hijazi] contract." (d/e 133-2 p.7 ("the underlying facts do not support the indictment")). We disagree both as a matter of law – as noted, the Major Fraud Act covers not just direct contracts with the United States, but subcontracts like Hijazi's – and fact. It might well be Hijazi's position that the $5 million-plus subcontract price was not inflated over his initial $1,673,100 bid. Or he might even try to profess ignorance about the purpose of the fuel tankers and

46

services he was providing at the Kuwaiti airport. (*See* d/e 59 ¶11) (airport used by the U.S. military for military operations). But these are matters for another day. At this point, the court's jurisdiction must be based not on what Hijazi might argue or what a jury may find, but on what the indictment alleges. And here, the indictment charges that Hijazi and Mazon intentionally schemed to defraud the United States of millions of dollars and that they took action in this country in furtherance of the scheme. Nothing in the DCA remotely prohibits the exercise of U.S. jurisdiction over such a claim.[11]

## V. Hijazi's Speedy-Trial Right Has Not Been Violated, and Dismissal Under Fed. R. Crim. P. 48(b) Is Unwarranted.

We anticipate that Hijazi will not dispute the following facts (*see, e.g.,* d/e 175 pp.14-15):

---

[11]     The apparently contrary view of a former Defense Department executive (d/e 133-2 pp.10-11) seems to be based on either a failed memory about the DCA or ill-informed assumptions about the facts of this case.

Moreover, regardless of whether the DCA is modeled after the NATO SOFA (again, we cannot publicly comment), Hijazi mischaracterizes the pertinent provisions of the NATO SOFA. Contrary to his representation, it in no way "expressly prohibits the exercise of sending state jurisdiction over local citizens" (d/e 133 p.19), but simply makes clear that it does not create any new bases for such jurisdiction. *See* NATO SOFA Art. VII, ¶ 4 (agreement's jurisdictional provisions do "not imply any right for the military authorities of the sending State to exercise jurisdiction over persons who are nationals of or ordinarily resident in the receiving State . . ."). There is, of course, substantial difference between prohibiting jurisdiction and not creating new bases for it. Hijazi's reading of the NATO SOFA is inaccurate, as is his speculation about the DCA.

47

Hijazi was first indicted in March 2005. He appeared before Kuwaiti authorities in April 2005 and was released on bond. That same month, the United State directed INTERPOL, the International Criminal Police Organization, to issue a "red notice" on Hijazi. The notice calls on member nations to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the United States. The red notice was published in October 2005 and remains active. *See* http://www.interpol.int/public/Data/Wanted/Notices/Data/2005/67/2005_1 6467.asp.

Although the United States has no extradition treaty with Kuwait, the Justice Department prepared a request in August 2005 for Hijazi's lawful return to the United States. Our embassy in Kuwait formally presented the request to the Government of Kuwait in September 2005. In a series of communications between the Department and the Kuwaiti Ambassador, the Government of Kuwait protested Hijazi's prosecution and said it will not extradite him. *See* d/e 133-2 pp.4-5, 7-8. Hijazi filed his dismissal motion based on his speedy-trial right on September 3, 2008. (d/e 174)

**A. The Government Has Not Violated Hijazi's Right To A Speedy Trial.**

Because it is "impossible to determine with precision when the right has been denied[,] . . . any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407

48

U.S. 514, 521-22 (1972). This analysis requires the balancing of four factors: the length of the delay; the reason for the delay; the defendant's assertion of his speedy-trial right; and prejudice to the defendant. *Id*. at 530.

We agree that, in light of the nearly five years that have passed since Hijazi's original indictment, an inquiry into the other three *Barker* factors is in order. *See United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007) (first factor, length of delay, "acts as a triggering mechanism"; delay approaching one year prompts full review of *Barker* factors); *see also Doggett v. United States*, 505 U.S. 647, 656 (1992) ("presumptive prejudice" created by lengthy delay "cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria"); *Garcia Montalvo v. United States*, 862 F.2d 425, 426 (2nd Cir. 1988) ("[w]here there is a reasonable explanation for a delay, its negative implications will be vitiated"). Contrary to Hijazi's arguments (d/e 175 pp.8-18), the remaining *Barker* factors all cut against his claim.

