**E-FILED**
Friday, 07 May, 2010  09:54:30 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-CR-40024 |
| | ) | |
| ALI HIJAZI, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This case is before the Court for a Report and Recommendation on Defendant's motions to dismiss (d/es 15, 131, 174)  the indictment against him.  For the reasons below, the Court recommends that the motions be denied.

### Background

On March 16, 2005, the U.S. Government ("Government") charged Defendant Ali Hijazi ("Hijazi") and Jeff Mazon ("Mazon") with counts under the Major Fraud Act, 18 U.S.C. § 1031(a), the wire fraud statute, 18 U.S.C. § 1343, and the aiding and abetting statute, 18 U.S.C. § 2.  A superseding indictment was filed August 3, 2006.  (d/e 59).

The superseding indictment alleges that Hijazi and Mazon "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait."  (d/e 59, ¶ 1).  In particular, the U.S. Army Operations Support Command entered into a prime contract with Kellogg Brown and Root Services, Inc. ("KBR"), to provide property and services to the U.S. military throughout the world.  Id. ¶ 7.  One of KBR's tasks was to provide for the storage and dispensation of fuel at an airport in Kuwait used by the U.S. military.  Id. ¶ 11.  KBR estimated the cost of this task at $685,080.  Id. ¶ 20.  To accomplish the task, KBR, through Mazon (its procurement employee), solicited bids from Kuwaiti companies.  Mazon was stationed in Kuwait and responsible for negotiating, executing and administering subcontracts under the prime contract.

Hijazi is a resident of Kuwait and was the managing partner of LaNouvelle General Trading and Contracting Co., a Kuwaiti company ("LaNouvelle").  Hijazi, through LaNouvelle, submitted a bid to Mazon of about $1,673,100.  A different company submitted a bid for about $1,891,890.  Id. ¶ 21.  Upon receiving the bids, Mazon allegedly inflated both bids, raising LaNouvelle's bid to over 5 ½ million dollars, and raising

the other company's bid to over 6.2 million dollars.  Id. ¶ 22.  LaNouvelle's

inflated bid was more than $4.8 million more than KBR's estimate for the

work, and more than $3.8 million more than its original bid.

Mazon picked LaNouvelle's "lower" bid, awarding the subcontract to

LaNouvelle in February 2003, for approximately $ 5 ½ million.  "Mazon and

Hijazi signed the subcontract, knowing that the subcontract price was

inflated and that Hijazi would pay Mazon money for Mazon's favorable

treatment of LaNouvelle."  Id. ¶ 16.

"From in or about March 2003 through in or about August 2003,

Mazon and Hijazi caused LaNouvelle to submit six different invoices to

KBR for payment under the" inflated subcontract.  Id. ¶ 27.  Mazon and

Hijazi then allegedly caused KBR to send four invoices to the Government,

and the Government paid those invoices in September and December

2003.  Id. ¶ 27. [1]

"In or about September 2003, Hijazi gave a $1 million draft to Mazon

in exchange for Mazon's favorable treatment of LaNouvelle.  Mazon and

Hijazi also executed a promissory note as a ruse to make the $1 million

---

[1]The indictment is silent as to whether the U.S. actually paid the entire $5.5 million to KBR.  Hijazi contends that no "lasting financial loss" was suffered because KBR "'reversed' the charges relating to the subcontract after 'discovering' the alleged fraud." (d/e 222, p. 21 n. 9).

payment appear to be a $1 million loan from Hijazi to Mazon." Id. ¶ 28.

Hijazi sent an e-mail to Mazon's employee account on September 24,

2003, characterizing "this whole lown [sic] (principal and interest) as totally

your money. . . ." Id. ¶ 29.  On or about October 1, 2003, Mazon allegedly

tried unsuccessfully to deposit the money in a U.S. bank.  Id. ¶ 30.  On

October 9, 2003, Hijazi sent an e-mail to Mazon's personal account,

imparting advice on how to deposit the funds: Hijazi allegedly told Mazon to

open three different offshore accounts and deposit about $300,000 in each,

stating that the money was from "consultancy work, business assoicates

[sic], salaries abd [sic] bonuses, or any other reasoning."  Id. ¶ 31.  Later

that month, Mazon tried again to deposit the money in a U.S. financial

institution, but the indictment is silent on whether that attempt was

successful.  Id. ¶ 32.

   In November 2003, a KBR investigator questioned Hijazi about the

subcontract.  Id. ¶ 33.  The next day Hijazi sent an e-mail to Mazon's

personal account stating, "Please when you call your ex-friends in kuwait

[sic] please be very carreful [sic] on what you say."  Id. ¶ 33.

   The superseding indictment, filed in August 2006, charges Hijazi and

Mazon with scheming to defraud the U.S. Government, in violation of the

Major Fraud Act, 18 U.S.C. § 1031, and with wire fraud based on the same scheme, 18 U.S.C. §§ 2, 1343.  The U.S. payments to KBR form the basis for four counts under the Major Fraud Act.  Mazon's four e-mails to and from KBR relating to the subcontract, and two wires directing payment to KBR form the basis for the five counts of wire fraud.

Mazon has been tried twice on these charges, each time the jury was unable to reach a verdict.  (d/e 217, p. 2).  In March 2009, the Government reached a plea agreement with Mazon.  Mazon pleaded guilty to a misdemeanor count for making a writing containing a false statement, and in return all the fraud charges against him were dropped.  U.S. v. Mazon, 05-cr-40024 (C.D. Ill., Judge McDade, plea agreement, d/e 210).  In the plea agreement, Mazon stipulated that he had created a "memorandum of record" for the KBR subcontract file which falsely stated that Mazon had obtained approval from the project manager when, in fact, Mazon had "knowingly and intentionally failed to inform . . [the project manager] that the amount of Subcontract 39 was nearly five million U.S. Dollars higher than the original KBR estimate."  Id. ¶ 14.  None of the original fraud allegations in the indictment were included in the stipulation, and the agreement does not require Mazon to testify against Hijazi.

Despite its inability to convict Mazon, the Government continues to pursue Hijazi's prosecution.  Hijazi's prosecution, however, is at a standstill because the Government has been unable to obtain his appearance in the U.S.  Hijazi remains in Kuwait, which has no extradition treaty with the U.S. Hijazi did voluntarily surrender himself to the authorities in Kuwait in April 2005, but he was released and posted bond was returned to him.  (d/e 133, p.2).  That same month, the U.S. directed the International Criminal Police Organization (INTERPOL) to issue a "red notice" on Hijazi, which "calls on member nations to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the U.S." (d/e 217, p. 48).  Several months later, in September 2005, the U.S. Government made a formal request to the Kuwaiti Government to turn over Hijazi, but Kuwait, through its Ambassador, refused and instead demanded that the charges against Hijazi be dropped.   Kuwait has requested in writing at least four times that the U.S. drop the charges against Hijazi, arguing that the U.S. has no jurisdiction to prosecute Hijazi for conduct which occurred entirely in Kuwait. (d/e 180-1, Appendix B &C, letters from Kuwait Ambassador to

Deputy Assistant Attorney General; d/e 161-1, Ex. A (same); d/e 33 in

7th Circuit Appeals case 08-3060 (communication from Kuwait's Minister of

Justice)).

After the indictment, Hijazi hired U.S. counsel and filed motions to

dismiss the indictment.  The District Court declined to rule on those

motions until Hijazi appeared before the Court for arraignment.  Hijazi then

filed a petition for mandamus with the Seventh Circuit Court of Appeals,

seeking a ruling on the motions.  The Court of Appeals granted the petition

on December 11, 2009, directing the District Court to rule on Hijazi's

motions to dismiss.  U.S. District Judge McDade referred the motions to the

undersigned on December 17, 2009.  Supplemental briefs at the District

Court level pursuant to the order of the undersigned were filed February 1,

2010 (d/e 217) and March 19, 2010 (d/e 222).  Supplemental issues were

addressed by the parties as ordered by the Court (see d/es 223 through

228) with the last filing on April 29, 2010.  The motions are now fully

briefed.  The case is now before this Court for a recommendation on those

motions.

