**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-40024 |
| ) | |
| ALI HIJAZI, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT ALI HIJAZI'S
OBJECTIONS TO REPORT AND RECOMMENDATION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

BACKGROUND.................................................................................. 3

    A.    Factual Background ................................................................. 3

    B.    Procedural History ................................................................. 5

            1.    Indictment of Hijazi ................................................ 5

            2.    Hijazi's Motions to Dismiss .................................. 6

            3.    Seventh Circuit Mandamus Opinion ................................ 8

            4.    Magistrate Judge's Report and Recommendation.............. 10

STANDARD OF REVIEW.................................................................... 10

ARGUMENT ..................................................................................... 11

I.    THE REPORT & RECOMMENDATION ERRED IN
    CONCLUDING THAT THE COURT HAS JURISDICTION OVER
    HIJAZI ....................................................................................... 11

    A.    The contacts between Hijazi and the United States are not
          sufficient to support the prosecution. ............................... 11

    B.    The conduct of Mazon may not be imputed to Hijazi for
          jurisdictional purposes. ................................................... 19

            1.    The conspiracy cases cited by the Magistrate Judge do
                not support jurisdiction over a scheme to defraud. ........... 19

            2.    Co-schemer liability has no bearing on the Court's
                jurisdiction over Hijazi. ...................................... 22

    C.    Hijazi's alleged conduct in Kuwait did not have a substantial,
          direct, and foreseeable effect on the United States and is
          insufficient to support jurisdiction.................................. 24

II.    THE REPORT AND RECOMMENDATION ERRED IN
    CONSTRUING THE MAJOR FRAUD ACT AND THE WIRE
    FRAUD STATUTE TO APPLY EXTRATERRITORIALLY TO
    HIJAZI ....................................................................................... 29

    A.    *Bowman* does not give extraterritorial effect to the Major
          Fraud Act. ....................................................................... 30

    B.    The Wire Fraud Statute does not apply to wholly foreign
          conduct. .......................................................................... 35

III. THE DEFENSE COOPERATION AGREEMENT BARS THIS
    PROSECUTION. ......................................................................... 38

IV. THE REPORT AND RECOMMENDATION ERRED IN
    CONCLUDING THAT THE LONG PRETRIAL DELAY DOES
    NOT VIOLATE HIJAZI'S RIGHT TO A SPEEDY TRIAL ...................... 40

    A.    The government bears responsibility for the long pretrial
          delay. ............................................................................ 40

    B.    There is no "fugitive-like" exception to the speedy trial right. ..... 42

    C.    Hijazi has diligently pursued his speedy trial right. ................... 45

    D.    Hijazi suffers substantial prejudice as a result of the
          government's delay. ........................................................ 47

    CONCLUSION ............................................................................... 49

Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Crim. P. 59(b)(2), and CDIL-LR 72.2(B), Defendant Ali Hijazi submits this memorandum of law in support of his objections to the Magistrate Judge's Report and Recommendation of May 7, 2010 (d/e 230) (hereinafter, "R & R"), and requests that the district court make a de novo determination of Hijazi's motion to dismiss the second superseding indictment.

## INTRODUCTION

Five years after Hijazi, a foreign national, first moved to dismiss the government's indictment, he continues to await resolution of the pending charges against him with no end in sight. During the intervening five years, Hijazi has vigorously pursued his legal rights, including twice renewing his motion to dismiss the indictment, and successfully petitioning the Seventh Circuit for a writ of mandamus, a remedy sparingly granted only in such "extraordinary circumstances" as presented in Hijazi's case. *In re Hijazi*, 589 F.3d 401, 406 (7th Cir. 2009). In holding that Hijazi met its stringent mandamus test, the Seventh Circuit provided extensive guidance in its opinion on the jurisdictional, statutory, and constitutional principles underlying Hijazi's motion to dismiss, while declining to decide the merits of Hijazi's dispositive motion before this Court had a chance to rule on Hijazi's points in light of the Seventh Circuit's guidance.

The R & R fails to consider the "fundamental questions" addressed in the Seventh Circuit's mandamus opinion, including those "going to the court's very power to act" and "how far a statute reaches out to address conduct undertaken outside the United States, in whole or in part." *Id.* at 408. The 52-page R & R does not cite the Seventh Circuit's opinion until page 31, and dismisses the Seventh

Circuit's serious jurisdictional concerns in little more than a footnote. R & R at 10 n.2. In addition to ignoring the Seventh Circuit's analysis of jurisdictional issues, the R & R misconstrues the law with respect to each of Hijazi's four major arguments.

First, the R & R errs in concluding that this Court has jurisdiction over Hijazi despite the lack of minimal contacts necessary to support the prosecution. The R & R erroneously applies two lines of inapposite conspiracy and scheme to defraud cases to suggest that Mazon's conduct may be imputed to Hijazi for purposes of jurisdiction, and assumes without discussion that because Hijazi is accused of a violation of the Major Fraud Act his conduct in Kuwait must have had a substantial, direct and foreseeable effect on the United States. The R & R also errs in considering the government's attempted prosecution of Hijazi to be consistent with well-established domestic and foreign law principles, as set forth in the Restatement of Foreign Relations.

Second, the R & R misconstrues the Major Fraud Act and the Wire Fraud Act to apply to extraterritorial activity, despite the Seventh Circuit's pointed rejection of the government's invocation of the *Bowman* exception.

Third, the R & R errs in failing to accord any deference to the Kuwaiti Government's interpretation of the United States – Kuwait Defense Cooperation Agreement ("DCA").

Finally, the R & R ignores Supreme Court and Seventh Circuit precedent – including the Seventh Circuit's holding *in this case* – by constructing a

"fugitive-like" exception to the speedy trial right.  The Seventh Circuit expressly rejected the prior magistrate judge's application of the fugitive disentitlement doctrine to Hijazi, as well as this Court's holding that the principal justifications for that doctrine applied to Hijazi.  Citing to the Supreme Court's decision in *Degen v. United States*, 517 U.S. 820, 828 (1996), the Seventh Circuit held that theories like "comparable disentitlement" or "a perceived lack of mutuality" – concepts similar to fugitive disentitlement but applied to non-fugitives – are too severe to punish a non-fugitive for refusing to appear.

The Court should reject the R & R as inconsistent with the law of the case established by the Seventh Circuit and other applicable precedents, and grant Hijazi's motion to dismiss the indictment for the reasons given by the Seventh Circuit.

## BACKGROUND

### A.    Factual Background

Ali Hijazi is a citizen of Lebanon and a lifelong resident of Kuwait. *Hijazi*, 589 F.3d at 403.  He has traveled to the United States only once, in 1993, under circumstances which "all agree" are unrelated to this case.  *Id*. at 412.  Hijazi is a principal of La Nouvelle General Trading & Contracting Co., a Kuwaiti company with no American ownership interests.  *Id*. at 404.  In early 2003, La Nouvelle submitted a bid to Kellogg, Brown & Root (KBR), a United States company doing business in Kuwait and with offices in Kuwait, to provide KBR with fuel tankers.  La Nouvelle was the low bidder and won the contract.  *Id*.

3

Jeff Mazon, an American, was the procurement manager for KBR stationed in Kuwait.  Among other things, Mazon was responsible for hiring subcontractors to perform work under a contract KBR entered into in 2001 with the U.S. Army.  Mazon is alleged to have received bids from La Nouvelle and at least one other company and to have inflated both bids more than threefold before awarding the contract to La Nouvelle.  *Id*. 1/

Mazon, on behalf of KBR, and Hijazi, on behalf of La Nouvelle, signed a contract that is alleged to have included the inflated amount, rather than La Nouvelle's original bid.  The United States was not a party to this contract, which specified that La Nouvelle would be paid by KBR.  From March through August 2003, La Nouvelle (not Hijazi) submitted invoices for its work to KBR, and KBR paid La Nouvelle.  *Id.*

In September 2003, Hijazi gave Mazon a $1 million draft and a promissory note.  Hijazi separately sent an email to Mazon, indicating that "this whole lown [sic] (principal and interest) [i]s totally your money. . . ."  R & R at 4.  At the time that he received this loan and email, Mazon was no longer employed by KBR as a procurement officer and was residing in Greece and working for another company, where he received and opened the email.  In October 2003, Hijazi sent Mazon an email suggesting that he deposit the $1 million in three separate banks.  Mazon was still residing in Greece when he received the October email, and he opened it in Greece.  The following month, Hijazi sent Mazon an email asking him

---

1/     The R & R states that "Hijazi, through LaNouvelle, submitted a bid."  R & R at 2.  But this is not correct.  The company, not Hijazi, was to perform the contract, and Hijazi was acting on its behalf.

to be careful about what he said to his "ex-friends in [K]uwait." The government alleges that Mazon was in the United States when he received this email. *See Hijazi*, 589 F.3d at 404.

The government alleges various contacts between Mazon and the United States, including four emails between Mazon in Kuwait and KBR employees in the United States. Second Superseding Indictment at 13. Two additional wire communications are alleged, between unnamed individuals in Ohio and Georgia. *Id.* at 14. The government further alleges that KBR billed the United States for reimbursement of the payments to La Nouvelle, and that the United States Army made payments to KBR in September and December 2003. *Id.* at 11. The government does not allege facts indicating that Hijazi was involved in any of these emails or billings between KBR and the United States government.

It is undisputed that neither La Nouvelle nor Hijazi had any contacts with the United States Army or the U.S. government. *Hijazi*, 589 F.3d at 404. It is also undisputed that Hijazi did not send or receive any wires or funds to or from the United States. *See* Second Superseding Indictment at 11, 13-14 (charts listing payments, wires and emails).