### 1. That Hijazi Remains In A Country From Which He Cannot Be Extradited Justifies The Delay In Bringing Him To Trial.

The second *Barker* factor – reason for the delay – is typically the centerpiece of a speedy-trial claim. *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986) (factor is "the flag all litigants seek to capture"). After indicting a defendant, the government has a "duty to make a diligent, good-faith effort" to bring him to

49

trial. *Smith v. Hooey*, 393 U.S. 374, 383 (1969). It has done so here: we immediately directed INTERPOL to issue a "red notice" for Hijazi's arrest and extradition; we formally requested his lawful return from Kuwait; and we engaged in a dialogue with the Kuwaitis about Hijazi's prosecution. The Kuwaitis, however, have steadfastly refused to turn Hijazi over. As the Seventh Circuit and other courts have recognized, where even lengthy delays are caused by our country's inability to extradite an overseas defendant, the delay is counted against him, not the government. *See United States v. Ocampo*, 266 Fed.Appx. 63, 64-65 (2nd Cir. 2008) (second *Barker* factor "weighs heavily in favor of the government" where nine-plus year delay between indictment and arrest due to government's inability to extradite; government acted diligently by entering information about defendant in various databases to ensure arrest if he traveled to U.S.); *United States v. Corona-Verbera*, 509 F.3d 1105, 1115-16 (9th Cir. 2007) (eight-year delay weighs against defendant where government tried to locate and extradite him, but extradition futile); *United States v. Tchibassa*, 452 F.3d 918, 925-26 (D.C. Cir. 2006) (defendant mainly to blame for 11-year delay because he continued to reside in a country from which he could not be extradited); *United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992) (delay due to impossibility of extradition not government's fault; "the government is not duty-bound to pursue futile legal gestures to return the defendant for trial"); *Garcia Montalvo*, 862 F.2d at 425

50

(eight-year delay "undeniably reasonable," given inability to extradite and lodging of warrant with foreign authorities); *United States v. Blanco*, 861 F.2d 773, 778 (2nd Cir. 1988) (government not to blame for delay caused by futility of extradition); *United States v. Diacolios*, 837 F.2d 79, 82-84 (2nd Cir. 1988) (same); *see also United States v. Reumayr*, 530 F.Supp.2d 1200, 1206 (D.N.M. 2007) ("courts have uniformly held the defendant, rather than the government, liable for delay caused by extradition proceedings or by other attempts to remain outside the United States").

Hijazi may be, as he claims, under no obligation to come to the United States to face these charges. But he cannot both stay beyond our reach and at the same time complain that we have not tried him fast enough. As one court recently noted, the right to resist extradition is at odds with the right to a speedy trial, and a defendant must "choose between the two." *Reumayr*, 530 F.Supp.2d at 1207 (defendant not denied speedy trial where he resisted government's efforts to extradite him). That Hijazi may not be a fugitive is irrelevant: by living in a country that refuses to extradite him, he is as unavailable to us as if he were in hiding or on the run. *Cf. Blanco*, 861 F.2d at 779 ("A person can be said to be a fugitive when, while abroad, they learn they are under indictment and make no effort to return to the United States to face charges"); *see Reumayr*, 530 F.Supp.2d at 1206 n.6 ("Whether or not a defendant is a fugitive, he cannot be allowed to

51

first resist efforts to bring him to trial in this country, and then turn around and

try to use the delay caused by that resistance as a reason to dismiss the charges").

Hijazi is also nothing like the defendant in *Doggett* (d/e 175 p.17) who, though

initially residing abroad, lived openly in Virginia for six years before the

government discovered him through a credit check. *See* 505 U.S. at 652-53 (had

government tried, it "could have found [Doggett] within minutes").[12]

   Also, the government did not merely write a pro forma letter requesting

Hijazi's extradition, but made the request to the Government of Kuwait through

formal channels, and additionally sought his arrest and extradition through the

INTERPOL community. Given the Kuwaiti government's strong resistence to our

request, we cannot be faulted for declining to make further overtures that would

obviously fall on deaf ears. *See United States v. Walton*, 814 F.2d 376, 379-80 (7th

Cir. 1987) (government was diligent, despite failure to formally request

extradition, where in response to informal inquiries, foreign officials indicated

they would not extradite defendant); *see also United States v. Hooker*, 607 F.2d 286,

289 (9th Cir. 1979) (not for court to judge wisdom or prudence of negotiating

---

[12]      Further contrary to Hijazi's argument, *United States v. Ingram*, 446 F.3d 1332 (11th
Cir. 2006), does not hold that absent a showing of intentional evasion, any delay caused
by a defendant's absence from a jurisdiction cannot be attributed to him. The court
merely found that any finding of evasion was clearly erroneous in that case, since the
defendant did not even know he was under indictment. *Id.* at 1337-38. In any event, to
say that a defendant who actively evades law enforcement is accountable for the delay
is not to say that anything short of active evasion counts against the government.

with another country for surrender of defendant).