## Analysis

**I.**     **Hijazi's alleged role in the scheme to defraud the U.S. is enough to permit his criminal prosecution in the U.S.  His prosecution is permissible because part of the scheme to defraud the U.S. took place in the U.S., and, in any event, the scheme was intended to and did produce injury to the U.S.**

    **A.**     **Hijazi's role in the scheme should not be viewed in isolation.**

Hijazi contends that all of his alleged conduct took place in Kuwait, outside the reaches of U.S. criminal law**.**  It is undisputed that Hijazi is a resident of Kuwait, a citizen of Lebanon, and his only trip to the U.S. occurred in 1993.  (d/e 222, p. 3).  The Government also does not dispute that LaNouvelle is a Kuwaiti company, and that the U.S. was not a party to the subcontract between KBR (a U.S. Company) and LaNouvelle.  Id.

Hijazi did send three electronic mails ("e-mails") to Mazon's e-mail accounts, which the Government maintains were "located in the United States." (Superseding indictment, d/e 59, ¶¶ 29, 31).  Mazon opened two of those e-mails in Greece, and one of the e-mails in the U.S.

The U.S. argues that it is not necessary to decide whether those e-mails alone were enough to allow criminal prosecution of Hijazi, because all the acts taken in furtherance of the scheme to defraud are relevant, including those taken by Mazon in the U.S. and the wire payments by the

U.S. Government to KBR.  In support of this argument, the U.S. cites cases

holding that an overt act in the U.S. to further a criminal conspiracy is

enough to prosecute all co-conspirators, even those who did not take

action in the U.S.  *See, e.g.,* Ford v. U.S., 273 U.S. 593 (1927)(allowing

criminal prosecution of British citizens for conspiracy to import liquor where

overt acts were taken in U.S. in furtherance of conspiracy); U.S. v.

Schmucker-Bula, 609 F.2d 399, 402 (7th Cir. 1980)(co-conspirator's mailing

of cocaine to Chicago enough to establish criminal jurisdiction over

defendant, even though defendant himself took no actions directed at

U.S.); U.S. v. Inco Bank & Trust Corp., 845 F.2d 919 (11th Cir. 1988)

(Cayman bank could be criminally prosecuted for money laundering, even

though bank took no overt actions in U.S., where conspiracy occurred

partly in U.S.).  These cases upheld the prosecutions without relying on

extraterritorial principles.

    The Court agrees with the Government.  Hijazi's conduct should not

be viewed in isolation, but instead in context of the overall scheme to

defraud the U.S. Government, part of which indisputably occurred in the

U.S.[2]  The indictment alleges that Hijazi and Mazon, in a scheme to

defraud the U.S., signed a subcontract with inflated prices, "caused

LaNouvelle to send inflated invoices to KBR . . . and to receive payment

from KBR," "caused KBR to submit inflated invoices to the United States

Government," and,  "caused the United States Government to pay the

inflated invoices submitted by KBR."  (d/e 59 ¶¶ 16-18).  The U.S.

payments and Mazon's e-mails were a part of that scheme, attributable to

Hijazi because he was allegedly a participant in the scheme.  Whether

those allegations can be proven beyond a reasonable doubt is subject to

speculation, but the allegations are clearly sufficient to allow Hijazi's

prosecution.

The fact that Hijazi was not formally charged with conspiracy does

not detract from the allegations that Hijazi schemed with Mazon to submit a

---

[2]Since the Government does not make the argument, the Court makes no recommendation regarding whether these three e-mails, standing alone without reference to the overall scheme to defraud, are sufficient U.S. contacts to permit Hijazi's prosecution.  The Court does point out, however, that Mazon did open one of those e-mails in the U.S., and, in any event, Hijazi arguably should have reasonably foreseen that sending an e-mail to a U.S. citizen's work or personal account was likely to involve contacts in or with the U.S., regardless of where the e-mail was opened.  The Court also believes, contrary to Hijazi's arguments, that the e-mails did "advance the alleged fraud" (d/e 215, Ex. 1 p. 23) because they coordinated the $1 million alleged kick back and created inferences of attempts to cover up. _See_ U.S. v. Lanas, 324 F.3d 894, 902 (7th Cir. 2003); U.S. v. LeDonne, 21 F.3d 1418, 1430 (7th Cir. 1994)("Communications which occur after the defendant has obtained the victims' money or property are in furtherance of the fraudulent scheme if they facilitate concealment or postpone investigation of the scheme.").

fraudulent bid to KBR, with the ultimate purpose of passing those fraudulent charges on to the U.S. Government.  *See* U.S. v. Dick, 744 F.2d 546, 552 (7th Cir. 1984)(defendant can be held accountable for mailings of a different defendant in scheme to defraud, "'whether or not he knew of or agreed to any specific mailing.'")(no separate conspiracy count)(citation omitted).; U.S. v. Wormick, 709 F.2d 454, 461 (7th Cir. 1983)(defendant's actions in mail fraud scheme should not be viewed "in isolation, . . . [but] examine[d] . . . in the context of the scheme as a whole"); U.S. Wilson, 506 F.2d 1252, 1257 (7th Cir. 1974)("It is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy."); U.S. v. Stapleton, 293 F.3d 1111, 1117 (9th Cir. 2002)("knowing participant in a scheme to defraud is vicariously liable for substantive acts of mail fraud or wire fraud committed by co-schemers."); U.S. v. Black, 469 F.Supp.2d 513, 536 (N.D. Ill. 2006)("'evidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy'")(quoted cite omitted).  Hijazi's actions are properly viewed as an important part of the overall scheme to defraud hatched by both Hijazi and Mazon, some of which indisputably occurred in the U.S.

Without Hijazi's agreement to sign the subcontract with inflated prices and submit inflated invoices to KBR, the scheme could not have occurred.

### B. The Major Fraud Act and the wire fraud statute apply extraterritorially to Hijazi.

The Government contends that the Court need not address extraterritorial reach because part of the scheme occurred in the U.S. Some of the cases cited by the Government support this conclusion, but others engage in an extraterritorial analysis even where part of the acts occurred in the U.S. *Compare* U.S. v. Inco Bank & Trust Corp., 845 F.2d 919, 920 n.4 (11th Cir. 1988)(citing with approval article concluding that "a conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction"); U.S. v. Philip Morris USA, Inc., 566 F.3d 1095, 1130 (D.C. Cir. 2009)(foreign conspiracy to deceive Americans about smoking was prosecutable under RICO; court need not address extraterritoriality since conduct had "substantial domestic effect"); *with* U.S. v. Leija-Sanchez, — F.3d —, 2010 WL 1375407 *3 (7th Cir. 2010)(discussing both co-conspirator and extraterritorial concepts, even though substantial part of acts occurred in U.S.); U.S. v. MacAllister, 160 F.3d 1304 (11th Cir. 1998)(addressing extraterritorial application even though significant actions taken in U.S.); U.S. v. Reumayr, 530 F.Supp.2d

1210 (D.N.M. 2008)(same).  Additionally, as the Seventh Circuit recognized in Leija-Sanchez, — F.3d —, 2010 WL 1375407 *3 (7th Cir. 2010), the Supreme Court case of Bowman, *infra*, "thought that there was a question about extraterritorial application because *some* of the elements occurred . . ." outside the U.S., even though at least one element (the U.S. overpayment) had occurred in the U.S. (emphasis in original).  Application of the criminal statutes to Hijazi might therefore be considered "extraterritorial" even though part of the scheme occurred in the U.S.  *See* Environmental Defense Fund, Inc. v. Massey, 986 F.2d 528, 531 (D.C. Cir. 1993)("By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders.").   Accordingly, the Court believes it is necessary to analyze the extraterritorial reach of the Major Fraud Act and the wire fraud statute.

### 1)     Statutory Construction of the Major Fraud Act

Congress has the power to apply its laws outside the U.S., if consistent with international law.  U.S. v. Dawn, 129 F.3d 878 (7th Cir. 1997).  The first task, then, is to determine whether Congress intended for the Major Fraud Act and wire fraud statute to apply extraterritorially.  If so, the Court then considers whether such application is consistent with international law.

18 U.S.C. § 1031 states in pertinent part:

**§ 1031.   Major fraud against the United States**

(a) Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent--

(1)     to defraud the United States; or

(2)     to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any grant, contract, subcontract, . . ., or in any procurement of property or services as a prime contractor with the United States or as a subcontractor or supplier on a contract in which there is a prime contract with the United States, if the value of such grant, contract, subcontract, . . . is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both.