**B.    Procedural History**

1.    <u>Indictment of Hijazi</u>

In March 2005, the government indicted both Mazon and Hijazi in this district, alleging violations of the Major Fraud Act and the Wire Fraud Statute, as well as aiding and abetting. Upon learning of the indictment, Hijazi promptly turned himself over to officials in Kuwait, posted bond, and was released. *Hijazi*,

589 F.3d at 405. Although the United States has no extradition treaty with Kuwait, Kuwait could extradite Hijazi voluntarily, and the Department of Justice has requested that Kuwait turn Hijazi over to United States officials. The government of Kuwait has declined to turn Hijazi over and has requested, on at least four occasions, that the United States discontinue this prosecution and dismiss the indictment against Hijazi. According to Kuwait, the United States lacks jurisdiction over Hijazi and his prosecution violates international law and Kuwait's sovereignty. *Id.*

Unable to reach an agreement with Kuwait to obtain custody of Hijazi, the government has directed INTERPOL, the international criminal police organization, to issue a "red notice" regarding Hijazi. *Id.* at 407. This operates as a request to all 188 INTERPOL members to arrest Hijazi if he enters their jurisdiction and, if possible, to extradite him to the United States. As a result, Hijazi is unable to travel home to Lebanon to see his family, and cannot leave the country of Kuwait without risking extradition to the United States. *Id.*

2.    <u>Hijazi's Motions to Dismiss</u>

Hijazi moved to dismiss the indictment on May 3, 2005, shortly after it was returned. The motion argued that (1) the statutes charged in the indictment did not have extraterritorial application and thus could not apply to his alleged conduct, which took place entirely in Kuwait, and (2) the government's prosecution violated his Fifth Amendment right to due process and principles of international law recognized by United States courts. *See* R & R at 7. Rather than respond to Hijazi's motion, the government filed its own motion to strike Hijazi's motion or

6

hold it in abeyance until Hijazi should appear in the district and subject himself to the jurisdiction of the court (effectively waiving the arguments raised in his motion). *Hijazi*, 589 F.3d at 405-06.

In August 2006, the government brought a second superseding indictment charging the same offenses as the initial indictment. Hijazi again moved to dismiss the indictment. *See id.* In the second motion, Hijazi asserted his right to a speedy trial and protested the undue delay by the government in moving forward with the resolution of his case. In September 2008, Hijazi filed a separate motion to dismiss the indictment on speedy trial grounds. *See* d/e 174.

In response to each of these motions, the government reiterated its position that the Court should refuse to decide Hijazi's motions to dismiss until he presented himself in the district for arraignment. *See* d/e 136, d/e 182. Accepting the government's arguments, the Court declined to rule on Hijazi's motions to dismiss, requiring Hijazi to appear for arraignment before his motions would be heard. R & R at 7.

While Hijazi sought to have the indictment against him dismissed, Mazon was brought to trial in the Central District of Illinois. Twice, in April 2008 and October 2008, the government was unable to prove the charges in the indictment – the same charges it has brought against Hijazi – beyond a reasonable doubt. Following the two mistrials, Mazon entered into a plea agreement that dismissed all charges against him, in exchange for pleading guilty to a single misdemeanor count of making a writing containing a false statement. The plea

agreement does not require Mazon to testify against Hijazi or cooperate with the government in prosecuting him, and the Factual Basis that Mazon provided to the government does not accuse Hijazi of any wrongdoing.  *See Hijazi*, 589 F.3d at 405; *see also* R & R at 5.

3.   Seventh Circuit Mandamus Opinion

In August 2008, having filed his second motion to dismiss the indictment in December 2007, Hijazi petitioned the Court of Appeals for the Seventh Circuit for a writ of mandamus ordering the district court to rule on the motions.  R & R at 7.  Following briefing and oral argument on that issue, the Court of Appeals asked the parties to file supplemental briefs addressing the merits of Hijazi's motions to dismiss.  *See* Government's Consolidated Response to the Defendant Hijazi's Motions to Dismiss the Indictment ("Gov't Br.") at 3 (d/e 217).

The Seventh Circuit issued the writ on December 11, 2009.  While the Seventh Circuit thought it best to follow "the usual method of proceeding," *Hijazi*, 589 F.3d. at 412, and have the district court rule on the motions to dismiss in the first instance, the Seventh Circuit's opinion shed considerable light on how those motions should be resolved.  Not only did the Seventh Circuit frame several of the issues to be decided, including Hijazi's jurisdictional arguments and his speedy trial motion, it made a number of critical findings and legal rulings, most of which have been ignored or inadequately addressed by the R & R.

The Seventh Circuit emphasized the importance of the issues implicated by Hijazi's motions to dismiss, and made it clear that it has serious doubts about whether the case may proceed.  *See id.* at 411.  Specifically, the court

found that "Hijazi's arguments raise serious questions about the reach of U.S. law, and it remains to be seen whether the U.S. contacts on which the government relies are sufficient to support its prosecution." *Id.* After analyzing the facts and the contacts alleged between Hijazi and the United States, the Seventh Circuit found that "upon closer inspection," the only direct contacts alleged between Hijazi and the United States were three "emails that Hijazi (located in Kuwait) sent to Mazon (located in Greece)," one of which was allegedly opened within the United States. *Id.* The Seventh Circuit directed this Court to consider in this context "how much is enough." *Id.* at 412.

With respect to Hijazi's conduct within Kuwait, the court noted that "[t]he Supreme Court's decision in *F. Hoffman-La Roche Ltd. v. Empagran*, 542 U.S. 155 (2004), emphasizes the importance and delicacy of the general issue we face here." *Id.* at 408. The Seventh Circuit stated that the government must establish that Hijazi's conduct outside of the United States "ha[d] or [wa]s intended to have substantial effect within [the United States]." *Id.* at 412. If Hijazi's conduct did have a substantial effect upon the United States, the Court must consider whether the exercise of jurisdiction over Hijazi would nevertheless be "unreasonable," because Hijazi's conduct, even though substantial, did not have a "direct and foreseeable effect upon or in the [United States]." *Id.* The Seventh Circuit added that the government's argument that Mazon's conduct may be attributed to Hijazi for purposes of jurisdiction "raises its own set of complex issues." *Id.* at 411.

9

The Seventh Circuit also addressed the importance of the statutory arguments raised by Hijazi's motions to dismiss, including his "fundamental questions about the legislative reach of the Major Fraud Act and the Wire Fraud Act." *Id.* at 408.

Finally, the Seventh Circuit addressed Hijazi's speedy trial argument, noting the lengthy delay in the proceedings and concluding that "nothing Hijazi has done has in any way prevented the district court from ruling on his motions." *Id.* at 411. The court found that Hijazi had acted appropriately, "fil[ing] the motions in a timely manner" and "follow[ing] up appropriately rather than allowing matters to languish," and concluded that Hijazi has suffered prejudice as a result of the pending indictment. *Id.* at 407, 413.

4.  <u>Magistrate Judge's Report and Recommendation</u>

On remand, following briefing by both parties, the district court referred this matter to Magistrate Judge Byron G. Cudmore for a Report and Recommendation. On May 7, 2010, the Magistrate Judge issued the Report and Recommendation.

## STANDARD OF REVIEW

This Court must consider Hijazi's objections to the R & R *de novo*. *See* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *see also Hijazi*, 589 F.3d at 406 (referring to this Court's "*de novo* review" of an earlier Report and Recommendation in this case).

10

## ARGUMENT

### I.   THE REPORT & RECOMMENDATION ERRED IN CONCLUDING THAT THE COURT HAS JURISDICTION OVER HIJAZI

#### A.   The contacts between Hijazi and the United States are not sufficient to support the prosecution.

The Seventh Circuit concluded in its mandamus opinion in this case that the only "direct contacts with the United States" that the government alleged "Hijazi personally had" were "the emails that Hijazi (located in Kuwait) sent to Mazon (located in Greece) using email addresses that the government characterizes as 'based in the United States.'" *Hijazi*, 589 F.3d at 411.  Based on its "concerns" about the paucity of these contacts, the Seventh Circuit noted that "it remains to be seen whether the U.S. contacts on which the government relies are sufficient to support its prosecution."  *Id.*  As the Seventh Circuit suggested, "the question 'how much is enough?'" is "[c]ritical to the decision whether these contacts are adequate to support the U.S. proceeding."  *Id.*

The R & R neither determined "how much is enough," nor recommended whether the emails "are sufficient U.S. contacts to permit Hijazi's prosecution."  R & R at 10, n.2 (making "no recommendation" on this point).  Rather, the R & R concurs with the government that "it is not necessary to decide whether those e-mails alone were enough to allow criminal prosecution of Hijazi. . . ."  *Id.* at 8, 9.  Because the Seventh Circuit opted to follow "the usual method of proceeding" and permit this Court to rule on Hijazi's motions in the first instance, this Court must determine whether the U.S. contacts are sufficient to support the prosecution.  *Id.* at 412.

As set forth more fully in Hijazi's Reply brief, d/e 222 pp. 6-13, the alleged contacts between Hijazi and the United States are <u>not</u> sufficient to support his prosecution in this country.  The indictment alleges <u>no</u> general contacts with the United States that would subject Hijazi to the authority of a U.S. court.  *See*, *e.g.*, *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (exercise of general jurisdiction over a foreign defendant is only appropriate where the defendant has "continuous and systematic" contacts with the state); *see also* R & R at 8 ("It is undisputed that Hijazi is a resident of Kuwait, a citizen of Lebanon, and his only trip to the U.S. occurred in 1993.  The Government also does not dispute that La Nouvelle is a Kuwaiti company, and that the U.S. was not a party to the subcontract between KBR (a U.S. Company) and La Nouvelle.").