### 2.    Hijazi Has Not Genuinely Demanded A Speedy Trial.

A defendant's failure to invoke his speedy-trial right "will make it difficult for [him] to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532; *see also Doggett*, 505 U.S. at 653 (non-assertion "weigh[s] heavily" against defendant). And as the Seventh Circuit recognized, "the quality of the defendant's assertion of the right" is entitled to "significant weight." *Oriedo*, 498 F.3d at 597; *see Barker*, 407 U.S. at 529, 531 (courts to assess "frequency and force" of objections and "whether and how" defendant asserts his right); *Oriedo*, 498 F.3d at 601 (defendant "did not unambiguously or consistently assert" the right).

Here, Hijazi first asserted his right to a speedy trial in a footnote to his memorandum in support of his second motion to dismiss the indictment, which motion he filed in December 2007, more than two-and-a-half years after indictment. (d/e 133 p.30 n.6 ("Defendant wishes to make clear . . . that he is asserting his right to a speedy trial in this matter.")) That perfunctory note does not evince a genuine request for a quick trial. *See United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 809 (7th Cir. 1984) ("pro forma demand for trial" is "entitled to no weight"); *see also Loud Hawk*, 474 U.S. at 314 (any assertion of right "must be viewed in light of [defendant's] other conduct").

At every turn, Hijazi has tried to avoid a trial – not to speed one up. He has

vigorously moved to dismiss the indictment from overseas and has steadfastly refused to subject himself to U.S. jurisdiction. As between the right to resist extradition and to a speedy trial, Hijazi has made his choice clear. *See United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992) (third *Barker* factor weighs against defendant who made no attempt to "waive extradition or to otherwise seek to return to the United States for trial"); *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995) (defendant cannot complain of delay where he knew of indictment and resisted extradition; "[defendant] could have avoided any post-indictment delay by returning to the United States"); *Blanco*, 861 F.2d at 779-80 ("Blanco clearly made no effort to return to the United States to face charges"); *United States v. Bagga*, 782 F.2d 1541, 1545 (11th Cir. 1986) (defendant not denied speedy trial right where, "instead of returning [to the United States] or indicating a desire for a speedy trial, he remained in India"); *see also Fairman*, 750 F.2d at 809 (filing motion to dismiss on speedy trial grounds did not evince desire for speedy trial; could "equally well have meant simply that [defendant] saw a way to get the case dismissed on the basis of previous delay"); *accord Loud Hawk*, 474 U.S. at 655-56.

Again, Hijazi may not be obligated to "bring himself to trial." *Barker*, 407 U.S. at 526. But he cannot have it both ways – and, here, rather than assert his speedy-trial right, Hijazi has made clear that he "ha[s] no interest in a trial, speedy or

4:05-cr-40024-JBM-BGC   # 217   Page 55 of 59

otherwise." *Blanco*, 861 F.2d at 780.

    **3.**    **Hijazi Has Not Demonstrated The Requisite Prejudice.**

    Where, as here, delay has not been caused by government negligence or bad faith, a defendant cannot prevail on a speedy trial claim without showing "specific prejudice to his defense." *Doggett*, 505 U.S. at 656; *see also Loud Hawk*, 474 U.S. at 315 ("possibility of prejudice is not sufficient"); *Corona-Verbera*, 509 F.3d at 1116 (even with lengthy delay, prejudice not presumed; defendant must "demonstrate specific prejudice"); *Manning*, 56 F.3d at 1194 (defendant's burden to "prove actual prejudice is a heavy one"); *accord Tchibassa*, 452 F.3d at 927; *Blanco*, 861 F.2d at 780; *Fairman*, 750 F.2d at 810; *cf. Ingram*, 446 F.3d at 1336 (defendant need not show actual prejudice if first three *Barker* factors weigh heavily against government).