This statute does not expressly address whether it applies to frauds against the U.S. which are executed from outside the U.S., nor do the parties point to any relevant legislative history.  The term "whoever" in statute does not point one way or the other.  *See* Small v. U.S., 544 U.S. 385, 388 (2005)(term "any court" in criminal statute does not answer whether Congress meant to include foreign courts).

"'[I]t is a longstanding principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."'" Dawn, 129 F.3d at 882

(citations omitted).  Congress knows how to expressly provide for the extraterritorial reach of a statute, and has done so expressly in other statutes.  *See, e.g.,* U.S. v. Black, 469 F.Supp.2d at 544 (18 U.S.C. § 1512(h) (obstruction of official proceedings) expressly states that it applies extraterritorially); Hijazi Memorandum, d/e 180 p. 12 n. 1 (citing examples)).  However, "[w]e normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."  Merck & Co., Inc. v. Reynolds, — S.Ct. —, 2010 WL 1655827 *11 (2010).

There is a category of statutes where the presumption either does not apply or is rebutted, even if the statute is silent.  Broadly described, these are statutes designed to protect the U.S. from injury, applied in situations where injury to the U.S. either occurs or is likely to occur.  This exception to the presumption against extraterritoriality was described in United States v. Bowman, 260 U.S. 94 (1922), in which the Supreme Court addressed the extraterritorial reach of a criminal statute prohibiting a conspiracy to defraud a corporation in which the Government was a shareholder.  The defendants in Bowman hatched a plot to bill the U.S. government for fuel that was never ordered.  The plot was hatched while on the high seas or in foreign ports; three of the conspirators were Americans, the fourth from

Britain.  The three Americans were caught and charged, but the British

defendant eluded capture.  260 U.S. at 95.

The American defendants in <u>Boman</u> moved to dismiss the indictment

on the ground that the crime had not been committed within the U.S., and

was therefore outside the reach of the criminal fraud statute.  The Supreme

Court disagreed, concluding that the criminal statute did apply to the three

American citizens:

> We have in this case a question of statutory construction. The
> necessary locus, when not specially defined, depends upon the
> purpose of Congress as evinced by the description and nature
> of the crime and upon the territorial limitations upon the power
> and jurisdiction of a government to punish crime under the law
> of nations. Crimes against private individuals or their property,
> like assaults, murder, burglary, larceny, robbery, arson,
> embezzlement, and frauds of all kinds, which affect the peace
> and good order of the community must, of course, be
> committed within the territorial jurisdiction of the government
> where it may properly exercise it. If punishment of them is to be
> extended to include those committed outside of the strict
> territorial jurisdiction, it is natural for Congress to say so in the
> statute, and failure to do so will negative the purpose of
> Congress in this regard. . . .
>
> But the same rule of interpretation should not be applied to
> criminal statutes which are, as a class, not logically dependent
> on their locality for the government's jurisdiction, but are
> enacted because of the right of the government to defend itself
> against obstruction, or fraud wherever perpetrated, especially if
> committed by its own citizens, officers, or agents. Some such
> offenses can only be committed within the territorial jurisdiction
> of the government because of the local acts required to
> constitute them. Others are such that to limit their locus to the

strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense. . . .

260 U.S. at 98.

Thus, <u>Bowman</u> acknowledged the presumption against extraterritorial application, but concluded that the presumption did not apply "to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." <u>Id.</u>  In these situations, <u>Bowman</u> teaches that extraterritorial application can be inferred, even if the statute does not expressly address the issue.[3]  *See* <u>U.S. v. Corey</u>, 232 F.3d 1166, 1170 (7th Cir. 2000)("The territorial presumption is thus based on the common-sense inference that, where

---

[3]*See* <u>U.S. v. Dawn</u>, 129 F.3d 878, 882 n. 7 (7th Cir. 1997)("*Bowman* recognizes an exception to the presumption against extraterritorial intent"); <u>United States v. Gatlin</u>, 216 F.3d 207, 211 n. 5 (2d Cir. 2000)("Statutes prohibiting crimes *against the United States government* may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended.")(emphasis in original)(citing <u>Bowman</u>)(disagreed with on other grounds by <u>U.S. v. Corey</u>, 232 F.3d 1166, 1172-73 (9th Cir. 2000).  While these cases did not involve foreign defendants, their interpretation of <u>Bowman</u> is still instructive.

Congress does not indicate otherwise, legislation dealing with domestic matters is not meant to extend beyond the nation's borders. But the presumption does not apply where the legislation implicates concerns that are not inherently domestic. . . . Thus, courts do not apply the territorial presumption where it is not a reliable guide to congressional intent.").

If Hijazi was an American citizen, Bowman would be dispositive. Bowman, however, specifically declined to address whether the British conspirator could be prosecuted:

> The three defendants who were found in New York were citizens of the United States, and were certainly subject to such laws as it might pass to protect itself and its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government to which they owe allegiance. The other defendant is a subject of Great Britain. He has never been apprehended, and it will be time enough to consider what, if any, jurisdiction the District Court below has to punish him when he is brought to trial.

260 U.S. at 103.

The question then is whether Bowman's reasoning can be extended to apply to non-U.S. citizens.  Case law suggests that it can and has.  For example, in U.S. v. Nippon Paper Industries Co., Ltd., 109 F.3d 1 (1st Cir. 1997), the First Circuit held that the U.S. could prosecute a Japanese corporation under the Sherman Act for price fixing paper ultimately sold in the U.S.  The Japanese corporation allegedly schemed to sell paper to

"unaffiliated trading houses [in Japan] on condition that the latter charge specified (inflated) prices for the paper when they resold it in North America." Id..  The Court acknowledged the presumption against extraterritorial application, 109 F.3d at 3, but concluded based on its review of precedent that this presumption either did not apply or was overcome because the criminal conduct was intended to and did cause injury in the U.S.  Id. at 3-4 (*citing* Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993)(civil antitrust claim allowed although actions occurred in Britain because the conduct "was meant to produce and did in fact produce some substantial effect in the United States."); *see also* Hoffmann-La Roche Ltd., 542 U.S. 155, 165 (2004)(antitrust laws did not apply to foreign conduct where harm caused was solely foreign, but recognizing that antitrust laws do apply to foreign conduct where injury is domestic).

Cases cited by the Government have reached the same conclusion for criminal conduct by a foreign citizen in a foreign country which produces injury in or to the U.S.  U.S. v. Benitez, 741 F.2d 1312, 1316 (11th Cir. 1984)(Columbian citizen could be prosecuted in U.S. for stealing from DEA agents, assaulting them and conspiring to murder them, even though all acts occurred outside U.S.—"Under the protective principle, the crime certainly had a potentially adverse effect upon the security or governmental

functions of the nation."); <u>U.S. v. Felix-Gutierrez</u>, 940 F.2d 1200, 1204 and

n. 3 (9th Cir. 1991)(defendant, who was not a U.S. citizen, could be

prosecuted in U.S. for accessory after the fact to kidnapping, torturing and

murder of DEA agents in Mexico)(recognizing *Bowman's* exception to

presumption against extraterritorial application where statute was enacted

to enable Government to protect itself); <u>U.S. v. Philip Morris USA, Inc.</u>,

566 F.3d 1095, 1130 (D.C. Cir. 2009)(where foreign conduct has

"substantial domestic effects [which] implicates a state's legitimate interest

in protecting its citizens within its borders," presumption against

extraterritoriality does not apply)(British company could be prosecuted

under RICO for scheme to misrepresent health effects of smoking where

scheme had substantial detrimental effects in U.S.); <u>U.S. v. Delgado-</u>

<u>Garcia</u>, 374 F.3d 1337 (D.C. Cir. 2004)(criminal statutes regarding bringing

illegal aliens into U.S. applied extraterritorially to non-U.S. citizens who

conspired to transport aliens from Ecuador to Mexico, where the aliens

could enter the U.S.)("On its face, [the criminal statute] concerns much

more than merely 'domestic conditions.'  It protects the borders of the

United States against illegal immigration.")(Judge Rogers, dissenting).