Nor does the indictment allege specific contacts sufficient to establish jurisdiction.  The only specific contacts between Hijazi and the United States alleged in the indictment are the three emails discussed in the Seventh Circuit's opinion.  Based on the indictment, the Seventh Circuit found that Hijazi "had <u>no</u> direct dealings with the U.S. Army or the U.S. government," and the governing contract was between "KBR, a U.S. company doing business in Kuwait, and La Nouvelle, a Kuwaiti company."  *Hijazi*, 589 F.3d. at 404, 411 (emphasis added).  The United States was not a party to the contract, La Nouvelle submitted invoices to KBR, and KBR made payments to La Nouvelle.  *Id.* at 404.

The indictment also does not allege that Hijazi sent any wires or funds <u>to</u> the United States or received any wires or funds <u>from</u> the United States.  Second

12

Superseding Indictment at 11, 13-14 (charts listing payments, wires and emails). Two of the three emails between Hijazi and Mazon alleged in the indictment were received and opened in Greece, and the third email was allegedly received in the United States.  R & R at 8.  There is no allegation that Hijazi knew where Mazon was located when he opened these emails.

The contract between KBR and La Nouvelle is insufficient to confer jurisdiction on this Court.  Even where a party has contracted <u>directly</u> with the U.S. government, rather than contracting with a private U.S. company that in turn contracts with the U.S. government, federal courts have found that the existence of the contract alone is insufficient to confer jurisdiction.  *See Baragona v. Kuwait Gulf Link Transport Co.,* No. 05-1267 (N.D. Ga.), *aff'd*, 594 F.3d 852 (11th Cir. 2010). In *Baragona*, U.S. plaintiffs filed a civil suit in federal district court in Georgia against KGL, a Kuwaiti company, for events occurring in Iraq.  The plaintiffs sought to hold KGL liable for the wrongful death of a U.S. Army officer, Col. Baragona, in a motor vehicle accident involving a truck operated by KGL.  The district court held that KGL lacked "sufficient contacts with the district or the United States generally for the Court to exercise personal jurisdiction over it." *Baragona* d/e 114 at 2 (May 8, 2009).  The district court dismissed the case, and the Eleventh Circuit affirmed.

The *Baragona* plaintiffs' argument in favor of personal jurisdiction focused on the fact that KGL was a contractor for the U.S. Army.  But the district court rejected the argument because those contracts were centered in Kuwait.  The

13

court found that the contracts "were exclusively military contracts for transportation services in Kuwait," and that "[t]he evidence shows that all contracts were negotiated and executed in Kuwait, that all services were performed in Kuwait, and that all payment was made from Kuwait to KGL's accounts in Kuwait." *Id*. at 25-26.

Plaintiffs argued that KGL should be subject to jurisdiction in the United States because the Army administered the contracts in the United States. The court rejected that argument, too, concluding that it could not "exercis[e] jurisdiction over a United States military contractor in the State where the military chooses to administer the contract, independent of any other contacts between the contractor and the State." *Id*. at 29. The court held that "the Constitution does not permit the Court to hold KGL liable in this State" because "KGL's contacts with Georgia are nonexistent or *de minimis* at best." *Id*. at 30-31. Plaintiffs' argument that jurisdiction arose from "KGL's 'general' contacts with the United States Government" was likewise rejected. *Id*. at 31.

Like KGL in *Baragona*, Hijazi's contacts with the state (and the United States) are "nonexistent or *de minimis* at best." *Baragona* d/e 114 at 30-31. Indeed, this is a far easier case because La Nouvelle was not leasing fuel tankers directly to the U.S. Army, but rather was dealing directly only with KBR, a U.S. company operating in Kuwait. The Magistrate Judge dismissed *Baragona* as "a case where the alleged misconduct and injury all occurred in a foreign country." R & R at 34. But Hijazi's alleged conduct also "all occurred in a foreign country." And

14

the "injury" in *Baragona* clearly was felt in the United States:  Col. Baragona, an American citizen, was killed, the U.S. Army lost an officer, and Col. Baragona's family in America was bereaved and no doubt financially affected.  Yet these U.S. effects did not establish personal jurisdiction.

The emails alleged in the indictment are also insufficient to confer jurisdiction in this Court.  The Seventh Circuit recently considered the question of when emails and online postings are sufficient to justify the exercise of jurisdiction over a foreign defendant.  *Tamburo*, 601 F.3d at 702.  The court concluded that before exercising jurisdiction over a foreign defendant, a United States court must find that the defendant "purposefully directed his activities at the forum state" <u>and</u> that "the alleged injury arises out of the defendant's forum-related activities."  *Id.*  Although *Tamburo* was a civil case, the jurisdictional standard is functionally identical to the standard applied to foreign defendants in criminal cases, which require that a letter, telephone call, or other communication be "intended for delivery to the United States" <u>and</u> that an element of the charged offense occur within the United States.  *United States v. Moncini*, 882 F.2d 401, 404 (9th Cir. 1989).

The Seventh Circuit in *Tamburo* found that the defendant's posting of messages to a private listserve was insufficient to establish that it had "expressly aimed" its conduct at Illinois – in part because the defendant was unaware that the plaintiff was located in Illinois.  Users of the listserve could have accessed it from anywhere.  Similarly, the court in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*,

15

952 F. Supp. 1119, 1124 (W.D. Pa. 1997), found that a defendant's use of a passive website—in which a defendant merely posts information that may be accessed from any location—is insufficient to confer jurisdiction in states where users have accessed the website. *See also Caterpillar Inc. v. Miskin Scraper Works, Inc.*, 256 F. Supp. 2d 849, 852-854 (C.D. Ill. 2003) (adopting *Zippo* framework).

      Hijazi's emails to Mazon were passive communications directed at a resident of Greece, who spent a significant amount of time in Kuwait. Mazon could have accessed the emails from any location. That he allegedly opened one of the emails in the United States does not confer jurisdiction over Hijazi, because Hijazi did not direct his email toward the United States. Rather, he simply posted the emails to Mazon, to be accessed wherever Mazon chose to access them. *See Zippo*, 952 F. Supp. at 1124; *see also Toys 'R' Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003) (emails sent by a defendant do not trigger personal jurisdiction absent purposeful availment of the forum); *Federated Rural Elec. Ins. Corp. v. Island Power & Light Co.*, 18 F.3d 389, 395 (7th Cir. 1994) ("making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction"); *McBreen v. Beech Aircraft Corp.*, 543 F.2d 26, 30 (7th Cir. 1976) (single phone call into the forum did not confer personal jurisdiction).

      While the R & R concludes in a footnote that Hijazi "arguably should have reasonably foreseen that sending an e-mail to a U.S. citizen's work or personal account was likely to involve contacts in or with the U.S., regardless of where the e-mail was opened," R & R at 10 n.2, the indictment does not even allege that Mazon

16

is a U.S. citizen, let alone that Hijazi knew of Mazon's citizenship.  Nothing in the government's briefs suggests that Hijazi knew or should have known that Mazon was a U.S. citizen or was planning to travel to the United States.  To the contrary, the record reflects that during the relevant periods Mazon lived in Greece and worked in Kuwait.  *See Hijazi*, 589 F.3d. at 404.  And while the indictment alleges that the email accounts were "located in the United States," Second Superseding Indictment at 8, 9, 10, it does not explain whether or how Hijazi knew or should have known where the accounts were "located."  Hijazi, like the defendants in *Tamburo* and *Zippo*, had no way of predicting or controlling where Mazon would be located when he opened and viewed the email.

The email Mazon is alleged to have opened in the United States was also not an element of the offenses charged here.  It was not a "payment-related wire communication," as required to constitute an act in furtherance of a violation of the Wire Fraud Statute.  *United States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005); *see also United States v. Maze*, 414 U.S. 395, 402 (1974) (holding that defendant's scheme reached fruition once he left the motel after paying with a stolen credit card, and that subsequent mailings could not be used to bring the scheme under the purview of the mail fraud statute).  Nor did the email "execute" a scheme to defraud under the Major Fraud Act.  *See United States v. Reitmeyer*, 356 F.3d 1313, 1323 (10th Cir. 2004) ("[T]he Major Fraud Act criminalizes each discrete 'execution' of a scheme rather than the scheme in its entirety.  Once an 'execution' is complete, the crime has ended, and additional acts do not violate the statute unless

they independently constitute a separate 'execution' or 'attempted execution' of a scheme. . . .  Although conduct in furtherance of a scheme may perpetrate a fraud, the Act does not punish the conduct unless it constitutes an 'execution' or 'attempted execution' of a scheme.").  *Cf. Rhodes v. Unisys Corp.*, 170 Fed. Appx. 681, 685 (11th Cir. 2006) (email did not create personal jurisdiction where "the email came in January, well after the contract's July formation, so there is no connection between the email and a claim for fraud").

The R & R suggests that "the emails did 'advance the alleged fraud' because they coordinated the $1 million alleged kick back and created inferences of attempts to cover up."  R & R at 10 n.2.  The R & R is factually incorrect.  The email referencing the $1 million was sent from Hijazi in Kuwait to Mazon in <u>Greece</u>, and could not provide a basis for jurisdiction in the United States, even if it were sent in furtherance of the alleged crime.  The email that Mazon allegedly opened in the United States does not even mention the alleged $1 million "kickback," and was sent after the $1 million draft was sent to Mazon in Greece, and after the federal government had allegedly paid KBR.  It simply stated "Please when you call your ex-friends in kuwait [sic] please be very carreful [sic] on what you say."  R & R at 4.