    Hijazi does not attempt to show how his defense has been impaired by the trial delay. *See Doggett*, 505 U.S. at 654 (most serious form of prejudice is loss of ability to present defense due to dimmed memory and lost evidence). Indeed, such a showing would be particularly hard for Hijazi to make in light of the trials of his co-conspirator, Mazon. *See United States v. Marquez-Charry*, 1997 WL 208403, at *2 (N.D.Ill. 1997) (prejudice minimal since defendant's co-conspirators had already been tried; "the trial record diminishes the possibility of prejudice . . . since key witness testimony and memories are preserved").

55

The government, also, should not be held to account for whatever personal and financial harm Hijazi has suffered as a result of unresolved charges that he himself refuses to answer. *See United States v. Wanigasinghe,* 545 F.3d 595, 599 (7th Cir. 2008), *cert. denied*, 129 S.Ct. 1599 (2009) (if defendant "suffered anxiety because of the charges hanging over his head . . . he could easily have turned himself in to resolve the matter"); *Manning*, 56 F.3d at 1195 (defendant who resists extradition cannot complain about delay); *see also United States v. Ward*, 211 F.3d 356, 361 (7th Cir. 2000) (general allegations of stress and anxiety constitute only minimal prejudice when unenhanced by impairment in presenting defense) (citing *United States v. Jackson*, 542 F.2d 403, 409 (7th Cir. 1976)).

On balance, the totality of the circumstances – including the government's efforts to extradite Hijazi, his obvious resistence to trial (speedy or otherwise), and the lack of specific prejudice – weigh decidedly against the "severe remedy" of dismissing the indictment. *Loud Hawk*, 474 U.S. at 317.

**B. Dismissal Under Rule 48(b) Is Unwarranted.**

Under Federal Rule of Criminal Procedure 48(b), a district court may dismiss an indictment "if there is unnecessary delay in bringing a defendant to trial." Although Rule 48(b) is not limited by the Sixth Amendment speedy-trial right, it is driven by the same general considerations. *Ward*, 211 F.3d at 361-62. The Rule is particularly focused on whether any trial delay is the government's fault – and,

56

in general, dismissal is appropriate only where delay is "purposeful or oppressive." *Id.* at 362 (quoting *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 739 (9th Cir. 1989)); *see also United States v. Yuan Qing Jiang*, 214 F.3d 1099, 1101 (9th Cir. 2000) (to dismiss under Rule, court must find prosecutorial misconduct and actual prejudice). Dismissal under Rule 48(b) is a particularly harsh remedy, warranted only in "extreme circumstances." *Qing Jiang*, 214 F.3d at 1101.

For much the same reasons, Hijazi's Rule 48(b) motion is as meritless as his speedy-trial claim: the government has diligently pursued extradition; Hijazi determinedly refuses to be tried; and he has failed to adequately demonstrate prejudice. If anyone here is acting "purposefully," it is Hijazi, and any oppression he has suffered because this case remains unresolved is of his own making. The government asked that Hijazi's dismissal motions be held until arraignment not to delay a trial, but to simply ensure a two-sided contest.

If a speedy trial is what Hijazi wants, he should come to court. We are prepared to try him right away. The key to resolution of Hijazi's case is in his hands.

## CONCLUSION

For the reasons presented in this pleading, the United States of America respectfully asks this court to deny Hijazi's motions to dismiss the indictment.


Respectfully submitted,

JEFFREY B. LANG
ACTING UNITED STATES ATTORNEY

s/ Joseph H. Hartzler
Assistant United States Attorney
318 South Sixth Street
Springfield, IL  62701
Telephone:  (217)  492-4450
Fax:  (217)  492-4512

## CERTIFICATE OF SERVICE

I hereby certify that on <u>February 1, 2010</u>, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following:

> H. Christopher Bartolomucci
> Thomas L. McGovern III
> Dominic F. Perella
> HOGAN & HARTSON L.L.P.
> 555 Thirteenth Street, N.W.
> Washington, D.C. 20004
>
> Vincent J. Connelly
> Zaldwaynaka Scott
> Dana S. Douglas
> MAYER BROWN L.L.P.
> 71 South Wacker Drive
> Chicago, IL 60606

> s/ <u>Joseph H. Hartzler</u>
> Assistant United States Attorney
> 318 South Sixth Street
> Springfield, IL 62701
> (217) 492-4450
> Fax: (217) 492-4044