     The Court believes that these cases, though they may differ in their

analysis, can be distilled to one idea:  if a statute is silent, extraterritorially

application will nevertheless be inferred if the conduct proscribed causes or is likely cause significant injury to the U.S.[4]  That injury or intended injury to the U.S. is what also justifies extraterritorial application under international law principles. *See discussion infra.*

Hijazi questions whether <u>Bowman</u> remains viable in light of several later Supreme Court cases addressing the extraterritorial reach of statutes. After briefing in this case, however, the Seventh Circuit affirmed <u>Bowman</u>'s continued vitality in <u>U.S. v. Leija-Sanchez</u>, — F.3d —, 2010 WL 1375407 * _ _ (7th Cir. 2010)("The Supreme Court has neither overruled *Bowman* nor suggested that the courts of appeals are free to reconsider its conclusion.").  <u>Bowman</u>, therefore, remains good law.

Hijazi attempts to limit <u>Bowman</u> to "crimes that as a practical matter will typically involve foreign conduct" such as illegal drug trafficking, immigration, terrorism and violence against DEA agents.  (Hijazi's Seventh Circuit Supplemental Brief, d/e 215, p. 18).  <u>Bowman,</u> though, involved

---

[4]Hijazi cites <u>United States v. Yakou</u>, 393 F.3d 231, 243 (D.C. Cir. 2005), republished at 428 F.3d 241 (D.C. Cir. 2005), for the proposition that the presumption applies in the criminal statute context as well as the civil.  It is true that the presumption can apply in the criminal context, but the court in <u>Yakou</u> found that the underlying criminal statute expressly applied only to "U.S. citizens."  393 F.3d at 243.  Relying on the presumption, the court then held that the aiding and abetting statute could not apply extraterritorially to a foreign citizen because the underlying criminal statute did not apply extraterritorially.  393 F.3d at 242.

none of these crimes, but instead involved fraudulent overbilling of the U.S., the same kind of crime at issue herein.  The Major Fraud Act is directed at schemes to obtain money under false pretenses in contracts and subcontracts where the U.S. is prime contractor—that is what Hijazi allegedly did by intentionally inflating his subcontract.  As this case demonstrates, U.S. military efforts abroad can require large sums of money spent on prime contracts and subcontracts throughout the world.  The need to protect the U.S. against fraud in these contracts is not an inherently domestic need, but extends globally to wherever those contracts are performed.  The potential for fraud is present regardless of the nationality of the subcontractors or the location of the work provided.  Bowman recognized this: "[t]he statute in Bowman was designed to prevent fraud by military contractors during the aftermath of World War I.  The Justices observed that, because military operations in that war took place throughout the world, the statute must reach frauds hatched abroad." United States v. Leija-Sanchez, — F.3d —, 2010  WL 1375407 *2 (7th Cir. 2010).  The reasoning is equally persuasive here.  Restricting the Major Fraud Act to domestic acts or to U.S. citizens "would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds . . . ."  Bowman, 260 U.S. at 98.  In the Court's opinion, the Major

Fraud Act, like the criminal statute in <u>Bowman</u>, is "not logically dependent

on [its] locality for the government's jurisdiction, but [is] enacted because of

the right of the government to defend itself against obstruction, or fraud,

wherever perpetrated . . . ."  260 U.S. at 98.  Under <u>Bowman</u>, the Major

Fraud Act does not need an express statement by Congress that it applies

extraterritorially—its extraterritorial application is "inferred from the nature

of the offense."  <u>Id.</u>

Unlike the cases cited by Hijazi, the Court sees nothing in the

context, structure, or text of Major Fraud Act to suggest that it applies only

domestically.  *Compare with* <u>U.S. v. Small</u>, 544 U.S. 385, 391

(2005)(borrowing from rationale behind presumption to conclude that felon-

in-possession statute referencing convictions "in any court" did not include

foreign courts, in part because "foreign convictions differ from domestic

convictions in important ways" and including foreign convictions would

produce anomalies and inconsistencies within statute); <u>Sale v. Haitian</u>

<u>Centers Council, Inc.</u>, 509 U.S. 155, 170-174 (1993)(statute limiting

Attorney General's authority to deport or return aliens did not preclude

executive order directing the Coast Guard to interdict Haitian immigrants on

open seas and repatriate without determining refugee status; text of statute

referred only to Attorney General's domestic institution of deportation/return

proceedings); <u>Smith v. U.S.</u>, 507 U.S. 197, 201-02 (1993)(Antarctica was "foreign country" within foreign country exception to waiver of immunity in Federal Tort Claims Act; construing ordinary meaning of word country and pointing out anomalies that would result with contrary interpretation).

The cases cited by Hijazi also do not support his assertion that <u>Bowman</u> has been limited to U.S. citizens.  For example, <u>Skiriotes v. State of Florida</u>, 313 U.S. 69, 73-74 (1941) presented no question of international law or extraterritorial application, since the defendant in that case was a U.S. citizen.  In <u>U.S. v. Villanueva</u>, 408 F.3d 193 (5th Cir. 2005) the court held that a criminal statute prohibiting the smuggling of undocumented aliens applied extraterritorially to conduct that occurred wholly outside the U.S.  <u>Vermilya-Brown Co. v. Connell</u>, 335 U.S. 377 (1948), dealt with statutory construction of the term "possession of the United States" under the Fair Labor Standards Act, concluding that a U.S. military base located on a leasehold in Bermuda was a U.S. "possession" and therefore subject to the FLSA, even if some of the employees were not U.S. citizens.  335 U.S. at 381.  None of these cases stand for the proposition that <u>Bowman</u> is limited to U.S. citizens.

Similarly, the cases Hijazi cites do not support his contention that the Major Fraud Statute must expressly state that it applies extraterritorially.  In

EEOC v. Arabian American Oil Co., 499 U.S. 244 (1991) ("Aramco")
(superseded by statute), the Supreme Court held that a U.S. citizen
working abroad for a U.S. employer could not pursue a Title VII action.  In
construing Title VII, the Court began with the presumption against
extraterritoriality and found that nothing in the history or language of the
statute clearly rebutted that presumption.  However,  Aramco dealt with civil
liability of a private employer, not the U.S. Government's ability to defend
itself against fraud and other crimes.  Bowman was not discussed because
it was not relevant.  The Aramco Court reasoned that, adopting the
plaintiffs' interpretation would mean that all employers with U.S.
employees, even foreign employers in foreign countries, would be subject
to Title VII.  499 U.S. at 255; *see also* Leija-Sanchez, — F.3d —, 2010 WL
1375407 *1 (7th Cir. 2010)("The main reason for requiring a clear legislative
decision before applying a civil statute to activity outside our borders is that
nations often differ with respect to acceptable conduct.").  Likewise,
Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 456 (2007), involved patent
laws, an area which, "in particular, foreign law 'may embody different policy
judgments about the relative rights of inventors, competitors and the public
in patented inventions.'" 550 U.S. at 456 ("foreign law alone, not United
States law, currently governs the manufacture and sale of components of

patented inventions in foreign countries.").  These cases demonstrate the principle that, when extraterritorial application would amount to regulation of another country's affairs, the rationale behind the presumption is strong, but that is not the case here.  *See also* <u>Foley Bros. v. Filardo</u>, 336 U.S. 281 (1949) (federal wage law did not apply to government contractor employing U.S. citizen in foreign country); <u>McCulloch v. Sociedad Nacional de Marineros de Honduras</u>, 372 U.S. 10 (1963)(National Labor Relations Act did not apply to foreign ships with foreign employees); <u>Benz v. Compania Naviera Hidalgo S.A.</u>, 353 U.S. 138 (1957)(Labor Management Relations Act did not apply to dispute between foreign ship and foreign crew); <u>Glass v. Kemper Corp</u>, 133 F.3d 999 (7th Cir. 1988)(Illinois Wage Payment and Collection Act did not apply to employee working in Spain for employer who had principal place of business in Illinois).