The scheme charged in the indictment was completed when Hijazi allegedly paid Mazon the $1 million draft in exchange for Mazon having inflated both La Nouvelle's bid and the competing bid.  *See*, *e.g.*, *Maze*, 414 U.S. at 402; *Reitmeyer*, 356 F.3d at 1323.  The government did not allege in the indictment a subsequent attempt to evade detection, and cannot argue now that Hijazi's email

18

constitutes such an attempt and that the attempt is part of the scheme alleged in the indictment.  *See Reitmeyer*, 356 F.3d at 1325 (continuing and related misrepresentations to government following submission of fraudulent application were not separate executions under the Major Fraud Act because the indictment did not allege that they constituted separate executions); *United States v. Cruikshank*, 92 U.S. 542, 558 (1875) ("every ingredient of which the offence is composed must be accurately and clearly alleged").  That the email allegedly opened by Mazon in the United States may have been factually related to the alleged scheme does not make it an element of the offense and is insufficient to confer jurisdiction. 2/

### B.     The conduct of Mazon may not be imputed to Hijazi for jurisdictional purposes.

#### 1.     The conspiracy cases cited by the Magistrate Judge do not support jurisdiction over a scheme to defraud.

The Magistrate Judge's recommendation that the district court has jurisdiction over Hijazi relies on inapposite conspiracy cases involving jurisdiction over foreign co-conspirators.  *See* R & R at 9, citing, *e.g.*, *Ford v. United States*, 273 U.S. 593 (1927); *United States v. Schmucker-Bula*, 609 F.2d 399 (7th Cir. 1980); *United States v. Inco Bank & Trust Corp.*, 845 F.2d 919 (11th Cir. 1988).  These cases hold that a United States court may exercise jurisdiction over a foreign defendant based on the actions of his co-conspirators within the United States only where (1) a conspiracy is charged in the indictment; and (2) specific overt acts in

_____

2/     The R & R's reliance (at 10 n.2) on *United States v. Lanas*, 324 F.3d 894 (7th Cir. 2003) is misplaced. *Lanas* upheld the  admission of evidence relating to "uncharged" acts that were allegedly part of a scheme to defraud.  *Id.* at 900.  The evidentiary holding does not suggest that Hijazi's email —which was sent two months after the alleged fraud was completed—is sufficient to confer jurisdiction in the United States.

furtherance of the conspiracy are alleged in the indictment to have taken place within the United States. *Ford*, 273 U.S. at 620; *Schmucker-Bula*, 609 F.2d at 402; *Inco Bank*, 845 F.2d at 920.  Here, neither a conspiracy nor any overt acts in furtherance of a conspiracy are charged in the indictment.  None of the cases cited in the R & R, as adopted from the government's brief, support the proposition that merely alleging participation in a scheme to defraud confers jurisdiction over a foreign citizen when it does not otherwise exist.  No case or statute has given prosecutors such broad authority.

This difference between a conspiracy and a scheme to defraud is more than semantic.  Conspiracy is a more difficult charge to prove, and requires the allegation of a number of specific elements that are not required for a scheme to defraud.  As the Seventh Circuit explained in *United States v. Jackson*, 546 F.3d 801 (2008), the offense of mail fraud "entails proof that the defendant participated in a scheme to defraud involving one or more material misrepresentations, that she acted with the intent to defraud, and that the mails were used in furtherance of the scheme." *Id.* at 810 (citations omitted).  Furthermore, "[p]roof that a defendant *conspired* to commit mail fraud – an offense distinct from mail fraud itself – demands proof that there was conspiratorial agreement to commit mail fraud, that the defendant became a member of that conspiracy with the intent to further its aim, and that at least one member of the conspiracy committed an overt act in furtherance of the conspiracy." *Id.* (emphasis in original, citations omitted).

The essence of conspiracy is agreement.  *See United States v. Harris*, 567 F.3d 846, 850 (7th Cir. 2009).  And because courts in conspiracy cases often refer to "jurisdiction over conspiracies," *see*, *e.g.*, *Schmucker-Bula*, 609 F.2d at 402, co-conspirators effectively agree to join an ongoing enterprise over which jurisdiction is already proper.  By contrast, a scheme to defraud does not require an agreement between co-schemers.  *See United States v. Reed*, 658 F.2d 1225, 1240 (7th Cir. 1981) ("[n]o agreement is necessary" for a scheme to defraud).  In fact, it need not even include co-schemers – under the Wire Fraud Act, a "scheme or artifice" requires no more than one perpetrator, acting alone.  18 U.S.C. § 1343 When a scheme to defraud is alleged, it cannot be presumed that the co-schemers have agreed to join an enterprise over which a court has generalized jurisdiction.  Hijazi has found no case, and neither the government nor the Magistrate Judge has cited any case, in which a court has exercised jurisdiction in a scheme to defraud by any means other than finding personal jurisdiction over each and every co-schemer.

"[P]ersonal jurisdiction is personal to each defendant," and must be evaluated separately.  *Perry v. Markman Capital Management*, 2002 WL 31248038, *3 (E.D. Pa. 2002). 3/  The only exception supported by existing case law is a charged conspiracy.  This Court cannot assume jurisdiction over a foreign defendant, whose actions were entirely outside of the United States, based on actions of another individual within the United States, without alleging a conspiracy in the indictment.  *Ford*, 273 U.S. at 620; *Jackson*, 546 F.3d at 809;

---

3/     *Perry* was a civil case, but the requirement that jurisdiction be evaluated for each defendant is no less true in criminal than in civil cases.

*Schmucker-Bula*, 609 F.2d at 400, 402.  It is the existence of a conspiracy, and the unlawful agreement inherent in a conspiracy, that permits the federal courts to exercise jurisdiction over defendants who have taken no action within the United States.  *See United States v. Winter*, 509 F.2d 975, 982-3 (5th Cir. 1975).  Since Hijazi is not charged with conspiracy but rather with scheming to defraud, the Court lacks jurisdiction over him, notwithstanding the line of cases extending jurisdiction to foreign co-conspirators.

> 2.    <u>Co-schemer liability has no bearing on the Court's jurisdiction over Hijazi.</u>

The Magistrate Judge's reliance on cases involving co-schemer liability to support jurisdiction is also flawed.  *See* R & R at 11, citing, *e.g.*, *United States v. Dick*, 744 F.2d 546, 552 (7th Cir. 1984); *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002); *United States v. Black*, 469 F.Supp.2d 513, 536 (N.D. Ill. 2006). Co-schemer liability may only be imposed after (1) the Court obtains jurisdiction over Hijazi; <u>and</u> (2) the government <u>proves beyond a reasonable doubt</u> that Hijazi participated in a scheme to defraud and that other co-schemers committed the acts that the government seeks to attribute to the defendant.  *See*, *e.g.*, *Stapleton*, 293 F.3d at 1117; *U.S. v. Wormick*, 709 F.2d 454, 461 (1983); *Dick*, 744 F.2d at 552.  The doctrine of co-schemer liability has never been applied to justify the exercise of jurisdiction over a defendant, because co-schemer liability cannot attach until jurisdiction has already been established, and the prerequisites to such liability have been proven beyond a reasonable doubt.

None of the co-schemer cases cited in the R & R discusses the exercise of jurisdiction over a co-schemer; in each of these cases, the court already had jurisdiction over the defendant. Nor did any of the cases involve foreign defendants, or questions of extraterritorial jurisdiction. In each of the cases, a scheme to commit mail fraud had been proven at trial, not merely alleged, as here. And the holding in each of these cases was quite narrow – and entirely unrelated to the exercise of jurisdiction. These cases simply held that a defendant in a fraud case "can be held accountable for mailings caused by other members, whether or not he knew of or agreed to any specific mailing," as long as the evidence presented at trial proves beyond a reasonable doubt that the defendant participated in the scheme to defraud and that another member of the scheme to defraud caused the mailings. *Wormick*, 709 F.2d at 461; *see also Stapleton*, 293 F.3d at 1117; *Dick*, 744 F.2d at 552.

The R & R also erroneously relies on *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974) for the proposition that "[i]t is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy." But *Wilson* addressed the application of substantive liability after a full trial on the merits, not the exercise of jurisdiction based on allegations in the indictment. Like the *Macey* case cited by the government for the same proposition (*United States v. Macey*, 8 F.3d 462, 468 (7th Cir. 1993)), *Wilson* stands for only the settled notion that a defendant may be convicted based on the acts of co-conspirators regardless of whether a conspiracy

was charged in the indictment as long as the evidence at trial proves beyond a reasonable doubt his involvement in a conspiracy.

Hijazi has not disputed that: (1) where an indictment specifically charges a conspiracy, including the requisite allegations of agreement among the co-conspirators and acts in furtherance of the conspiracy, the alleged conduct of one co-conspirator may be used to support jurisdiction over another co-conspirator; (2) at a trial on the merits, one co-schemer may be held liable for the acts of another if the evidence proves beyond a reasonable doubt that both participated in the scheme to defraud; and (3) at a trial on the merits, one co-conspirator may be held liable for the acts of another if the evidence proves beyond a reasonable doubt that both participated in the conspiracy.