No such problem exists here, despite the concerns expressed by the Kuwaiti government.  Applying the Major Fraud Act to Hijazi will not interfere with Kuwait's laws or governance.  Defrauding a government is not the kind of activity that is allowed in one country and prohibited in another, like religious discrimination, poor working conditions, or patent appropriation.  *See* <u>U.S. v. Leija-Sanchez</u>, — F.3d —, 2010 WL at *1

("The crime in *Bowman* was fraud; the Court observed that fraud was unlawful in all of the places where Bowman's scheme was implemented.").[5]

The cases cited by Hijazi do not counsel otherwise. For example, American Banana Co. v. United Fruit Co., 213 U.S. 347 (1909)(substantial abrogation recognized by United Phosphorus, Ltd. v. Angus Chemical Co., 322 F.3d 942, 947 (7th Cir. 2003), was a civil case which involved whether the Sherman Anti-Trust act applied to actions taken in Costa Rica to prevent the plaintiff from competing in the banana trade. But the acts in Costa Rica had been approved by its government and executed by its soldiers; allowing the Sherman Act to apply would have clearly interfered with Costa Rica's sovereignty. 213 U.S. at 358-59. In U.S. v. Mitchell, 553 F.2d 996 (5th Cir. 1977), the Fifth Circuit found that the nature of the Marine Mammal Protection Act did not apply to a U.S. citizen in a foreign

---

[5]Hijazi argues that "the conduct of which [he] is accused is not a crime under Kuwaiti law," but he does not explain this. (d/e 16, p. 3). The assertion may be based on Kuwait's argument that the contract price was "adjusted on account of penalties to be imposed by a Kuwait State-owned Company, on account of removing these tankers from service under a lease with the Kuwait State-owned Company." (d/e 161-1, Ex. A., p. 2, letter from Kuwait Ambassador). According to this letter, the penalties were later waived. Id. Whether any penalties were a proper part of the bid was contested at Mazon's trial, where the Government introduced evidence that penalties were not a proper part of the bidding process. The Government also introduced another similar subcontract executed by Hijazi with LaNouvelle shortly after the contract at issue in this case which carried no such penalties. (Mazon trial transcript, pp. 327,336-37, 527-29, 537-541). In any event, whether penalties were part of the bid goes to the strength of the case against Hijazi, which is a question for the jury.

country, distinguishing <u>Bowman</u> on the grounds that applying the Act outside U.S. territory would interfere with other nation's governance of their own natural resources.  553 F.2d at 1002-03.  Again, the Court sees no risk of interference with Kuwait's governance by prosecuting Hijazi for defrauding the U.S.

The other cases cited by Hijazi are also distinguishable.  *See* <u>Yenkichi Ito v. U.S.</u>, 64 F.2d 73 (9th Cir. 1933)(alien smuggling statute did not apply extraterritorially, but this case did not discuss <u>Bowman</u> and later 9th Circuit cases retreated from that conclusion: *see* <u>U.S. v. Liang</u>, 224 F.3d 1057, 1059-1060 (9th Cir. 2000); <u>U.S. v. Javino</u>, 960 F.2d 1137, 1142-43 (2d Cir. 1992)(statute criminalizing possession of destructive device "made" in violation of Act only applied to devices made in U.S., where extraterritorial application would mean that "nowhere in the world may a person" violate the Act, and a different section of the Act dealt with importation);  <u>U.S. v. Smiley</u>, 6 Sawy. 640 (N.D. Cal. 1864)(pre-<u>Bowman</u>)(statute against plundering sunken ships did not apply to ship sunk off Mexico coast because Mexico had jurisdiction over attempts to recover treasure).

In short, unlike the cases cited by Hijazi, here the nature of the offense (fraud against the U.S. Government) *does* create an inference of extraterritorial application under <u>Bowman</u>, and extraterritorial application does not interfere with Kuwait's sovereignty or governance.

### 2) Statutory Construction of the Wire Fraud Statute

The wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The Government contends that the term "foreign commerce" demonstrates Congressional intent for extraterritorial application. The Court agrees with Hijazi, however, that this term alone does not evince such intent, if "extraterritorial" means communications originating and ending in a foreign country. The legislative history shows that the term "foreign commerce" was added to extend the statute to wires between the U.S. and a foreign country, in response to dismissal of a criminal case involving a fraudulent phone call from Mexico to California. <u>Aramco</u>, 499 U.S. at 251 ("we have repeatedly held that even statutes that contain broad

language in their definitions of 'commerce' that expressly refer to 'foreign

commerce' do not apply abroad."); H.Rep. No. 84-2385 (1956), 1956

U.S.C.C.A.N. 3091, at 1 ("*General Statement*").

However, for the same reasons set forth for the Major Fraud Act, the

Court concludes that the wire fraud statute applies to Hijazi.  As discussed

above, the wires that form the basis for the counts occurred either in the

U.S., or were sent to the U.S. from Kuwait.  Thus, this is not a case where

the wires began and ended entirely in a foreign country.  As discussed

above, Hijazi's role in the scheme permits his prosecution for those wire

frauds, even if his role was played from Kuwait.  *See* United States v.

Adcock, 534 F.3d 635, 640-41 (7th Cir. 2008)(defendant liable even if he did

not send wire, where wire transfer was "reasonably foreseeable" part of

scheme); U.S. v. Dick, 744 F.2d 546, 552 (7th Cir. 1984)(defendant held

accountable for other defendant's mailings in scheme to defraud).

Second, extraterritorial application of the wire fraud statute to Hijazi

can be inferred under Bowman by the nature of the offense alleged: a

financial fraud against the United States.  To find otherwise would make

the U.S. vulnerable to wire fraud depending on where the fraud was

committed and who committed it, a result contrary to the rationale of

Bowman.  Accordingly, the Court concludes that the wire fraud statute may

be applied extraterritorially to fraudulent schemes against the U.S. Government.[6]  In light of this conclusion, the aiding and abetting statute also applies to Hijazi.

One caveat: the Court agrees with Hijazi that the wire fraud statute "reach[es] and make[s] criminal all sorts of conduct that does not involve the Government at all."  (d/e 16, p. 16).  However, this case is not that fact pattern.  Here, the fraud did involve the U.S. Government and this Recommendation is limited to that issue alone.

### C.    Hijazi's prosecution comports with international law.

This Court agrees with the Seventh Circuit that Hijazi's prosecution raises "delicate foreign relations issues."  In re Hijazi, 589 F.3d 401, 411 (7th Cir. 2009).  In the Court's opinion, though, those issues are not concerns for the judicial branch.  Whatever the political wisdom of Hijazi's prosecution, it is permitted under international law because governments have an internationally recognized right to protect their countries from "substantial effects" such as fraud.  Leija-Sanchez, — F.3d —, 2010 WL

---

[6]Hijazi cites U.S. v. Golitschek, 808 F.2d 195, 197 (2d Cir. 1986), in which a foreign defendant's conviction under 18 U.S.C. Section 1343 (among others) was reversed.  The defendant in Golitschek "never set foot" in the U.S. in an alleged plot to ship helicopters from the U.S. to Iran.  However, the case was reversed on faulty jury instructions, not on whether the defendant could be prosecuted under the statute.  In the Court's opinion, Golitschek is an example of how section 1343 can be applied extraterritorially.

1375407 *4 (7th Cir. 2010)("Even in civil litigation, the Supreme Court has held that the laws of this nation may be applied to multinational operations that have substantial effects in this nation.")(*citing* F. Hoffman-La Roche, *supra*, and Restatement (Third) of Foreign Relations § 402(1)).

The Third Restatement on Foreign Relations recognizes that a country may apply its law to "conduct outside its territory that has or is intended to have substantial effect within its territory," as well as to "conduct outside its territory by persons not its nationals that is directed against the security of the state . . . ."  Restatement (Third) of Foreign Relations § 402(1)(c) & (d).  Fraud against the U.S. clearly has a "substantial effect" in the U.S., threatening the Government's ability to function, as explained in Bowman.   Id. at § 402 (f)(protective principle applies to "offenses directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes . . . .); F. Hoffmann-La Roche v. Empagran, 542 U.S. 155, 165 (2004)(U.S. anti-trust laws can apply to foreign conduct to "redress *domestic* antitrust injury" even if doing so would interfere with foreign nation)(emphasis in original); U.S. v. Columba-Colella, 604 F.2d 356, 358 (5th Cir. 1979)("A state/nation is competent, for example, to punish one who has successfully defrauded

its treasury, no matter where the fraudulent scheme was perpetrated."); U.S. v. Nippon Paper Industries Co., Ltd., 109 F.3d 1 (1st Cir. 1997).