The R & R merges these three separate doctrines to create new law that would permit the exercise of jurisdiction over a defendant who has committed no acts within the United States, has not been convicted of participating in a scheme to defraud or a conspiracy, and has not even been underlined accused of participating in a conspiracy.  There is no authority and no basis for this novel theory, which violates constitutional limitations on the exercise of jurisdiction over criminal defendants, either in the cases cited in the R & R, in the government's brief, or in our own research.

**C.    Hijazi's alleged conduct in Kuwait did not have a substantial, direct, and foreseeable effect on the United States and is insufficient to support jurisdiction.**

The R & R erroneously accepts the government's argument that the Restatement (Third) of Foreign Relations permits the prosecution of Hijazi, because

24

"[f]raud against the U.S. clearly has a 'substantial effect' in the U.S. . ." *See* R & R 32-33; *see also* Gov't. Br. 31-35.  But Hijazi's actions neither had nor were intended to have substantial effect within the United States.  The only conduct alleged in the indictment that could have resulted in alleged harm to the United States was conduct by Mazon.  *See* Hijazi Reply Brief d/e 222 pp. 18-19.  Mazon's actions cannot be attributed to Hijazi for the purpose of establishing jurisdiction.

The Seventh Circuit found this same argument unconvincing when the government raised it, and looked beyond the conclusory allegations in the indictment (which are unsupported by specific allegations of fact as to Hijazi's conduct) to the actual facts alleged in the government's Seventh Circuit briefs. *Hijazi*, 589 F.3d at 411.  The facts set forth in the government's briefs make it clear that even under the government's theory, it was Mazon who attempted to defraud the United States, not Hijazi.  *See id.*; *see also* Gov't Br. at 5-6.  The Seventh Circuit emphasized that the allegations against Hijazi involved a contract between KBR, a U.S. company doing business in Kuwait, and La Nouvelle, a Kuwaiti company.  589 F.3d at 411.  And, while "it is a fact that KBR was operating under a contract with the U.S. government, it is not clear whether Hijazi knew or cared where KBR's money was coming from."  *Id.*  In short, even if the government could prove the facts set forth in its indictment and briefs, it will have established that when KBR offered to pay La Nouvelle more for the contract than La Nouvelle had requested, Hijazi accepted the additional funds.  Gov't Br. at 5-6.  Hijazi's conduct, which took

place entirely in Kuwait, was directed at KBR, not at the United States.  *Id.*; *Hijazi*, 589 F.3d at 411.

   "Whether we think of this as an issue relating to legislative jurisdiction or as something going to the court's very power to act," the Seventh Circuit noted, "there is no doubt that the question of how far a statute reaches out to address conduct undertaken outside the United States, in whole or in part, is a fundamental one."  589 F.3d at 408 (citations omitted).  Citing to the Supreme Court's decision in *F. Hoffman-La Roche Ltd. v. Empagran*, 542 U.S. 155 (2004), which "emphasizes the importance and delicacy of the general issue we face here," *id.*, the Seventh Circuit's opinion directs this Court to apply the test in the Restatement (Third) of Foreign Relations, Sections 402-403, to the facts of this case to determine whether the exercise of jurisdiction would be appropriate here.  *Id.* at 412.

   That test requires the Court to determine whether Hijazi's conduct in Kuwait "has or is intended to have substantial effect within [the United States]." *Id.* at 412, citing Restatement (Third) of Foreign Relations § 402 (ALI 1987).  If the answer to this question is yes, the Court must then go on to determine whether the exercise of jurisdiction over Hijazi would nevertheless be "unreasonable."  *Id.*, citing to Rest. § 403(2).  Section 403 of the Restatement specifies eight circumstances that might indicate unreasonableness.  *Id.*  The first (and the only factor referenced in the Seventh Circuit's opinion) "looks at how strong the link is between the activity and the territory of the regulating state and calls for consideration of 'the extent to

which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory.'" *Hijazi*, 589 F.3d at 412, citing Rest. § 403(2)(a), *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997).

Hijazi's conduct did not, and could not have, harmed the United States. While the R & R concludes that "Hijazi's conduct must be viewed in context of the alleged overall scheme to defraud the U.S. Government," it relies upon the conflation of the three disparate strands of conspiracy and co-schemer liability cases discussed above. The conduct of Mazon and KBR may not be imputed to Hijazi before his participation in a scheme to defraud has been proven beyond a reasonable doubt. 4/ There is thus no basis for this Court to exercise jurisdiction under the "substantial effects" test enunciated by the Seventh Circuit and the Supreme Court. *See United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 952-3 (7th Cir. 2003) (upholding dismissal on jurisdictional grounds based on finding of no substantial effect); *Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd*, 299 F.2d 281, 285 (4th Cir. 2002) (upholding finding that price-fixing conspiracy did not have a substantial effect on United States); *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 869 (10th Cir. 1981) ("[w]hen the contacts with the United States are few, the effects upon American commerce minimal, and the foreign elements overwhelming . . . we do not accept jurisdiction"); Rest. § 403, Reporter's Note 8 ("the exercise of criminal jurisdiction with respect to conduct outside the state's territory has been infrequent" and "has generally been limited to serious and universally condemned

---

4/      It is noteworthy that the government has twice failed to prove beyond a reasonable doubt the involvement of Mazon, the only other alleged co-schemer, in the alleged scheme to defraud.

27

offenses, such as treason or traffic in narcotics, and to offenses by or against military forces").

Even if Hijazi's conduct had some indirect substantial effect within the United States, the exercise of jurisdiction would still be unreasonable under the test set forth by the Seventh Circuit because any such effect was not "substantial, direct, and foreseeable." *Hijazi*, 589 F.3d at 412. Any impact Hijazi's conduct might have had on the United States must of necessity have been indirect, because Hijazi had no direct dealings with the United States. *Id.* at 404. Furthermore, because Hijazi acted entirely within Kuwait, and had dealings, as a representative of La Nouvelle, only with Mazon and KBR, *id.*, there is no evidence that any substantial effect was foreseeable. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements"); Second Superseding Indictment (alleging generally that Hijazi and Mazon had the "intent to defraud the United States" but not making specific allegations as to Hijazi's knowledge); *see also Hijazi*, 589 F.3d at 411 ("[I]t is not clear whether Hijazi knew or cared where KBR's money was coming from.").

The exercise of jurisdiction over Hijazi would also not be "reasonable" under Restatement § 403. The Magistrate Judge concluded that applying the charging statutes to Hijazi does not "interfere with Kuwait's laws or governance." R & R at 26. The government of Kuwait, however, is best positioned to determine what is and is not an affront to its notions of sovereignty, and it strongly disagrees that the prosecution of Hijazi is unproblematic. *See* Letter from Ambassador Salem

Abdullam Al-Jaber Al-Sabah to Bruce Swartz, Deputy Assistant Attorney General (Aug. 22, 2007) (Appx. C to Hijazi Mem.) ("The State of Kuwait believes that the indictment by The United States Government has impinged on the sovereign right of Kuwait to defend and practice its jurisdiction over actions that occur within Kuwait."); *see also Torres v. Southern Peru Copper Corp.*, 965 F. Supp. 899, 909 (S.D. Tex. 1996) (dismissing indictment based on § 403 factors where the alleged conduct occurred in Peru and "the Republic of Peru has expressed strenuous objection to the exercise of jurisdiction by this Court"); Rest. § 403, Reporter's Note 8 ("exercise of criminal (as distinguished from civil) jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive" and is generally limited to cases where "the state in whose territory the act occurs is not likely to object to regulation by the state concerned"). The prosecution of Hijazi is not "reasonable" because it does not comport with well-established principles of international law.

## II.  THE REPORT AND RECOMMENDATION ERRED IN CONSTRUING THE MAJOR FRAUD ACT AND THE WIRE FRAUD STATUTE TO APPLY EXTRATERRITORIALLY TO HIJAZI

The R & R properly concludes that application of the Major Fraud Act ("MFA") and the Wire Fraud Statute to Hijazi would be considered extraterritorial even if part of the alleged conduct occurred in the United States. The R & R errs, however, in concluding that both statutes may apply to Hijazi's conduct. The text and legislative history of both statutes makes it clear that neither was intended to apply extraterritorially, and *Bowman* does not change that outcome. *See also*,

Military Extraterritorial Jurisdiction Act, 18 U.S.C. §§ 3261-67; Hijazi Reply Brief, d/e 222 pp. 36-37.

### A.  *Bowman* does not give extraterritorial effect to the Major Fraud Act.

The R & R errs in adopting the government's position that *Bowman* and related cases hold that any law arguably aimed at protecting the government can be applied extraterritorially.  *See* R & R 20-21 ("[E]xtraterritorially [sic] application will . . . be inferred if the conduct proscribed causes or is likely cause [sic] significant injury to the U.S."); *see also* Gov't Br. 20 (extraterritorial application may be inferred where a law is enacted "because of the right of the United States to defend itself against obstruction or fraud wherever perpetrated"); *United States v. Bowman*, 260 U.S. 94 (1922).

The Magistrate Judge correctly observed that the text of the Major Fraud Act, 18 U.S.C. §1031, "does not expressly address whether it applies to frauds against the U.S. which are executed from outside the U.S., nor do the parties point to any relevant legislative history."  R & R at 14.  Thus, under the Extraterritoriality Canon, the MFA should be construed not to apply to foreign conduct.  *See United States v. Dawn*, 129 F.3d 878, 882 (7th Cir. 1997) ("[A] statute will be applied to conduct occurring abroad only when to do so comports with the *affirmative* intention of the Congress clearly *expressed*.") (emphases in original) (quotation marks omitted).  The presumption against extraterritoriality applies unless "specific language" in the statute "definitely disclose[s] an intention to give it extraterritorial effect."  *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 251-252

(1991) (quotation marks omitted).  The MFA contains no such language.  *Contrast Leija-Sanchez*, 602 F.3d at 799-800 (holding that 18 U.S.C. §1959 applies extraterritorially based on text expressly applying the statute to criminal enterprises engaged in or affecting "interstate or foreign commerce").  The Magistrate Judge was also correct that the use of the word "Whoever" in the MFA does not overcome the presumption.  *See* R & R at 14 (citing *Small v. United States*, 544 U.S. 385, 388 (2005)).