Hijazi contends that his alleged conduct had no effect in the U.S.— "At the most, Hijazi's actions could have harmed KBR, and KBR could have passed that harm along to the U.S. government."  (d/e 222, p. 18).  As discussed above, however, Hijazi's conduct must be viewed in context of the alleged overall scheme to defraud the U.S. Government.  Hijazi had an important role in this scheme: sign the subcontract with the inflated prices, bill KBR the inflated prices, and give $1 million to Mazon as a kickback. His knowledge that the U.S. was the ultimate payor is sufficiently alleged in the indictment and also supported by the terms of the subcontract and evidence introduced at Mazon's trial (though the Court does not believe that evidence is properly considered in the procedural posture of this case, *see discussion of 7th Circuit opinion, infra at section 6.).*

Section 403 of the Restatement provides a catch-all limit to extraterritorial application:  jurisdiction must still be "reasonable" even if envisioned under § 402.  Restatement (Third) of Foreign Relations § 403(1).  Determining whether the exercise of jurisdiction is unreasonable is case and context specific, but can include considerations of the extent of the conduct within the country, and whether that conduct has a

"substantial, direct, and foreseeable effect" upon the country seeking to exercise jurisdiction.  Hijazi again contends that his actions had no substantial, foreseeable effect on the U.S., but as discussed above, Hijazi's role must be viewed in the context of the overall scheme to defraud the U.S., not simply the overbilling of KBR.

As discussed above, Hijazi contends that prosecuting him interferes with Kuwait's sovereignty, and Kuwait agrees.  (d/e 215, Ex. A, 8/22/07 letter ("Kuwait believes that the indictment by The United States Government has impinged on the sovereign right of Kuwait to defend and practice its jurisdiction over actions that occur within Kuwait.")).  Yet neither explain how the U.S. Government's efforts to protect itself from fraud interferes with Kuwait's sovereignty.  Kuwait has no duty to protect the U.S. from fraud, and therefore no motivation to prosecute Hijazi or to prevent similar schemes to defraud the U.S. in the future.  There is no suggestion that Kuwait would allow such a fraud against itself, regardless of where perpetrated or by whom.  This is not a case where the alleged misconduct and injury all occurred in a foreign country, like Torres or Baragona, cases cited by Hijazi.  Baragona v. Kuwait Gulf Link Transport Co., 594 F.3d 852 (11th Cir. 2010)(serviceman killed in Iraq in truck collision); Torres v. Southern Peru Copper Corp., 965 F.Supp. 899 (S.D. Tex. 1996)(Peruvian

citizens injured by mining operations in Peru); <u>Columba-Colella</u>, 604 F.2d

356 (5th Cir. 1979)(cited by Hijazi)(Mexican citizen could not be prosecuted

for receiving stolen vehicle, where he received vehicle in Mexico and had

nothing to do with stealing it).  The injury here occurred in and directly to

the United States Government: the U.S. was the alleged ultimate target of

the fraud.  Even if by some imagining Kuwait would permit a similar fraud

against itself, that would not prevent the U.S. from protecting its own

coffers from fraud.  *See* <u>Bowman</u>, 260 U.S. at 98; <u>F. Hoffmann-La Roche v.</u>

<u>Empagran</u>, 542 U.S. 155, 165 (2004).  Hijazi's prosecution does not "enact

a Criminal Code for Kuwait" as Hijazi contends.  (d/e 16, p. 20).

Hijazi also asserts that his prosecution is unreasonable under the

Restatement principles because his conduct did not harm U.S. national

security or "involve drug-trafficking or any physical violence or harm to any

U.S. citizen."  (d/e 16, p. 19). He does admit, though, that "the immediate

impact of such offense is on the U.S. Treasury."  Protecting the U.S.

Treasury is an important national interest, as <u>Bowman</u> demonstrates.

 This is not to say that the continued prosecution of Hijazi is wise or

good foreign relations policy.  Mazon arguably played the more major role

in the scheme yet the Government twice failed to convince a jury of his

guilt.  If a jury could not be convinced of Mazon's guilt, one wonders how

substantially the same evidence will convince a jury to convict Hijazi. But it is not the Court's province to determine the political wisdom of the prosecution. The Court is saying only that the prosecution is consistent with international law principles.

### D. Hijazi's prosecution comports with due process.

Exercising criminal jurisdiction over Hijazi does not comport with due process if it is "arbitrary or fundamentally unfair." U.S. v. Yousef, 327 F.3d 56, 111 (2d Cir. 2003); U.S. v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990). In further delineation of this standard, the Second and Ninth Circuits require a "'sufficient nexus between the defendant and the United States, . . .'" Yousef, 327 F.3d at 111 (2d Cir. 2003)(quoting Davis, 905 F.2d at 248-49). The parties agree that not all Circuits have adopted the nexus test, and the Government asserts that other courts have rejected the nexus requirement in favor of the principles of international law discussed above. (d/e 217,

p. 39, cases cited therein). Hijazi also borrows the standards set forth in Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112 (1987), a civil action against a foreign corporation, in arguing that due process requires a " 'substantial connection between the defendant and the forum' based on 'an action of the defendant purposefully directed toward the forum State.'"

(d/e 133, p. 28)(italics omitted).  He does not, however, cite a case where Asahi's standard is applied in a criminal context.

The Court concludes that Hijazi's prosecution comports with due process under any of these standards.  The issue again comes down to the characterization of Hijazi's actions.  Hijazi characterizes his conduct as limited to, at most, fraudulent behavior directed only at KBR through actions limited to Kuwait.  That, however, is not how the indictment characterizes his conduct.  According to the indictment, Hijazi's actions were an important part of an overall scheme to defraud the U.S. Government.  His actions must be viewed in the context of this alleged scheme, not in isolation.  Purposefully scheming to defraud the U.S. Government is a sufficient nexus with the U.S. to satisfy due process requirements.  See U.S. v. Peterson, 812 F.2d 486, 493 (9th Cir. 1987) (sufficient nexus for drug prosecution where drugs bound for U.S.)("Where an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction to arrest and try the offenders.").  Taking the allegations in the indictment as true, Hijazi actions were purposefully directed to produce financial injury to the U.S.—haling him into Court is neither arbitrary, unfair, nor unexpected.

### E.   The Military Extraterritorial Jurisdiction Act of 2000 ("MEJA") is inapplicable

Hijazi asserts that the MEJA "confirm[s] that Hijazi is not subject to the criminal jurisdiction of the United States."  (d/e 133, p. 15).  MEJA addresses criminal offenses committed outside the U.S. by U.S. forces and those employed by or accompanying U.S. forces.  Simplified, it subjects those persons to the same U.S. criminal laws as if the crime had been committed within the U.S.  The Act, by its definitions, does not apply to foreign residents.  32 C.F.R. § 153.5(a)(7).

Hijazi contends that MEJA is "additional evidence that Congress likely did not intend for the Major Fraud Act to apply extraterritorially." (d/e 222, p. 36).  However, he does not dispute the Government's argument that MEJA was enacted to close a "'jurisdictional gap'" which had allowed U.S. citizens to escape punishment for the violation of U.S. criminal statutes that had no extraterritorial application, like rape, arson, robbery, and murder.  (d/e 217, pp. 42-44).   With that history in mind, exclusion of foreign residents from MEJA's reach is not surprising. Including foreign residents would have allowed the U.S. to prosecute foreign residents for such crimes against other foreign residents regardless of the effects on the U.S., which would clearly present international law

problems.  In sum, the Court agrees with the Government that MEJA is not relevant to determining whether the Major Fraud Act or the Wire Act applies extraterritorially.

### F.  The Defense Cooperation Agreement is inapplicable.

On April 14, 2010, the undersigned reviewed the Defense Cooperation Agreement (hereinafter DCA) between the United States and the Country of Kuwait.  Said document was brought to the undersigned for an in camera inspection by a Department of Justice employee from Washington, D.C.  The DCA is classified as a "secret" document and can only be viewed by those with certain security clearance levels.  The Court reviewed the DCA in full in chambers on April 14, 2010.  Thereafter, the copy of the DCA reviewed by the Court was tendered to AUSA Gilmore, Central District of Illinois, who is the Security Chief for the Central District of Illinois, for storage in the U.S. Attorney's Office safe in accordance with classified document protocol.  Any judge wishing to review this report and recommendation or Judge McDade's order pertaining to same, should be able to review a copy of the DCA under the same security steps as the undersigned.