   *Bowman* created an exception to this "longstanding principle," but its application is not as broad or simple as the R & R suggests.  It does not create a presumption of extraterritorial application for all "statutes designed to protect the U.S. from injury."  R & R at 15.  If the standard were this broad, the *Bowman* exception would swallow the rule. 5/  According to the Magistrate Judge, "if a statute is silent, extraterritorially [sic] application will nevertheless be inferred if the conduct proscribed causes or is likely cause [sic] significant injury to the U.S."  R & R at 20-21.  Yet it is hard to imagine a federal criminal statute in which the proscribed conduct is *not* likely to cause "significant injury" to the United States.  The conduct is criminalized precisely because of the likelihood of such injury.  For example, in *Yakou*, the D.C. Circuit held (contrary to the Magistrate Judge's proposed rule) that 18 U.S.C. § 2 did not reach the extraterritorial aiding and abetting of a violation of the Arms Export Control Act—conduct that is surely likely

---

5/  Nor does *Corey*, cited in the R & R for this proposition, go so far.  *United States v. Corey*, 232 F.3d 1166, 1170 (9th Cir. 2000).  In that case, the Ninth Circuit looked to congressional intent "employ[ing] the standard tools of statutory interpretation."  *Id.* at 1171 (internal citation omitted).  The court concluded that "[t]he history of the statute . . . confirms that Congress intended precisely this interpretation."  *Id.*

to cause significant injury to the United States.  *United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005).

The Magistrate Judge's sweeping re-write of *Bowman* inverts the presumption *against* extraterritoriality into a virtually conclusive presumption *in favor of* extraterritoriality in all criminal cases, even where the statute is completely "silent" on the matter.  So instead of requiring affirmative evidence that Congress intended the MFA to apply abroad, the Magistrate Judge found the *absence* of evidence of congressional intent sufficient to find extraterritorial application.  *See* R & R at 23 ("[T]he Court sees nothing in the context, structure, or text of Major Fraud Act [sic] to suggest that it applies only domestically.").  The Magistrate Judge's reading is inconsistent with the Seventh Circuit's recent opinion in *Leija-Sanchez*.  There, the Seventh Circuit explained that "*Bowman* does not hold that criminal statutes must always apply extraterritorially.  It concludes that judges must consider the language and function of the prohibition." *Leija-Sanchez*, 602 F.3d at 799.

The Magistrate Judge read *Bowman* far too broadly.  A closer look at the Supreme Court's opinion in *Bowman* reveals that the rule set forth in that case is both more complex and more narrow than the Magistrate Judge believed.  The Supreme Court in *Bowman* found that even where a statute does not expressly provide for extraterritorial application, it may be given extraterritorial effect "depending upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of

a government to punish crime under the law of nations." *Bowman*, 260 U.S. at 97-98.  The Court held that the requirement of an explicit statement by Congress "should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Id.* at 98.  Some such laws, the Court emphasized, may <u>still</u> require a local act within the territorial jurisdiction.  But others "are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute. . . ." *Id.*  It is in those cases that Congress need not make extraterritoriality explicit, but may allow it "to be inferred from the nature of the offense." *Id.*

The statute at issue in *Bowman* had been amended to include fraud against "any corporation in which the United States of America is a stockholder." Based on its legislative history, the Court found that the purpose of the amendment was to protect the Emergency Fleet Corporation, a corporation formed to engage in ocean transport during World War I.  *Id.* at 101-02.  Finding that the statute could not adequately serve its purpose without extraterritorial application, the court looked to several other statutes that similarly prohibited conduct that necessarily implicated international activity.  *Id.* at 99 (statutes punishing diplomatic consul who certify false invoices, the alteration of a ship's papers, and enticing desertion of

33

the Navy, all of which the Court found are most likely to occur abroad).  In such

cases, <u>the nature of the offense implies extraterritorial application</u>.

Courts have since applied the *Bowman* exception to similar offenses

that <u>as a practical matter will typically involve foreign conduct</u>, including

smuggling drugs or undocumented aliens into the United States.  *See, e.g.*, *United*

*States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005) (finding that "the context of

immigration statutes makes it natural to expect that Congress intends for them to

reach extraterritorial conduct"); *United States v. Plummer*, 221 F.3d 1298, 1305

(11th Cir. 2000) ("smuggling is quintessentially an international crime" that

"necessarily involves activities outside the U.S. territory"); *MacAllister*, 160 F.3d at

1308 ("[B]y its very nature [drug smuggling] involves foreign countries, and. . . the

accomplishment of the crime always requires some action in a foreign country. . . .").

The Seventh Circuit recently reiterated that *Bowman* requires judges

to "consider the language and function of the [statutory] prohibition."  *United States*

*v. Leija-Sanchez*, 602 F.3d 797, 799 (7th Cir. 2010); *see also Hijazi*, 589 F.3d at 410

(noting that the Court in *Bowman* "treated the issue before it as one of statutory

construction and concluded that Congress did intend to reach the conduct in

question.").  It is not enough to simply assert that the conduct proscribed would

cause injury to the United States.  The *Leija-Sanchez* court concluded that a statute

that criminalized violent crimes related to racketeering passed muster under

*Bowman* not because it proscribed conduct likely to cause injury to the United

34

States, but because it defined criminal "enterprises" which engaged in "<u>foreign</u> <u>commerce</u>." *Leija-Sanchez*, 602 F.3d at 799-800 (emphasis added).

The Major Fraud Act, unlike the statutes reviewed by the Court in *Bowman* and by other courts applying *Bowman*, does not necessarily involve international activity or apply overseas. Indeed, the government recognized in its opposition to Hijazi's motions to dismiss that no other court has "had occasion" to consider whether the act applies extraterritorially. Gov't Br. at 23.

Extraterritorial application of the Major Fraud Act to encompass Hijazi's actions in this case also would not fit within "the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations." *Id.* at 97-98. This additional consideration requires the Court to look to international law and notes that there can be no offense to the sovereignty of other nations when the United States prosecutes its own citizens. *Id.* at 102. In this case, Hijazi is *not* a citizen of the United States. Rather, he is a resident of Kuwait, and Kuwait has strenuously objected to his prosecution in the United States for actions he allegedly committed entirely in Kuwait. *See Hijazi*, 589 F.3d at 405, 407, 411. Prosecution of Hijazi in this case would violate principles of international law recognized by United States courts; it cannot fall within the narrow exception created by the Court in the *Bowman* case.

**B.     The Wire Fraud Statute does not apply to wholly foreign conduct.**

The R & R properly concludes that the text and legislative history of the Wire Fraud Statute, 18 U.S.C. § 1343, demonstrate that Congress intended it to

apply only to wires between the United States and a foreign country, not wires originating and ending within a foreign country. *See* R & R at 29-30. However, the R & R errs in concluding that (1) the wires originating or terminating within the United States provide a basis for jurisdiction over Hijazi, even though he is not alleged to have sent or received them; and (2) extraterritorial application may be inferred under *Bowman* based on the nature of the offense alleged, a financial fraud against the United States. *Id.* at 30.

    The indictment alleges six wire transfers:  four that Mazon sent or received between Kuwait and the United States, and two others sent and received within the United States.  It is undisputed that Hijazi never entered the United States during the relevant time period, Gov't. Br. at 8, and therefore could not have sent or received either of these two domestic wires.  Nor is he alleged to have sent or received <u>any</u> of the wires in the indictment.

    Neither of the cases cited in the R & R justify extraterritorial application of the Wire Fraud Statute.  Both *Adcock* and *Dick* address the extent to which a criminal defendant may be held liable for the conduct of a co-schemer once his participation in a scheme to defraud has been proven beyond a reasonable doubt.  *U.S. v. Adcock*, 534 F.3d 635 (7th Cir. 2008); *U.S. v. Dick*, 744 F.2d 546 (7th Cir. 1984).  In *Adcock*, the defendant (a United States citizen) orchestrated a fraudulent government contract to direct federal government funding through his employer to a contracting business that he owned.  He argued that his wire fraud conviction was invalid because he did not know that the government funds would be

36

sent by wire. *See Adcock*, 534 F.3d at 640-41. Pointing out that payment by Pony Express rider or cash sent by train or truck were alternatives too ridiculous to consider, the Seventh Circuit explained that the defendant must have reasonably known that "in the ordinary course of business" the interbank wire system would be the means of transferring funds, and therefore his fraud "caused" a wire to be made. *See id.*

Unlike the defendant in *Adcock*, Hijazi took no action that would "in the ordinary course of business" result in any of the six wires in this case. The contract between La Nouvelle and KBR (a U.S. company operating in Kuwait) specifically provided that KBR would pay La Nouvelle. There is no reason to believe that Hijazi would or should have expected that wires would be exchanged between the United States and Kuwait, or within the United States. Even viewed in the light most favorable to the government, the indictment only alleges that Hijazi, on behalf of La Nouvelle, contracted with Mazon, on behalf of KBR, in Kuwait. It was Mazon, separately and without Hijazi's knowledge, who engaged in wire transmissions that crossed into the United States.