The parties take competing views as to the effect of DCA on the issues herein.  Defendant contends that the DCA prohibits the United

States from prosecuting him for criminal acts taken entirely within Kuwait and he argues that all of his alleged actions were taken in Kuwait.  In addition, the Kuwait Government has also taken the position that the DCA prohibits United States criminal prosecution over this Defendant because all of his actions, they argue, occurred in Kuwait.

The United States Government, on the other hand, contends that nothing in the DCA precludes this Defendant's prosecution and that the DCA is really immaterial herein.  Further, that the U.S. Government is not relying on the DCA to obtain jurisdiction, but is relying on both United States and existing international law.

From the Court's in camera review of the DCA, the Court concludes that the DCA is completely inapplicable to this criminal cause.  The classified status of the Agreement prohibits the Court from going into further detail, but, as discussed above, a judge wishing to review a copy of the DCA should be able to do so under the same security steps as the undersigned.

### G.     The Seventh Circuit's opinion does not dictate a different conclusion.

In ruling on the petition for mandamus, the Seventh Circuit Court of Appeals directed the parties to file supplemental briefs on the merits of the

motions to dismiss the indictment.  The Seventh Circuit ultimately declined to decide the merits, however, noting that "there could be facts that the district court needs to explore; the district court is familiar with the developments in Mazon's prosecution; . . . ."  *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009).  The Seventh Circuit further remarked:

> Although it is a fact that KBR was operating under a contract with the U.S. government, it is not clear whether Hijazi knew or cared where KBR's money was coming from. He obviously knew that LaNouvelle was submitting a bid for fuel tankers. It might matter whether Hijazi knew that the tankers were for the use of the U.S. military, but the sketchy record we have thus far does not permit one to draw any conclusions about his knowledge.

589 F.3d at 411.

This Court is unsure what these comments mean in the posture of this case, which is to test the sufficiency of the indictment, not the strength of the evidence to support that indictment.   "An indictment is sufficient if it serves three main functions. It must state the elements of the crime charged, adequately inform the defendant of the nature of the charges, and allow the defendant to plead the judgment as a bar to future prosecutions."  U.S. v. Singleton, 588 F.3d 497, 500 (7th Cir. 2009);  U.S. v. Black, 469 F.Supp.2d 513, 518 (N.D. Ill. 2006)(same).   The allegations in the indictment are taken as true.  U.S. v. Moore, 563 F.3d 583, 586 (7th Cir.

2009). "'Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence.'" Id. (citation omitted).

In the Court's view, the indictment already sufficiently alleges Hijazi's knowledge that the United States was the ultimate target of the fraudulent scheme.  The indictment alleges that Hijazi and Mazon "devised a scheme to defraud the United States of over $3.5 million by falsely inflating the cost of supplying fuel tankers used to support United States military operations in Kuwait."  (d/e 59, ¶ 1).  Hijazi allegedly originally submitted a bid to KBR of about $1.7 million dollars, but then schemed with Mazon to inflate the bid, "to ensure that LaNouvelle would be overpaid."  (d/e 59, ¶¶ 15, )(caps omitted).   "Mazon and Hijazi signed the subcontract, knowing that the subcontract price was inflated and that Hijazi would pay Mazon money for Mazon's favorable treatment of La Nouvelle."  (d/e 59 ¶ 16).  Hijazi and Mazon allegedly both "caused LaNouvelle to send inflated invoices to KBR . . . and to receive payment from KBR on those invoices."  (d/e 59, ¶ 17). They also both allegedly caused KBR to submit inflated invoices to the United States and caused the United States to pay those inflated invoices. Id.  These allegations set forth the elements of the crime, give adequate

notice to Hijazi of the nature of the charges, and are specific enough for double jeopardy purposes.

To the extent that Mazon's trial is relevant, the subcontract introduced at the trial, signed by Hijazi, states that it is a subcontract for a prime contract with the U.S. Government, who is defined in the subcontract as the "Owner".  (d/e 226, p. 1 of subcontract terms, sections 1.2, 1.5).[7] Completion of the subcontract was "defined as Final Notice of service delivery by the Owner."  Id., section 4.1 (caps omitted).  The subcontract also required LaNouvelle to maintain insurance coverage which included "a waiver of subrogation to the benefit of Brown & Root, Inc. and the U.S. Government." Id. Sections 8.0, 13.0.  Thus, the subcontract is evidence that Hijazi knew that LaNouvelle was providing fuel tankers for the U.S., and that satisfactory completion of the subcontract was in U.S. hands. Additionally, there was testimony at Mazon's trial that the "APOD" was a vast reception and staging area for U.S. and coalition military personnel and their military equipment, situated adjacent to the Kuwait International Airport.  (U.S. v. Mazon, 05-cr-40024, trial transcript from second trial beginning 9/29/08, pp. 289-90).   LaNouvelle's subcontract was to provide

---

[7]Hijazi has submitted change orders to the subcontract (d/e 228), which the Court has reviewed.  They are not relevant to the Court's analysis.

thousands of gallons fuel to that APOD, to be used to fuel the military vehicles and equipment that had been flown over.  (Mazon trial transcript at 290, 299; d/e 226, subcontract terms section 2.0.).  The large scope of the military operation at APOD is also evidence that Hijazi knew that the fuel tankers going there were for the U.S. military.  There was also testimony that Hijazi had signed another subcontract for LaNouvelle to provide more fuel to the APOD, but that this second subcontract was not at an inflated price, which could be viewed as evidence to impeach Mazon's innocent explanations for that inflation.  Id. at 536-539.

The Court has no opinion on the strength of the inferences that can be drawn from this evidence—Mazon proffered innocent explanations at his trial and the jury hung twice.  The Court is only pointing out, in response to the Seventh Circuit's concerns, that there was evidence introduced at Mazon's trial to back up the indictment's allegations that Hijazi and Mazon schemed to defraud the U.S.[8]

---

[8]In his initial briefs, Hijazi argued that the rule of lenity (construing ambiguous criminal statutes against government) counseled against extraterritorial application.  He does not press that argument in his later briefs.  In any event, as discussed above, the statutes are not ambiguous because the nature of the offenses alleged against the U.S. clearly create an inference of extraterritorial application.  Hijazi also argued in one of his initial briefs that extraterritorial application was unconstitutional because the U.S. Constitution only empowers Congress to "'define and punish Piracies and Felonies on the High Seas.'" (d/e 16, p. 21).  Hijazi does not pursue this argument in later briefs.  In any event, the cases discussed above confirm Congress' constitutional authority to regulate conduct beyond its borders that has substantial effects within its borders,

**II.    Speedy trial concerns do not warrant dismissal of the indictment.**

As the Seventh Circuit stressed, Hijazi is not a fugitive.  *In re Hijazi*, 589 F.3d at 412-13 (7th Cir. 2009).   He surrendered himself to Kuwaiti authorities, where he lawfully remains a resident.  He has no legal obligation to travel to the U.S and Kuwait has no intention of turning him over.  Further, there is no extradition treaty between the U.S. and Kuwait, and Kuwait has repeatedly demanded dismissal of the charges.  The U.S. cannot proceed to prosecute Hijazi without his appearance unless he consents.  Id. at 408 (*citation omitted*).

Hijazi argues that his right to a speedy trial warrants dismissal of the charges, since the case is over five years old and at an impasse with no end in sight.

> [i]n considering a defendant's Sixth Amendment speedy trial challenge, we apply the following four-part test: "whether the delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result."

U.S. v. Oriedo, 498 F.3d 593, 597 (7th Cir. 2007)(relying on Barker v. Wingo, 407 U.S. 514, 519-20 (1972)(other citations omitted)).  These

---

regardless of whether that conduct occurs on the high seas.

factors are not exclusive and do not have "talismanic qualities"; there are no bright line rules, but instead "[a] balancing test [that] necessarily compels courts to approach speedy trial cases on an ad hoc basis." Barker, 407 U.S. at 530, 533.   The government bears the burden of bringing the case to trial, but "if delay is attributable to the defendant, then his waiver [of a speedy trial] may be given effect . . . ."  Barker, 407 U.S. at 529.   The parties agree that the a five year delay is presumptively prejudicial, so the focus is on the remaining three factors.