Extraterritorial application may not be inferred from "the nature of the offense alleged" here, because "the wire fraud statute 'reaches and makes criminal all sorts of conduct that does not involve the Government at all.'" R & R at 30-31. The Wire Fraud Statute does not necessarily implicate foreign conduct, as required under *Bowman*, 260 U.S. at 98-99, and its application to wholly extraterritorial wires that never enter the United States would not comport with international law,

as the *Bowman* case further requires, *id*. at 97-98, 102.  The *Bowman* exception is thus inapplicable to the Wire Fraud Statute, which was expressly intended to cover wires that originate from or terminate in the United States.  *See* R & R at 29.

Because the Wire Fraud Statute does not reach conduct that is wholly extraterritorial, and because Hijazi neither sent nor received (nor is alleged to have sent or received) any of the wires alleged in the indictment, the statute may not be applied to his alleged conduct.

## III.   THE DEFENSE COOPERATION AGREEMENT BARS THIS PROSECUTION.

The Government of Kuwait has "taken the position that the Defense Cooperation Agreement ("DCA") between the United States and Kuwait prohibits United States criminal prosecution over this Defendant."  R & R at 40; *see id*. at 6 (acknowledging Kuwait's position "that the U.S. has no jurisdiction to prosecute Hijazi for conduct which occurred entirely in Kuwait") (*citing* d/e. 180-1, Appendix B & C; d/e 161-1, Exhibit A; and 7th Cir. d/e 33); *see also Hijazi*, 589 F.3d at 405, 411.  The Magistrate Judge, however, agreed with the Justice Department's position that the DCA is "inapplicable to this criminal cause."  R & R at 40.

The R & R improperly fails to give any deference to the Kuwaiti Government's interpretation of the DCA.  As the Supreme Court reiterated recently, "[i]n interpreting any treaty, the opinions of our sister signatories are entitled to considerable weight."  *Abbott v. Abbott*, 2010 WL 1946730, at *9 (U.S. May 17, 2010) (quotation marks and ellipses omitted) (citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999), and *Air France v. Saks*, 470 U.S. 392 (1985)).

38

In contrast, the U.S. Justice Department's interpretation is not entitled to deference. Courts give weight to "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement," but the Justice Department has no such charge. *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-185 (1982). The U.S. Department of Defense, which negotiated the DCA, has not expressed its views on this matter. Nor has the U.S. Department of State.

The Magistrate Judge also erred by failing to apply the interpretive rule that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor v. Laubenheimer*, 290 U.S. 276, 293-294 (1933). This has been the "settled rule" for more than a century. *Hauenstein v. Lynham*, 100 U.S. 483, 487 (1879). Here, it is clear that the DCA "fairly admits of two constructions." *Factor*, 290 U.S. at 293. Not only does the Government of Kuwait construe it to bar this prosecution, but a U.S. Department of Defense official personally involved in negotiating the DCA has testified that "the Kuwaiti Government could rightfully consider [this prosecution] a violation of the DCA." Affidavit of Frederick C. Smith ¶ 9 (d/e 180-1 at 11). Given two fair constructions of the DCA, the construction favoring Hijazi's right to be free from prosecution in the United States "is to be preferred." *Factor*, 290 U.S. at 294.

## IV.  THE REPORT AND RECOMMENDATION ERRED IN CONCLUDING THAT THE LONG PRETRIAL DELAY DOES NOT VIOLATE HIJAZI'S RIGHT TO A SPEEDY TRIAL

The R & R accepts, as it must, the parties' "agree[ment] that a five year delay is presumptively prejudicial" to Hijazi.  The R & R errs, however, in assigning blame for the long pretrial delay to Hijazi rather than the government. The R & R also resurrects – even while disclaiming reliance on – a watered-down version of the fugitive disentitlement doctrine.  This "fugitive-like" exception to a criminal defendant's constitutional right to a speedy trial has no basis in Supreme Court or Seventh Circuit precedent and should be rejected.  The R & R also ignores the substantial hardships suffered by Hijazi as a result of the long pretrial delay and erroneously credits the government for diligent prosecution while according no weight to Hijazi's zealous pursuit of his legal rights.  Contrary to the Magistrate Judge's conclusions, each of the four factors set forth in the Supreme Court's *Barker v. Wingo*, 407 U.S. 514, 527 (1972), speedy trial test weigh in Hijazi's favor, and the indictment should be dismissed as violative of Hijazi's Sixth Amendment right to a speedy trial.

### A.  The government bears responsibility for the long pretrial delay.

The R & R assigns sole blame for the delay to Hijazi, based on his election to pursue his legal rights from his lawful residence without voluntarily turning himself over to the United States for arraignment.  *See* R & R at 48-49 ("[a] defendant lawfully living in a country with no extradition treaty, who is aware of an indictment against him, can be held responsible for the delay if he chooses to

40

remain beyond th[e] Government's reach.")  As the Seventh Circuit recognized, however, "this reasoning overlooks the entire point of Hijazi's attack on the indictment.  Hijazi was lawfully in Kuwait at the time of the indictment and remains so today."  *Hijazi*, 589 F.3d at 407.  Because Hijazi is not "behaving in an obstructive way;" had no "legal duty to take an action;" is "represented by first-rate counsel;" and "has followed up appropriately rather than allowing matters to languish," *id.* at 411, it is the government and not Hijazi that is responsible for the delay.

By consulting the government of Kuwait and a former negotiator of the DCA to determine whether he is subject to jurisdiction in the United States, Hijazi has made a serious and concerted effort to determine whether the United States has jurisdiction over him in this case.  *See* Letter from Ambassador Salem Abdullam Al-Jaber Al-Sabah to Bruce Swartz, Deputy Assistant Attorney General (Aug. 22, 2007) (Appx. C to Hijazi Mem.); Affidavit of Frederick C. Smith ¶ 9 (d/e 180-1 at 11).  Similarly, he promptly turned himself in to Kuwaiti authorities upon learning of his indictment in the United States.  *See* R & R 47.  Rather than attempting to thwart the criminal justice process, Hijazi has diligently pursued his legal rights within that system.  Kuwait might have told Hijazi that the DCA required him to submit to U.S. jurisdiction, or it might have chosen to extradite Hijazi.  That it did neither does not make the delay Hijazi's fault.

The R & R states that Hijazi has not suggested any course of action that the government has not followed. R & R at 47.  But "[a] defendant has no duty

to bring himself to trial; the [government] has that duty." *Barker*, 407 U.S. at 527 (footnote omitted). *See also id.* at 529 ("[T]he rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial."); *Dickey v. Florida*, 398 U.S. 30, 38 (1970) ("[T]he duty of the charging authority is to provide a prompt trial.").

   The root of the government's inability to bring Hijazi to trial—the lack of an extradition treaty between the United States and Kuwait—is properly viewed as a "neutral" factor because Hijazi cannot be blamed for the two nations' failure to negotiate an extradition treaty. And the Supreme Court has held that "a more neutral reason" for delay—for example, "overcrowded courts"—must be tallied against the government "since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. The Supreme Court reaffirmed this principle just last year. *See Vermont v. Brillon*, 129 S. Ct. 1283, 1290 (2009). Here, the lack of an extradition treaty is a neutral factor that must be charged against the government in the speedy trial calculus.

  **B.**  **There is no "fugitive-like" exception to the speedy trial right.**

   The Magistrate Judge disclaims reliance on the fugitive disentitlement doctrine – as he must in light of both the Seventh Circuit's and this court's determination that the doctrine does not apply to Hijazi. R & R at 48 ("In the Court's opinion, the plaintiff's status as non-fugitive has little or no bearing on determining who is responsible for delay.") Immediately following this disclaimer,

however, the R & R brands Hijazi as "just like a fugitive in hiding" in reasoning that because he "voluntarily remains beyond reach of the Government," his speedy trial right has not been violated.  R & R at 48.  This cannot possibly be true.  Unlike a fugitive, Hijazi has no obligation to present himself in the United States; unlike a fugitive, Hijazi has not fled from the jurisdiction where he was being prosecuted; and unlike a fugitive, he is not "in hiding" but rather has diligently pursued his legal rights by retaining counsel to represent him in hearings before the court and asserting his speedy trial and other legal rights to dismiss the indictment.

The Seventh Circuit squarely rejected the argument that the fugitive disentitlement doctrine might still apply because Hijazi, though not a fugitive, had not satisfied concerns about "mutuality."  *See Hijazi*, 589 F.3d at 413.  The R & R's "just like a fugitive in hiding" argument is at odds with the Seventh's Circuit's extensive analysis of the inapplicability of the fugitive disentitlement and lack of mutuality doctrines and must be similarly rejected.  As the Seventh Circuit explained, "[a] successor government in Kuwait could change its mind about cooperating with the United States.  Moreover, the Government of Kuwait, Lebanon, or any other country that does not have an extradition treaty with the United States has discretion to extradite Hijazi if it so chooses."  *Id*.  Thus Hijazi's choice to stay within the territorial jurisdiction of Kuwait is not the only reason for a five year trial delay.