Regarding who is to blame for the delay, Hijazi argues that the Seventh Circuit has already found it is not him because he is not a fugitive. (d/e 222, p. 38).  The Seventh Circuit, though, "express[ed] no view about the arguments Hijazi has presented based on the Sixth Amendment's guarantee of a speedy trial, . . . ."  In re Hijazi, 589 F.3d at 410.  The Seventh Circuit only relied on speedy trial principles to explain why a *ruling* on the motion to dismiss was necessary.  Id.

Hijazi also maintains that the Government made "little effort to discharge its duty to bring this case to trial" before Kuwait made it clear that such efforts would be futile.  (d/e 222, pp. 40-41).  He asserts that "before Kuwait's position had hardened, the government did not make a serious effort to convince the Kuwaiti government that Hijazi should have to stand

trial here." Id. at 41.  Yet just one month after the indictment, Hijazi

voluntarily surrendered himself to Kuwaiti authorities, and Kuwaiti

authorities chose to release him and return his bond.  This was a strong

indication, coupled with the lack of an extradition treaty, that Kuwait would

not be cooperating in Hijazi's prosecution.  Further, that same month, the

U.S. directed INTERPOL to issue a "red notice" on Hijazi, which he admits

puts him at peril of arrest should he leave Kuwait. Several months later, in

September 2005, the U.S. Government made a formal request to the

Kuwaiti Government to turn over Hijazi.

The Court does not know what more the U.S. should have done, nor

does Hijazi offer a suggestion.  The cases cited by Hijazi involved the

Government's failure to take obvious actions to locate and arrest a

defendant, or to bring the defendant to trial, which is not the case here.

See Doggett v. U.S., 505 U.S. 647 (1992)(government did not follow up on

attempts to locate defendant, who had been living openly in U.S. for six

years); Dickey v. Florida, 398 U.S. 30 (1970)(state made no effort to obtain

defendant's presence for trial for eight years, though state knew that

defendant was incarcerated in federal prison and defendant had repeatedly

tried to obtain trial or dismissal); U.S. v. Mendoza, 530 F.3d 758, 763

(9th Cir. 2008)(no effort to inform defendant of indictment, even though

agents had phone numbers for wife and relatives); <u>U.S. v. Macino</u>, 486 F.2d 750 (7th Cir. 1973)(government offered no explanation for 2 ½ year delay between arrest and return of indictment); <u>U.S. v. Ingram</u>, 446 F.3d 1332 (11th Cir. 2006)(government did not inform defendant of indictment and efforts to find him were minimal); <u>U.S. v. Fernandes</u>, 618 F.Supp.2d 62 (D.D.C. 2009)(no attempts to extradite pursuant to extradition treaty, and no showing that those attempts would have been futile); <u>U.S. v. Leaver</u>, 358 F.Supp.2d 255, 270 (S.D.N.Y. 2004)("Had the Government pursued Leaver with proper diligence, it could have located him and begun extradition proceedings years ago."); <u>U.S. v. Robotham</u>, 430 F.Supp. 1254 (D. Mass. 1977)(no efforts to extradite and defendant's counsel had tried to arrange for defendant's presence in court).

In the Court's opinion, the plaintiff's status as non-fugitive has little or no bearing on determining who is responsible for the delay.  Just like a fugitive in hiding, Hijazi voluntarily remains beyond reach of the Government, despite the Government's due diligence.  Hijazi is the only one with the power to compel a trial, either by surrendering or consenting to proceedings in his absence.  A defendant lawfully living in a country with no extradition treaty, who is aware of an indictment against him, can be held responsible for the delay if he chooses to remain beyond that

Government's reach.  *See* <u>U.S. v. Corona-Verbera</u>, 509 F.3d 1105

(9th Cir. 2007)(8 year delay did not violate speedy trial for defendant who

was Mexican citizen residing in Mexico, where extradition efforts would

have been futile); <u>U.S. v. Tchibassa</u>, 452 F.3d 918 (D.C. Cir. 2006)(11 year

delay did not violate speedy trial for defendant who was a citizen of and

resided in Zaire, with no extradition treaty); <u>United States v. Blanco</u>, 861

F.2d 773 (2d Cir. 1988)(no speedy trial violation for time period when

defendant, a Columbian citizen, lawfully resided in Columbia--extradition

efforts would have been futile).  In short, the Court concludes that Hijazi is

responsible for the delay.

As to asserting the right to a speedy trial, the failure to do so "will

make it difficult for a defendant to prove that he was denied a speedy trial."

<u>Barker</u>, 407 U.S. at 532.  Hijazi's motion to dismiss based on speedy trial

concerns does constitute an assertion of that right, in the Court's opinion.

However, the assertion is hollow, since he refuses to appear for a trial, and

the Government cannot compel his appearance.  This is not a situation

where Hijazi is powerless to obtain a trial, like the case cited by Hijazi,

<u>Klopfer v. State of N.C.</u>, 386 U.S. 213, 216-218 (1967), where the Supreme

Court held that the right to speedy trial was violated because the entry of a

nolle prosequi allowed the government unlimited time to restore the

charges, but yet no avenue for the defendant to demand a trial or to obtain dismissal.  Hijazi does have an avenue to obtain a trial; he just chooses not to travel it.

Hijazi does cite one case where an alleged draft dodger living in Israel successfully move to dismiss charges under the speedy trial rules without ever appearing in court, but the Government in that case had not exercised due diligence to obtain the defendant's presence at trial.  U.S. v. Salzmann, 548 F.2d 395, 404 (2d Cir. 1976).  The defendant in Salzmann had written the Government, asserting that he was unable to afford the trip to appear for trial.  The Government failed to inquire into the truth of this assertion or offer to pay for the trip; the Government further admitted that its failure to pay for the trip, if the defendant was in fact impoverished, amounted to a lack of due diligence.  The Court in Salzmann held that this admission was enough to show that the Government had not been diligent, thus justifying the dismissal of the indictment.

Unlike Salzmann, the Government in this case was diligent.  There is no indication that the Government failed to take any steps that could have reasonably procured Hijazi's presence.  Salzmann, therefore, does not help Hijazi.  For the same reasons, the prejudice to Hijazi from the delay does not compel dismissal.  Hijazi has the power to prevent that prejudice, so its

existence does not weigh much in his favor.  *See* U.S. v. Reumayr, 530 F.Supp.2d 1200 (D.N.M. 2007)("Since most of the delay is attributable to Defendant, however, the prejudice he has suffered cannot be weighed against the Government."); *see also* U.S. v. Watkins, 983 F.2d 1413, 1419-20 (7th Cir. 1993)(criminal defendant may lose right to be present by consent or misconduct); Clark v. Stinson, 214 F.3d 315, 323 (2d Cir. 2000) (criminal defendant can knowingly and voluntarily waive right to be present at trial).

Hijazi argues in the alternative that dismissal under Federal Rule of Criminal Procedure 48 is warranted due to the "unnecessary delay . . .in . . . bringing a defendant to trial."  Fed. R. Crim. P. 48(b).  "Rule 48 'is not circumscribed by the Sixth Amendment,' . . .; however, . . . it is driven 'by the same general considerations as the Sixth Amendment.'" U.S. v. Ward, 211 F.3d 356, 361-62 (7th Cir. 2000)(cites to 8th Circuit cases omitted).  As discussed above, the delay is attributable to Hijazi's choice to remain beyond the Government's reach.  That choice is within Hijazi's rights, but it is not without consequences.  *See* Reumayr, 530 F.Supp. at 1207 ("Defendant contends he should not be forced to choose between his lawful right to resist extradition and his right to a speedy trial.  However, the

two rights are incompatible, and therefore a defendant can indeed be forced to choose between the two.").[9]

WHEREFORE, the Court RECOMMENDS that Defendant's Motions to Dismiss be denied (d/e's 15, 131, 174).

Any objections to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to timely object will constitute a waiver of objections on appeal. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See also Local Rule 72.2.

ENTER:    May 7, 2010

_____s/ Byron G. Cudmore_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE

---

[9]Rule 48(b) has been held to apply only to postarrest delays, so the Court is not sure that Rule 48(b) even applies, but the Government does not make this argument. U.S. v. Blanco, 861 F.2d 773, 780 (2d Cir. 1988)("Rule 48(b) only applies to delays following arrest" not prearrest delays)(citing United States v. Marion, 404 U.S. 307, 319 (1971).