Notably, the cases on which the Magistrate Judge relies all relate to fugitives.  In *United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007),

43

despite diligent efforts, the United States could not locate the defendant during the eight years of delay between indictment and trial.  *See id*. at 1115 (explaining that the government had enlisted the help of two television shows, Unsolved Mysteries and America's Most Wanted, in an attempt to track down the defendant).  In *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006) the D.C. Circuit applied fugitive case law in holding that a defendant who had left the country in which the crime occurred and never surrendered to any country's authorities, was responsible for trial delay.  *See id*. at 925.  Similarly, in *United States v. Blanco*, 861 F.2d 773 (2d Cir. 1988), the court determined that a fugitive living under an alias and using a fake passport was responsible for the delay.  *See id*. at 779-80.  These cases are wholly inapplicable to Hijazi, whom the Seventh Circuit has deemed a "non-fugitive foreign defendant" "who did not flee the United States."  *Hijazi*, 589 F.3d at 409.  Indeed, as the Seventh Circuit noted, "Hijazi's own case is even more deserving of relief [than an ordinary non-fugitive foreign defendant] since he surrendered himself to the authorities in the country in which he resides and in which his relevant conduct physically occurred."  *Id*. at 409-410.

Hijazi is also differently situated than the defendant in *Reumayr*, who requested several lengthy postponements and adjournments for strategic reasons (hoping to examine a particular witness in person at a preliminary hearing), personal reasons (the death of his attorney's father), and scheduling conflicts. *United States v. Reumayr*, 530 F. Supp. 2d 1200, 1203-1204 (D.N.M. 2007).  While

Reumayr requested that the proceedings be delayed at every turn, Hijazi has consistently sought prompt resolution of the indictment.

### C.   Hijazi has diligently pursued his speedy trial right.

The R & R erroneously characterizes Hijazi's assertion of his right to a speedy trial as "hollow" because he refuses to appear voluntarily in the United States.  But again, Hijazi has no obligation to give the court jurisdiction over his person.  The Magistrate Judge concluded that "Hijazi does have an avenue to obtain a trial [i.e. voluntarily consenting to the prosecution]; he just chooses not to travel it."  R & R 50.  This statement ignores the Supreme Court's clear holding that "[a] defendant has no duty to bring himself to trial; the [government] has that duty." *Barker*, 407 U.S. at 527 (footnote omitted).

Supreme Court precedent requires a defendant to assert his right to a speedy trial "in due course."  *Doggett*, 505 U.S. at 651.  Hijazi has consistently asserted a speedy trial right.  He first asserted his right in a 2007 filing.  *See* d/e 133 at 30 n.6 ("Defendant wishes to make clear . . . that he is asserting his right to a speedy trial in this matter.").  Hijazi then followed up that demand for a speedy trial with a motion to dismiss.  *See* d/e 174-175.

A non-fugitive defendant who resides overseas does not forfeit his right to demand a speedy trial.  *See United States v. Judge*, 425  F. Supp. 499, 502 (D. Mass. 1976) ("The mere fact that a defendant is out of the jurisdiction, without more . . . does not preclude him from asserting his right to a speedy trial."); *United States v. McDonald*, 172 F. Supp. 2d 941, 949-950 (W.D. Mich. 2001) (granting non-fugitive defendant's motion to dismiss on speedy trial grounds) ("The Defendant in

45

this case never fled the United States to escape arrest.  He never secreted himself in the Bahamas to escape extradition.").

The R & R also fails to properly consider *Klopfer v. North Carolina*, 386 U.S. 213 (1967).  *See* R & R at 49-50.  As the Seventh Circuit explained, *Klopfer* stands for the proposition that "an indictment left pending indefinitely constitutes a Sixth Amendment violation."  *Hijazi*, 589 F.3d at 411.  Here, Hijazi faces an indictment left pending indefinitely.  As the Seventh Circuit observed, this case has "dragged on for years" and presents "no prospect of ever being resolved."  *Id.* at 409. "[T]he Kuwaiti government has informed the court that it does not intend to turn Hijazi over voluntarily," *id.* at 403,  and it has no duty to do so.  *See United States v. Alvarez-Machain*, 504 U.S. 655, 665 (1992) ("In the absence of an extradition treaty, nations are under no obligation to surrender those in their country to foreign authorities for prosecution."); *Hijazi*, 589 F.3d at 407 ("the Kuwaiti government is [acting] well within its rights").

At this point, there is no reason to believe that Hijazi will ever be brought to trial.  The Sixth Amendment does not allow the government to leave the indictment pending indefinitely in the hope that the Kuwaiti Government will change its mind.  By its own admission, the government's current plan to bring this case to trial consists of hoping that Hijazi will come here voluntarily or be caught outside of Kuwait.  *See id.* at 405 (quoting the government's statement that it "stand[s] ready to try Hijazi should he submit to the court's jurisdiction or be intercepted by the authorities") (quoting 7th Cir. d/e 31).  The Speedy Trial Clause

requires dismissal in such circumstances.  *See United States v. Leaver*, 358 F. Supp. 2d 255, 271-272 (S.D.N.Y. 2004) ("[W]hen the Government chooses to . . . wait passively for chance to deliver [the defendant] into its hands . . . it is the Government and not the defendant that must bear the risks associated with delay.").

**D.   Hijazi suffers substantial prejudice as a result of the government's delay.**

The R & R's assessment of prejudice hinges on the Magistrate Judge's view that Hijazi is solely responsible for the pretrial delay, since he has elected to pursue his legal rights rather than voluntarily appear for arraignment.  The R & R overlooks the litany of substantial hardships contained in the Seventh Circuit's decision.  "As long as the indictment hangs over Hijazi, he is prejudiced even if he does not travel to the United States."  *Hijazi*, 589 F.3d at 407.  The pending indictment makes it

> "very risky for him ever to leave Kuwait, which is not his native country.  INTERPOL has a long arm, and any travel outside Kuwait's approximately 6,880 square miles (which makes it just a shade bigger than Connecticut, and smaller than Vermont) would risk apprehension and extradition.  Naturally, he could never travel to the United States, because the Department of Justice could place a border watch for him (if it has not already done so).  A successor government in Kuwait could change its mind about cooperating with the United States.  Moreover, the government of Kuwait, Lebanon, or any other country that does not have an extradition treaty with the United States has the discretion to extradite Hijazi if it so chooses."

*Id*. at 413.

47

Under the Seventh Circuit's reasoning, Hijazi's status is more akin to a refugee – unable to return to his homeland, or to freely travel to other countries for fear of extradition under a perpetually pending but never proven set of charges – than a fugitive.

The five-year delay is also likely to have prejudiced Hijazi's defense. As the Seventh Circuit recognized, with long pretrial delay, "witnesses become unavailable and memories fade." *Hijazi*, 589 F.3d at 410. "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify." *Doggett*, 505 U.S. at 655. Indeed, "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id*. (quoting *Barker*, 407 U.S. at 532). The presumption of prejudice to Hijazi's defense grows stronger with each passing day. *See id*. at 657 (presumptive prejudice "compounds over time"); *United States v. Macino*, 486 F.2d 750, 752 (7th Cir. 1973) ("As the length of delay extends, the more certain prejudice is to result."). A delay exceeding one year is presumptively prejudicial, and as in *Doggett*, the government has not rebutted the presumption here. *See Doggett*, 505 U.S. at 657-658 & n.4.

Finally, "the Supreme Court has repeatedly admonished courts that prejudice in the presentation of a defense is not the only kind of prejudice that a defendant may demonstrate in support of a speedy trial claim." *United States v. Oriedo*, 498 F.3d 593, 600 (7th Cir. 2007). The right to a speedy trial is designed to protect against other forms of prejudice as well, including interference "with the

48

defendant's liberty. . . disrupt[ion] [of] his employment, drain[ing] [of] his financial resources, curtail[ment] [of] his associations, subject[ion] [] to public obloquy, and creat[ion] [of] anxiety in him, his family and his friends." *United States v. Marion*, 404 U.S. 307, 320 (1971).

Based on the government's responsibility for the half-decade pretrial delay, the substantial prejudice suffered by Hijazi, and the Magistrate Judge's application of an unfounded "fugitive-like" exception to the speedy trial right, the R & R's recommended denial of Hijazi's motion to dismiss the indictment should be rejected.  *See also* Fed. R. Crim. P. 48(b); Hijazi Reply Brief, d/e 222 pp. 48-50.

## CONCLUSION

For the foregoing reasons, as well as those stated in Hijazi's memoranda in support of his motions to dismiss the indictment and his reply brief in support of his motions to dismiss the indictment, the Court should (1) reject the Magistrate Judge's recommendation that the motion be denied, and (2) grant the Motion to Dismiss.

Respectfully submitted,

s/ H. Christopher Bartolomucci
H. Christopher Bartolomucci
Thomas L. McGovern III
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5810
Facsimile:  (202) 637-5910
christopher.bartolomucci@hoganlovells.com
thomas.mcgovern@hoganlovells.com

Zaldwaynaka Scott
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 706-8308
ZScott@mayerbrown.com

Dated:  June 11, 2010                    *Counsel for Defendant Ali Hijazi*

## <u>RULE 7.1(B)(4)(c) STATEMENT</u>

Pursuant to CDIL-LR 7.1(B)(4)(c), I hereby state that, pursuant to the Court's Text Order of May 28, 2010, the foregoing Memorandum in Support of Defendant Ali Hijazi's Objections to Report contains 13,426 words.

s/ H. Christopher Bartolomucci
H. Christopher Bartolomucci

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 11, 2010, I electronically filed the foregoing

Memorandum in Support of Defendant Ali Hijazi's Objections to Report and

Recommendation with the Clerk of the Court using the CM/ECF system which will

send notification of the filing to:

> Jeffrey B. Lang
> Joseph H. Hartzler
> Matthew J. Cannon
> John A. Michelich
>
> *Counsel for the United States*

> <u>s/ H. Christopher Bartolomucci</u>
> H. Christopher Bartolomucci